UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD. )<br>                    Plaintiff, )<br> )<br>    and )<br> )<br>JA SOLAR TECHNOLOGY YANGZHOU CO., )<br>LTD. and SHANGHAI JA SOLAR )<br>TECHNOLOGY  CO., LTD., ET AL., )<br>                    Consolidated Plaintiffs, )<br>    v. )<br> )<br>UNITED STATES, )<br>                    Defendant. )<br> ) | Consol. Court No. 22-231 |

**PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang
**deKieffer & Horgan, PLLC**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: January 30, 2023

## TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ................................................................................. 1

    A.   Administrative Determination Subject to Appeal ........................................ 1

    B.   Issues Presented ......................................................................................... 1

II.     STANDARDS OF REVIEW ............................................................................. 1

III.    ARGUMENT ..................................................................................................... 3

    A.   The Department's Application of The EBC Countervailing Duty Program
        to Risen Is Unsupported By Record Evidence And Contrary to Law ......... 3

    B.   The Department's Reliance on the Descartes Ocean Freight Data is Not
        Supported by Substantial Evidence ........................................................... 13

IV.     Conclusion and Prayer for Relief ................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Anderson v. U.S. Sec'y of Agric.*, 30 C.I.T. 1742, 462 F. Supp. 2d 1333 (2006)............................3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)q .........................................2

*Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015).............14

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015).........................................................................................................................13

*Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 24; SLIP OP. 2020-23 (Feb. 25, 2020)............................................................................................................................8

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ..........................................................................................................................8-11

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019).........................................................................................................8

*Changzhou Trina Solar Energy Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 179; SLIP OP. 2018-167 (Nov. 30, 2018).......................................................................................................8

*Changzhou Trina Solar Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-143 (Nov. 18, 2019).......................................................................................................8

*Clearon Corp. v. United States*, 359 F. Supp. 3d 1344 (Ct. Int'l Trade  2019) ..............................7

*Clearon Corp. v. United States*, 2020 Ct. Intl. Trade LEXIS 149 (Oct. 8, 2019)...........................7

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) ..................................................1

*Consol. Bearings Co. v. United States*, 348 F.3d 997 (Fed. Cir. 2003) ......................................2-3

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983).........................................2

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ..................9-10

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) .....................................2

*Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018)......................7-8

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade  2019)......................7-8

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade  2019)......................7-8

*Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct. Int'l Trade, 2019)......................7-8

*Guizhou Tyre Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020) ........................................................................................................................ 7-8

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade  2019) .................................................................................................................. 11-12

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020) ........................................................................ 11-12

*Mueller Commercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1231-32 (Fed. Cir. 2014) (quoting *Nippon Steel*, 337 F.3d at 1381) ................................................ 4

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .............................. 3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ................ 2

*Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016)q .......................................................................................................................... 2

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) ...................................... 2

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ........................................... 1-2

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade  2019) .......... 6

## STATUTES & REGULATIONS

19 U.S.C. § 1516a(b)(l)(A) ...................................................................................... 2-3

19 U.S.C. § 1677(5) .............................................................................................. 13-16

19 U.S.C. § 1677e .................................................................................................. *passim*

19 U.S.C. § 1677m(d) ............................................................................................... 5-6

19 C.F.R. §351.511(a)(2)(ii) ........................................................................................ 16

## ADMINISTRATIVE DECISIONS

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission and Intent To Rescind, in Part; 2020,* 88 Fed. Reg. 1,355 (January 10, 2023) .................................................................................................................................. 6

## I.      RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff Risen Energy Co., Ltd. ("Risen"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.      Administrative Determinations Subject to Appeal

The U.S. Department of Commerce (the "Department") published the contested final results in the Federal Register on July 7, 2022.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (July 7, 2022) ("Final Results"), *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR429**.

### B.      Issues Presented

1.     <u>Issue One</u>:  Whether the Department's application of adverse facts available ("AFA") to the China Ex-Im Bank's Export Buyer's Credit Program ("EBC" program or "EBCP") against the mandatory respondents after they demonstrated non-use of the EBCP is supported by substantial evidence or otherwise contrary to the law?

2.     <u>Issue Two</u>:  Whether the Department's selection of the ocean freight benchmark is unsupported by substantial evidence?  Whether the Department's calculation of the ocean freight benchmark is unsupported by substantial evidence and is not in accordance with the law?

## II.     STANDARDS OF REVIEW

The Court will only sustain the Department's factual determination if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).  Furthermore,

"substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 C.I.T. 155, 161, 572 F. Supp. 883, 888 (1983) (quoting *Universal Camera*, 340 U.S. at 488).  Moreover, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (internal citation omitted).  The substantial evidence standard "requires more than mere assertion of 'evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'"  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera*, 340 U.S. at 487).

Further, the Court will also hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion.  *See* 19 U.S.C. § 1516a(b)(l)(A).  Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Department acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the

change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted).  An agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted).  Internal inconsistency and self-contradiction do not satisfy this requirement.  Indeed, a "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'" *Anderson v. U.S. Sec'y of Agric.*, 30 C.I.T. 1742, 462 F. Supp. 2d 1333, 1339 (2006) (internal citation omitted) ("Courts will therefore not defer to an agency regulation or adjudicative decision when they produce results which are arbitrary, capricious, or manifestly contrary to the statutory scheme.").  Thus, when the administering agency treats similarly situated parties differently or fails to consider an important aspect of a problem, its decisions are arbitrary and capricious and subject to reversal.

## III.  ARGUMENT

### A.  The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence and Contrary to Law.

The Department's use of adverse facts available ("AFA") to find that Risen benefitted from the EBC program when record evidence only contains evidence of non-use is unreasonable and unlawful.  The Federal Circuit has described the application of AFA as a two-part inquiry. First, the Department must identify why it needs to rely on facts otherwise available, and second, the Department must show how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting from the facts otherwise available."  *See* 19 U.S.C. § 1677e(b); *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("{T}he legislative history mirrors the language in the statute by recognizing that: (1) the

3

Department must use facts otherwise available when requested information is missing and (2) the Department may impose an adverse inference after determining that a respondent has not been fully cooperative or has failed to act to the best of its ability in gathering information."); *Mueller Commercial de Mex., S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1231-32 (Fed. Cir. 2014) (quoting *Nippon Steel*, 337 F.3d at 1381. The Department is allowed to use facts available only when "necessary information is not available on the record," or an interested party has withheld requested information, significantly impeded the investigation, or provided unverifiable information. 19 U.S.C. § 1677e(a). As such, the Department must first establish its authority to act under Section 1677e(a) before it can properly invoke Section 1677e(b) and apply AFA.

In its Final Results, the Department cited 19 U.S.C. §§ 1677e(a)(1), (a)(2)(A), the Department found that the GOC had "not cooperated to the best of its ability in response to Commerce's specific information requests, and respondents' voluntary attempts to cure the record deficiencies resulting from the GOC's lack of full cooperation are incomplete and insufficient. Thus, we find that the use of AFA is warranted, in accordance with section 776(a)(2)(A)-(C) and (b)." *Id.* at 31. The Department restated the same issues from past reviews that it has found with the GOC's supposedly deficient responses to questions on this program, namely finding that the EBC loans can potentially be distributed to the importer's account from a partner bank of the China Ex-Im Bank, and then from there be sent to the exporter's bank account, such that if they do not know the names of these intermediary banks they cannot verify this program. *See* Final IDM at 28-31.

Unlike the prior reviews, while still acknowledging it was the GOC deficiency, the Department particularly emphasized that the respondents' failed to fill the gap left by the GOC:

The fact that the respondents in this case were able to provide certifications for
only some of their customers meant Commerce could not reasonably expect
cooperation from at least a number of the customers going forward, thus
guaranteeing that the record would remain incomplete as to usage information and
rendering futile any efforts to verify non-usage. For this reason, Commerce took
no further steps to gather additional financing information from respondents with
respect to those U.S. customers that did provide certifications, since Commerce
could not reasonably expect that the incomplete information gathered would yield
a meaningful or complete basis for verification. Accordingly, Commerce
refrained from obligating the respondents with further requests for additional
information that it could not reasonably expect to be of practical use for
verification of an ultimate determination.

IDM at 29.

The Department noted that Risen did not provide EBC certifications for all of its

customers.  Risen provided certifications in its original questionnaire responses for all of its

customers except for one (Risen had altogether four U.S. customers of subject merchandise

during the POR).  Risen is not affiliated with its customers and had no control over that company

to obtain the certification for the submission.  However, Risen was able to obtain this

certification later and attempted to submit it to the Department before the preliminary results and

final results, but the Department rejected it as untimely new information.  Dep't Rejection Memo

(December 20, 2021) **PR342**.  If the Department is suggesting that if it had received certificates

from all of Risen's U.S. customers it would have attempted verification, then the Department

was obliged to actually request the EBC certificates as part of the questionnaire or a

supplemental questionnaire—all the more so here where the Department affirmatively knew that

Risen eventually was able to obtain through its best efforts the only missing customer

certification.  The questionnaire does not request such information; rather, Risen of its own

initiative placed certifications on the record.  Risen cannot be faulted with failing to provide

information that the Department <u>never</u> requested and never identified as a deficiency in its

questionnaire response.  *See* 19 U.S.C. 1677m(d).  Moreover, when Risen has submitted non-use

certificates for all of its customers in the past, the Department still applied AFA and found use of the program. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission and Intent To Rescind, in Part; 2020*, 88 Fed. Reg. 1,355 (January 10, 2023) and accompanying Prelim. IDM at 43 (applying AFA to the EBC program for Risen where Risen provided certifications from all customers); *see also Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1355 (Ct. Int'l Trade  2019) (where the respondent filed no certifications of non-use and the Court still found the Department has no basis to find use of the program as AFA).

Indeed, notably, the Department apparently was satisfied initially with Risen's answer that Risen and its customers did not benefit from this program and did not issue any supplemental questionnaires to Risen regarding EBC.  It is unconceivable that Risen would not be aware of their existence as a beneficiary of EBC under these circumstances.  It is not credible that the GOC would hand out free money to U.S. buyers without coordinating with and auditing the supposed producer/exporter of the goods.  Nonetheless, the Department found, as AFA, that Risen benefitted from the EBC program because GOC did not provide a copy of the alleged China Ex-Im Bank's internal guidelines from 2013 or supply a list of the alleged partner banks/third-party institutions.

Record evidence only establishes that Risen and its customers did not use or benefit from the EBC program.  Risen responded that it has never applied for any EBC loans for itself or assisted its customers to apply for such loans.  In addition, Risen provided customer declarations of non-use from every single U.S. customer to whom they exported during the POR.  *See* Risen Section III Resp. at 40-41, Exhibit 20 (June 21, 2022), **PR187-190, CR211-216**; *see also* Dep't

Rejection Memo (December 20, 2021) **PR342** (rejecting Risen's attempt to submit the last certification).  Additionally, the GOC corroborated Risen's and its customers' non-use by searching the customers' names in China Ex-Im Bank's loan database.  GOC Initial Questionnaire Resp. (June 21, 2021) at 134-138, Exhibits F-1 through F-3 **PR192-204, CR235-255**.  Indeed, the Department does not point to any evidence to the contrary; instead, the Department claims that it needs a complete understanding of how the program is run in order to verify the non-use of the program.  Final IDM at Cmt. 1.  The Department's assertion cannot be sustained.  *See Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1359 (Ct. Int'l Trade 2019) ("It is important to keep in mind that a determination concerning the presence or absence of a subsidy revolves around whether 'the manufacture, production, or export' of particular 'merchandise' has been subsidized. Thus, a determination as to whether the use of facts available or adverse facts available is lawful depends on whether the information missing from the record relates to the 'manufacture, production, or export' of that 'merchandise.' If it does not, the information is not 'necessary' and so the application of neither facts available nor adverse facts available is lawful.") (internal citation omitted).

The Court of International Trade has in many instances held that the China Ex-Im Bank's 2013 revision and a list of the third-party banks involved in disbursing the EBC funds do not create a "gap" on the record that warrants the application of AFA.  *See Guizhou Tyre Co. v. United States*, 348 F. Supp. 3d 1261, 1270 – 71 (Ct. Int'l Trade 2018) ("Although GOC failed to fully respond to the Department's request for information, this failure did not create the requisite gap needed to make an adverse inference.") (*OTR Tires from China* POR 2014 first opinion); *see e.g., Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346 (Ct. Int'l Trade  2019) (*OTR Tires from China* POR 2014 remand opinion); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d

7

1402 (Ct. Int'l Trade  2019) (*OTR Tires from China* POR 2014 second remand opinion);

*Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) (*OTR Tires from*

*China* POR 2015 first opinion); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1335 (Ct.

Int'l Trade 2019) (*OTR Tires from China* POR 2015 remand opinion); *Guizhou Tyre Co. v.*

*United States*, 2020 Ct. Intl. Trade LEXIS 86; Slip Op. 2020-81 (June 5, 2020) (*OTR Tires from*

*China* POR 2015 second remand opinion); *Changzhou Trina Solar Energy Co. v. United States*,

255 F. Supp. 3d 1312 (Ct. Int'l Trade 2017) ("*Changzhou I*"); *Changzhou Trina Solar Energy*

*Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) (*Solar Cells from China* POR

2014 first opinion; "*Changzhou Trina II*"); *Changzhou Trina Solar Energy Co. v. United States*,

2018 Ct. Intl. Trade LEXIS 179; SLIP OP. 2018-167 (Nov. 30, 2018) (*Solar Products from*

*China* POR 2014-15 first opinion; "*Changzhou Trina III*"); *Changzhou Trina Solar Energy Co.*

*v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137 (Nov. 8, 2019) (*Solar*

*Cells from China* POR 2014 remand opinion; "*Changzhou Trina IV*"); *Changzhou Trina Solar*

*Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 144; SLIP OP. 2019-143 (Nov. 18,

2019) (*Solar Products from China* POR 2014-15 remand opinion; "*Changzhou Trina V*");

*Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 24; SLIP OP. 2020-23 (Feb.

25, 2020) (*Solar Cells from China* POR 2015, granting the Department's request for voluntary

remand to reevaluate the AFA application on the EBC program); *Clearon Corp. v. United States*,

359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) (*Chlorinated Isos from China* POR 2014 first

opinion); *Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade

2019) (*Narrow Woven Ribbons from China* POR 2015 first opinion); *Jiangsu Zhongji*

*Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)

(*Aluminum Foil CVD Investigation* first opinion); *Jiangsu Zhongji Lamination Materials Co. v.*

*United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020)

(*Aluminum Foil CVD Investigation* remand opinion).

The *Guizhou Tyre* litigation arose from the *OTR Tires from China* 2014 administrative

review.  The Department's second remand redetermination filed with the Court in that case is

substantially the same reasoning used in the Final IDM in the instant case, which was scrutinized

and criticized by the Court.  *See Guizhou Tyre*, 415 F. Supp. 3d 1402 (Ct. Int'l Trade 2019).  In

pertinent part, the Court held:

> The Department has provided a myriad of reasons why verification might be
> onerous without additional information pertaining to the EBCP revisions. But until
> these reasons are grounded in facts supported by the record—that is, until the
> Department actually attempts verification and adequately confronts these
> (purportedly) insurmountable challenges, there is little for the Department to hang
> its hat on when it "continues to find a 'gap' in the record." The court is sympathetic
> to the Department's struggles surrounding this Program, but an adverse inference is
> not one that can be applied just because the Department is unsatisfied with the
> respondent's answers about the EBCP's operations—a program that Plaintiffs do
> not even use, according to the only evidence available on the record. The court
> remains convinced that the Department has not adequately addressed what the gap
> in the record is (as required under the AFA statute), or, that the missing information
> is required to effectively verify respondent's non-use of the Program.

*Id.* at 1405.

Indeed, the record in the instant investigation contains no evidence that Risen or its

customers used or benefitted from the EBC program.  Instead of confronting the record evidence

and conducting a verification of non-use as the Department normally does for all other programs

that Respondents asserted not to have used, for EBCP, the Department completely disregarded

the record evidence and applied AFA based on a vague claim that, due to GOC's failure to

submit the 2013 Revisions and a list of partner banks, the Department lacked a complete and

reliable understanding of the program.  And rather than confront the information provided by the

respondents themselves or request further reasonable information from them on this program, the

Department unreasonably determined on its own that the customers would not provide this information and thus respondents could not to cure the GOC deficiency.

Lastly, Risen cooperated in this investigation to the utmost of its abilities.  Regarding the impact of AFA on fully cooperating parties when applied to a non-cooperating party, the Federal Circuit found in *Fine Furniture* that in a countervailing duty investigation, a collateral impact on a cooperating party does not render the AFA application against the foreign government improper.  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1372 (Fed. Cir. 2014).  Central to the Federal Circuit's decision, however, was the fact that the adverse inferences were used to substitute for information the GOC failed to provide and were <u>not</u> used against Fine Furniture.

> The Government points out that **the Department used respondents' actual reported data to measure the benefit received in order to ensure that the adverse inference was applied only with regard to the missing information and not the information supplied by Fine Furniture.**  Therefore, the Government argues, by not substituting any adverse inferences for the facts provided by Fine Furniture, the Department did not apply adverse inferences against Fine Furniture.

*Fine Furniture*, 748 F.3d 1365, 1371 {emphasis added}.  The Federal Circuit therefore found that "the Department did not apply adverse inferences to substitute for any information that was actually submitted by the cooperating respondents, such as the actual rate Fine Furniture reported paying for electricity."  *Id.* at 1372.  However, in the instant case, the Department did precisely the opposite – it applied adverse inferences against the GOC and substituted facts available to the record evidence supporting a finding of *non-use* of the EBC program that was provided by the cooperating respondent and its customers.

In *Changzhou Trina II,* for instance, the Court acknowledged that if a foreign government fails to cooperate in a countervailing duty case, the Department may apply AFA even if the

collateral effect is to adversely impact a cooperating party." *See Changzhou Trina II*, 352 F.

Supp. 3d 1316, 1325.  But in the very next sentence, the Court states that "the Department,

however, should seek to avoid such impact if relevant information exists elsewhere on the

record." *Changzhou Trina II*, 352 F. Supp. 3d at 1325.  *Changzhou Trina II* is the Court's first

opinion remanding several aspects of the Department's final results in the *Solar Cells from*

*China* POR 2014 CVD review.  *See id.* at 1323.  In that opinion, the Court overturned the

Department's AFA finding on the EBC program and directed the Department to explain what

information is actually missing from the record, and reasonably show that such information is, in

fact, unverifiable.  *Id.*, at 1327.

However, following the Court's opinion in *Changzhou II,* upon remand, the Department

used the same exact reasoning as it used in Risen's case and insisted that it could not verify non-

use of the EBC program because it does not have a list of partner banks involved in the

disbursement of the EBC loan, which was remanded by the Court in *Changzhou Trina Solar*

*Energy Co. v. United States*, 2019 Ct. Intl. Trade LEXIS 138; SLIP OP. 2019-137, dated

November 2019 - three months before the Department released the Final IDM in the instant case

("*Changzhou Trina IV*").  The Court stated, yet again, that "it cannot sustain the Department's

determination that verification would be impossible or unduly onerous," and "it is still not

entirely clear to the court that the missing information is required to effectively verify

respondent's non-use of the program." *Changzhou Trina*, SLIP OP. 2019-137 at 11.  Little room

remains for the Department to distinguish the instant case from *Changzhou Trina II* and its

subsequent remand opinion.

In the *Aluminium Foil from China CVD Investigation* litigation, the Court of International

Trade held:

> the Department again does not explain why a complete understanding of the operation of the program is necessary to verify non-use of the program. … In its brief to the court, for example, the government provides one such explanation: that the identities of third-party banks allegedly involved are unknown to the Department, and those names, not "China Ex-Im Bank," would appear in the records of U.S. customers that received EBCP credits. Thus, if the Department were to verify the ledgers of U.S. customers, it could check for credits from those third-party banks…. But that argument still fails to explain how the 2013 rule change "affected the way {the Department} conducts verification" of non-use claims. Critically, the Department does not explain why it could not identify the intermediate banks and the corresponding bank disbursement information by soliciting information from respondents. Instead, the Department summarily declares that, as the "primary entity" involved, the Ex-Im Bank is the only entity that possesses records sufficient to verify claims of non-use.

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333-34 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji I*") (internal citation omitted).  The Court instructed the Department to "consider what information could be verified that would show non-use" and emphasized that "effort should be made to avoid the collateral consequences to cooperating parties of another's non-cooperation."  *Id.*, at 1334 (*citing Archer Daniels Midland Co. v. United States*, 917, F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013)).  On remand, the Department opted to remove the EBC rate from Jiangsu Zhongji' rate but did so only "under respectful protest."

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 41, SLIP OP. 2020-39 at 5 (Mar. 24, 2020) ("*Jiangsu Zhongji II*").  The Department still insisted that it does not know how to verify non-use of the program and refused to even issue the proposed questions to Zhongji's customers.  *See id.* at 6 - 7.  Indeed, as the Court in *Jiangsu Zhongji II* observed, "the Department's true position is that it wishes to rely solely on GOC's failures" and after the position being rejected by the Court in many cases, it now has "interposed non-verifiability or incompleteness as reasons to maintain the EBCP as contributing to the CVD rates, without much to back up such stances."  *Id.* at 7-8.

    In sum, the Department's finding that Risen used and benefitted from the EBC program is

unsupported by record evidence.  The administrative record provides the Department with no

basis upon which to find that Risen used or benefitted from the EBC program.  As the

Department itself chose not seek any information from Risen's customers' or to attempt

verification of Risen's customers' assertion of non-use, their statements of non-use, including the

certification filed after the initial response in the absence of any inquiry of that sort by

Commerce must be deemed accurate.

>    **B.**     **The Department's Reliance on the Descartes Ocean Freight Data is Not Supported by Substantial Evidence.**

In the Final Results, the Department relied upon an average of Xeneta and Descartes

freight data.  IDM at Comment 7.  While Risen argued that the Department should rely solely on

Xeneta, the Department did not actually address this argument in the Final Results at all.  Rather,

the Department only addressed and agreed with Risen's fallback argument concerning changing

the averaging methodology between the sources.  Risen maintains, as argued below, that the

Department should only rely on Xeneta. The failure to address the threshold  argument alone

demands remand.

Generally, when the Department uses tier-two benchmarks it considers whether it is

getting a world benchmark that would be comparable to what purchasers in China would obtain:

> In selecting a world market price, Commerce will "seek" to measure the adequacy of remuneration by comparing the government price to a "world market" price where it is reasonable to conclude that such a price would be available to purchasers in the country in question. 19 C.F.R. §351.511(a)(2)(ii). Where there is more than one commercially available "world market price," Commerce will average such prices, to the extent practicable, "making due allowance for factors affecting comparability." *Id*.  Such factors include delivery charges and import duties, and these Commerce will include, if not otherwise included, when adjusting "the comparison price to reflect the price that a firm actually paid or would pay if it imported the product". *See* 19 C.F.R. §351.511(a)(2)(iv).

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1332

(Ct. Int'l Trade 2015); *see also Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade 2015) ("The statute requires that 'the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.' 19 U.S.C. § 1677(5)(E). Such '[p]revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.' *Id*.").

While the Department relied upon world ocean freight prices, it failed to properly rely upon ocean freight data that is reasonably reflective of the price Risen paid or would pay for imported inputs – glass and aluminum.  The Xeneta data <u>alone</u> is reasonably reflective of world market prices, while the Descartes prices are not reasonable commercial prices that Risen would pay for ocean freight to import such materials.

Xeneta is an actual world ocean freight benchmarking source.  The company gathers several hundred thousand rates per month for the purpose of providing reliable benchmarks for the cost of ocean freight.  *See* JA Solar Benchmarks (November 17, 2021) at Exhibit 4E (information on Xeneta) **CR448-451 PR313**; *see also* Risen Benchmarks (November 17, 2021) at Exhibit 6 (Xeneta methodology) **CR439 PR304**.  For mature trade routes (i.e. normal commercial routes), the benchmarks are based on several hundred valid rates per day.  Before Xeneta will even make information available on a particular route, a minimum of 4 rates per route, per day, per equipment (i.e. container type) is required.  Therefore, a monthly benchmark for any particular route from Xeneta would be based on at least 120 individual datapoints (so for the sixteen routes provided, the monthly benchmark is based on at least 1920 datapoints).  The record of this review contains daily ocean benchmarks for sixteen major routes:  Antwerp, Barcelona, Buenos Aires, Busan, Cai Mep, Hamburg, Jakarta, Japan Main, Laem Chabang, Long

Beach, Los Angeles, Mumbai Area, Rotterdam, Savannah, Tanjung Pelepas, and Tokyo to China.  Further, as these are major, mature commercial routes, as noted above, Xeneta is actually collecting several hundred rates per day.  Therefore, the Xeneta benchmark data on the record is reflective of thousands of datapoints per month.  The wide breadth of collected data on a daily basis, based on numerous carriers, and from major routes around the world, makes the Xeneta data most reflective of prevailing market conditions for freight compared with other record evidence.

In contrast, the Descartes ocean freight data is only based on routes from USA to China, are based on only one single carrier's prices, and are in reality representative of one repeated datapoint for the entire POR for one stand-alone rate.  Upon further inspection, petitioner provided only one Descartes datapoint for the entire POR.  Petitioner Benchmarks (November 17, 2021) at NFI-10 **CR444-446 PR306-307**.  As seen on each Descartes data page, the same TLI and tariff number is listed, indicating each page is for the exact same tariff that is merely applicable to some different routes (the Norfolk, New York, Baltimore, and Miami to Shanghai routes that petitioner selected).  This is also made evident in the commodity detail page that petitioner provided.  *Id*. at NFI-12.  The Descartes data is based on one single ocean tariff rate from one freight forwarder, Transworld Shipping USA, that the company submitted on May 11, 2001.  *Id*.  Thus, in reality, the Descartes data is representative of a single company's single ocean rate.  The Descartes data thus is not representative of commercial freight rates during the POR.

In sum, the Descartes data does not present prevailing market conditions for worldwide costs to ship to China during the POR.  As a threshold issue, the Descartes data only consists of routes from the USA to China.  Therefore, the data fails to fulfil the basic criteria to rely upon a

"world market price" as benchmarks.  19 C.F.R. §351.511(a)(2)(ii).  Further, the ocean freight

data is being added to international worldwide benchmarks for glass and aluminum.  Therefore,

it is a mismatch to apply USA to China freight rates to the benchmark values of inputs from a

varied world market.  The Department must rely upon available *world market* freight rates to be

demonstrative of the ocean freight costs that a Chinese respondent would pay to import the

inputs from around the world.  The combination of a USA-China ocean freight expenses and

worldwide input prices are not reflective of commercial reality and what would be available to

Chinese respondents in the world market.  Therefore, the Descartes data source, as a threshold

matter, fails to fulfil the regulatory requirements for benchmark data and the Court should find it

is not supported by substantial evidence for the Department to rely upon this data in any

capacity.

Further, the "routes" as described above are based on a single company's one ocean

freight tariff.  A single rate from a single freight forwarder was merely available to multiple

ports, and this does not make the rate more broadly based.  The Descartes data also does not

adequately take into consider the contemporaneity.  The route provided the rate details revealed

the rates were established in 2001.  Even if the routes where such details were not provided are

more contemporaneous, the rate is the same for each month of the POR and therefore no

seasonal or demand changes are taken into consideration for the price.  The Descartes data are

not representative, particularly in consideration of the alternative data on the record from Xeneta.

As described above, Xeneta prices are collected daily and major commercial route rates are

based on hundreds of rates per day.  The Xeneta prices are true benchmarks of worldwide

shipping costs and are the only data that fulfils the regulatory directive to rely upon benchmarks

that are indicative of prevailing market conditions.  The Court should order the Department to

consider the entire record and justify how the Descartes data fulfils the regulatory requirement

for benchmarks or withdraw the Descartes data entirely from its calculations.

## IV.      Conclusion and Prayer for Relief

In light of the foregoing, the Department's *Final Results* were not supported by

substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court

remand this case for redetermination of the issues presented in this brief.


Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman[*]
Vivien Jinghui Wang[**]
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
Date: January 30, 2023                *Counsel to Plaintiff*

---

[*] Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).
[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

17

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **5,381** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*