**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

| | |
|---|---|
| **RISEN ENERGY CO., LTD.** ) | |
| ) | |
| **Plaintiff, and** ) | |
| ) | |
| **JA SOLAR TECHNOLOGY YANGZHOU CO., LTD.** ) | |
| **ET AL.,** ) | |
| ) | |
| **Consolidated Plaintiffs and** ) | **Consol. Court No. 22-00231** |
| **Plaintiff-Intervenors,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |

**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF
CONSOLIDATED PLAINTIFFS AND PLAINTIFF-INTERVENORS JA SOLAR
TECHNOLOGY YANGZHOU CO., LTD., SHANGHAI JA SOLAR TECHNOLOGY
CO., LTD., JA SOLAR CO., LTD.  (A.K.A JINGAO SOLAR CO., LTD.) AND JA SOLAR
(XINGTAI) CO., LTD.**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated

Plaintiffs and Plaintiff-Intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar

Technology Co., Ltd., JA Solar Co., Ltd.  (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai)

Co., Ltd. (collectively, "JA Solar"), hereby move for judgment upon the agency record.  JA Solar

challenges certain aspects of the final results of the eighth administrative review of the

countervailing duty ("CVD") order on Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From the People's Republic of China ("China") conducted by the

Department of Commerce ("Commerce").  See Crystalline Silicon Photovoltaic Cells, Whether or

Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial

<u>Rescission of Countervailing Duty Administrative Review; 2019</u>, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022), as amended by <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2019</u>, 87 Fed. Reg. 50,069 (Dep't of Commerce Aug. 15, 2022).  JA Solar seeks judgment on the agency record because, for the reasons provided in JA Solar's brief in support of this Motion, Commerce made factual and legal errors in its determination that resulted in an inaccurate countervailing duty rate for JA Solar.  Specifically, Commerce's determination was unsupported by substantial evidence and otherwise not in accordance with law because (i) Commerce wrongly imputed a benefit to JA Solar under the Export Buyer's Credit Program ("EBCP")  based on application of adverse facts available ("AFA") to the Government of China ("GOC") despite numerous other opinions by the Court remanding Commerce for the same systemic error; (ii) Commerce wrongly included the outdated CB Richard Ellis for Thailand 2010 report ("2010 CBRE Report") for the land benchmark calculation; (iii) Commerce failed to revise the calculations for the 2017 land leases and land purchases reported in the 2017 review; (iv) Commerce impermissibly determined that the Article 26(2) Tax Exemption Program was countervailable and (v) Commerce wrongly treated the Article 26(2) Tax Exemption Program as recurring despite substantial record evidence that it could not be.

For the reasons elaborated in the accompanying brief in support of this Motion, JA Solar respectfully moves this Court for an order granting judgment on the agency record including, but not limited to, the following relief:

1. Declaring that Commerce's decision to impute a benefit to JA Solar under the EBCP, based on the application of AFA to the GOC was not supported by substantial evidence and otherwise not in accordance with law;

2.  Declaring that Commerce's decision to include the 2010 CBRE Report to calculate the benefits for the land program was not supported by substantial evidence and was otherwise not in accordance with law;

3.  Declaring that Commerce's decision not to expense the benefits of the 2017 land leases reported in 2017, when Commerce treats land lease as a recurring program, was not supported by substantial evidence and was otherwise not in accordance with law;

4.  Declaring that Commerce's decision not to revise the calculations for the land purchases reported in the 2017 review was not supported by substantial evidence and was otherwise not in accordance with law;

5.  Declaring that Commerce's decision to treat the Article 26(2) Tax Exemption Program as countervailable, when the program is not specific and does not provide a financial contribution, was not supported by substantial evidence and was otherwise not in accordance with law; and

6.  Declaring that Commerce's decision to treat the benefits under the Article 26(2) Tax Exemption program as recurring, when a company normally would not receive an exemption on an ongoing basis from year to year, was not supported by substantial evidence and was otherwise not in accordance with law.

WHEREFORE, for the reasons described in this Motion and the accompanying brief in support of this Motion, JA Solar respectfully requests that this Court enter judgment in its favor. A proposed order is attached for the Court's consideration.

Respectfully submitted,

<u>Dated</u>: January 30, 2023

<u>/s/ Jeffrey S. Grimson</u>
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
Jacob M. Reiskin
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd.  (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd.*

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| **RISEN ENERGY CO., LTD.** ) | |
| ) | |
| **Plaintiff, and** ) | |
| ) | |
| **JA SOLAR TECHNOLOGY YANGZHOU CO., LTD** ) | |
| **ET AL.,** ) | |
| ) | **Consol. Court No. 22-00231** |
| **Consolidated Plaintiffs and** ) | **Nonconfidential Version** |
| **Plaintiff-Intervenors,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| **Defendant.** ) | |

**BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE
AGENCY RECORD OF CONSOLIDTED PLAINTIFFS AND PLAINTIFF-
INTERVENORS JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., SHANGHAI JA
SOLAR TECHNOLOGY CO., LTD., JA SOLAR CO., LTD.  (A.K.A JINGAO SOLAR
CO., LTD.) AND JA SOLAR (XINGTAI) CO., LTD.**

Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
Jacob M. Reiskin
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com

January 30, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ......................................... 1

ISSUES PRESENTED ........................................................................................................ 2

STATEMENT OF FACTS ................................................................................................. 3

SUMMARY OF ARGUMENT .......................................................................................... 6

STANDARD OF REVIEW ................................................................................................ 8

ARGUMENT ...................................................................................................................... 9

    **I.    Commerce Had No Basis to Apply AFA To Impute a Benefit Under the Export Buyer's Credit Program** ............................................................................................ 9

        A.    Commerce's Application of AFA Was Contrary to Law Because JA Solar Provided Extensive Evidence of Non-Use That Left No Information Gap ......................... 11

        B.    Commerce's Decision to Apply AFA Is Inconsistent with Recent Decisions From This Court Requiring Commerce to Verify Non-Use ......................................... 13

        C.    Commerce's Lengthy Explanation of the GOC's Lack of Cooperation Does Not Provide Substantial Evidence of Gap in the Record ........................................... 15

        D.    Commerce Could Have Conducted a Verification .................................................... 16

        E.    Conclusion ................................................................................................................. 17

    **II.   COMMERCE'S USE OF THE 2010 CBRE REPORT IN THE LAND BENCHMARK WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW** ............................................................................... 18

        A.    The 2010 CBRE Report is Grossly Outdated .......................................................... 18

        B.    Commerce's Comparability Analysis in Selecting Thailand as the Benchmark Country Was Unsupported by Substantial Evidence ............................................. 22

    **III.  COMMERCE'S REFUSAL TO REVISE BENEFIT CALCULATIONS FROM THE 2017 REVIEW WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS NOT OTHERWISE IN ACCORDANCE WITH LAW** ........................................... 25

        A.    Commerce Failed to Expense the Benefits from the 2017 Leases Even Though This Is a Recurring Program ............................................................................................... 26

        B.    Commerce Failed to Revise the Benchmark for the Land Purchases Reported in the 2017 Review ........................................................................................................... 29

    **IV.  The Tax Exemption Program is Not Countervailable Under Section 19 of U.S. Code** .................................................................................................................. 31

A. The Tax Exemption Program is Not Countervailable Because it is Not <u>De Jure</u> Specific ............................................................................................ 32

B. The Tax Exemption Programing Did Not Confer a Financial Contribution Or Benefit ........................................................................................ 38

**V. Commerce's Treatment of the Article 26(2) Tax Exemption Program as Recurring Was Unlawful ............................................................................................................... 41**

**CONCLUSION ......................................................................................................... 42**

**REQUEST FOR COURT ORDER AND RELIEF SOUGHT ............................................. 43**

# TABLE OF AUTHORITIES

**Cases**

AK Steel Corp. v. United States,
  192 F.3d 1367 (Fed. Cir. 1999)..............................................................32, 33, 35, 36

Aqua Prods., Inc. v. Matal,
  872 F.3d 1290 (Fed. Cir. 2017)............................................................................. 9

Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,
  __ CIT __, 523 F. Supp. 3d 1393 (2021) ...................................................32, 33, 34

Atlas Copco, Inc. v. United States,
  10 CIT 790, 651 F. Supp. 1446 (1986) ................................................................. 40

Bethlehem Steel Corp. v. United States,
  26 CIT 1003 (2002)............................................................................................. 31

Both-Well Taizhou Steel Fittings v. United States,
  __ CIT __, 557 F. Supp. 3d 1327 (2022) ...................................................13, 15, 16

Canadian Solar, Inc. v. United States,
  No. 18-00184, 2020 Ct. Intl. Trade LEXIS 157 (Oct. 19, 2020) ............................ 16

Changzhou Trina Solar Energy Co. v. United States,
  __ CIT __,  255 F. Supp. 3d 1312 (2017) ......................................................... 19, 20

Changzhou Trina Solar Energy Co. v. United States,
  __ CIT __, 466 F. Supp. 3d 1287 (2020) .............................................................. 16

Changzhou Trina Solar Energy Co., Ltd. v. United States,
  __ CIT __, 161 F. Supp. 3d 1343 (2016) .............................................................. 27

Chevron U.S.A., Inc. v. NRDC,
  467 U.S. 837 (1984) ........................................................................................ 9, 33

Consol. Edison Co. v. NLRB,
  305 U.S. 197 (1938)............................................................................................. 8

Dalian Meisen Woodworking Co v. United States,
  __ CIT __, 571 F. Supp. 3d 1364 (2021) .............................................................. 33

Diamond Sawblades Mfrs. Coal. v. United States,
  986 F.3d 1351 (Fed. Cir. 2021)........................................................................... 11

Gov't of Québec v. United States,
  __ CIT __, 567 F. Supp. 3d 1273 (2022) .........................................................35, 36

Guizhou Tyre Co. v. United States,
  __ CIT __, 415 F. Supp. 3d 1335 (2019) .........................................................15, 16

Huayin Foreign Trade Corp. v. United States,
  322 F.3d 1369 (Fed. Cir. 2003)............................................................................. 8

Husteel Co. v. United States,
  __ CIT __, 517 F. Supp. 3d 1342 (2021) .............................................................. 30

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,
  463 U.S. 29 (1983) .............................................................................................. 9

Nippon Steel Corp. v. United States,
  458 F.3d 1345 (Fed. Cir. 2006)............................................................................. 8

NMB Sing. Ltd. v. United States,
 557 F.3d 1316 (Fed. Cir. 2009)........................................................................... 20
NMB Singapore Ltd. v. United States,
 557 F.3d 1316 (Fed. Cir. 2009)....................................................................... 8, 37
Norsk Hydro Canada, Inc. v. United States,
 472 F.3d 1347 (Fed. Cir. 2006)........................................................................... 31
Porsche Motorsport N. Am., Inc. v. United States,
 No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115 (Aug. 22, 2018) .......................... 40
RHP Bearings v. United States,
 288 F.3d 1334 (Fed. Cir. 2002)........................................................................... 15
Risen Energy Co. v. United States,
 __ CIT __, 570 F. Supp. 3d 1369 (2022) ..................................................... passim
Shandong Huarong Mach. Co. v. United States,
 29 CIT 484 (2005)............................................................................................... 27
SKF USA Inc. v. United States,
 263 F.3d 1369 (Fed. Cir. 2001).......................................................... 9, 14, 20, 21
SKF USA, Inc. v. United States,
 254 F.3d 1022 (Fed. Cir. 2001)........................................................................... 30
Swiff-Train Co. v. United States,
 793 F.3d 1355 (Fed. Cir. 2015)............................................................................. 8
Toscelik Profil ve Sac Endustrisi A.S. v. United States,
 38 CIT 1534 (2014)....................................................................................... 30, 31
U.S. Steel Corp. v. United States,
 37 CIT 1799, 953 F. Supp. 2d 1332 (2013) .......................................................... 9
United States v. Haggar Apparel Co.,
 526 U.S. 380 (1999) .............................................................................................. 9
Universal Camera Corp. v. NLRB,
 340 U.S. 474 (1951) .............................................................................................. 8
Zhejiang Dunan Hetian Metal Co. v. United States,
 652 F.3d 1333 (Fed. Cir. 2011).................................................................... 11, 16

**Statutes**

19 U.S.C. § 1516a.................................................................................................... 8
19 U.S.C. § 1677(5)................................................................................................ 38
19 U.S.C. § 1677(5A) ................................................................................ 32, 33, 34
19 U.S.C. § 1677e.................................................................................................. 10


**Regulations**

19 C.F.R. § 351.524(c)............................................................................................ 41

**Other Authorities**

<u>Countervailing Duties; Final Rule</u>, 63 Fed. Reg. 65,348 (Nov. 25, 1998) ........................... 37, 41

<u>Crystalline Silicon Photovoltaic Cells and Modules From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations</u>, 76 Fed. Reg. 66,748 (Int'l Trade Comm'n Oct. 27, 2011) ............................................................ 3

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019</u>, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) ....... 1, 5

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of CVD Investigation</u>, 76 Fed. Reg. 70,966 (Dep't of Commerce Nov. 16, 2011) ....................................................................................................... 3

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2019</u>, 87 Fed. Reg. 50,069 (Dep't of Commerce Aug. 15, 2022) .... 1, 5

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind, in Part; 2019</u>, 87 Fed. Reg. 748 (Dep't of Commerce Jan. 6, 2022) ...................................................................................................................................... 4

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2016</u>, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019) ...................................................................................................................................... 18

<u>Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination</u>, 86 Fed. Reg. 35,479 (Dep't of Commerce July 6, 2021) .............................................................. 19

<u>Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) ............................................................................ 3

<u>Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination</u>, 72 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007) 22, 23, 24

Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial
   Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't
   of Commerce Nov. 27, 2020)................................................................................................... 18

See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
   People's Republic of China: Final Results of Countervailing Duty Administrative Review;
   2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) .............................................. 16

Pursuant to Rule 56.2(c) of the Rules of the U.S. Court of International Trade, Consolidated Plaintiffs and Plaintiff-Intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd.  (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd. (collectively, "JA Solar"), hereby moves for judgment upon the agency record because the U.S. Department of Commerce ("Commerce") acted without substantial evidence and otherwise not in accordance with law in determining the countervailing duty ("CVD") rate for JA Solar in the 2019 administrative review of the CVD order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules ("solar cells"), From the People's Republic of China ("China").  As described below, Commerce made numerous decisions that violated the statute and regulations and were unsupported by substantial record evidence.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

JA Solar challenges certain aspects of the final results of the eighth administrative review of the CVD order on solar cells from China conducted by Commerce covering 2019 entries into the United States.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) ("Final Results") (P.R. 437), and accompanying Issues and Decision Mem. ("Final IDM") (P.R. 429), amended by Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Notice of Amended Final Results of Countervailing Duty Administrative Review; 2019, 87 Fed. Reg. 50,069 (Dep't of Commerce Aug. 15, 2022) ("Am. Final Results") (P.R. 452).

**ISSUES PRESENTED**

I.  **Whether Commerce's decision to impute a benefit to JA Solar under the Export Buyer's Credit Program ("EBCP"), based on the application of AFA to the GOC, was supported by substantial evidence and otherwise in accordance with law.**

Commerce's decision to impute a benefit to JA Solar under the EBCP based on the application of AFA to the GOC was unsupported by substantial evidence and not in accordance with law because Commerce refused to consider accurate and substantial information available on the record to verify non-use.

II.  **Whether Commerce's decision to include the 2010 CBRE Report to calculate the benchmark for the land program was supported by substantial evidence and otherwise in accordance with law.**

Commerce's inclusion of the CB Richard Ellis for Thailand 2010 report ("2010 CBRE Report") in the land benchmark calculation was unsupported by substantial evidence and not in accordance with law because the report and Commerce's underlying analysis for selecting a land source country are both grossly outdated.

III.  **Whether Commerce's decision not to revise benefit calculations from the 2017 review was supported by substantial evidence and otherwise in accordance with law.**

Commerce's refusal to revise the benefit calculations reused from the 2017 review was unsupported by substantial evidence and not in accordance with law because Commerce's own regulation demands expensing the benefits from the 2017 leases to year 2017 and demands revision to the benchmark used for the land purchases from the 2017 review.

IV.  **Whether Commerce's decision to treat the Article 26(2) Tax Exemption Program as countervailable was supported by substantial evidence and otherwise in accordance with law.**

Commerce's treatment of the Article 26(2) Tax Exemption Program was unsupported by substantial evidence and not in accordance with law because the program was not specific and

2

conferred no benefit but rather was an automatic tax provision to prevent double taxation.

**V.   Whether Commerce's decision to treat the benefits under the Article 26(2) Tax Exemption program as recurring was supported by substantial evidence and otherwise in accordance with law.**

Commerce's treatment of the alleged benefit as recurring was unsupported by substantial evidence and not in accordance with law because the program is tied to capital structure and would not be granted on an ongoing basis.

**STATEMENT OF FACTS**

Commerce initiated the CVD investigation of solar cells from China on November 16, 2011, following the filing of the petition on October 19, 2011.  See <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of CVD Investigation</u>, 76 Fed. Reg. 70,966 (Dep't of Commerce Nov. 16, 2011).  The International Trade Commission ("Commission") simultaneously conducted its investigation.  See <u>Crystalline Silicon Photovoltaic Cells and Modules From China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations</u>, 76 Fed. Reg. 66,748 (Int'l Trade Comm'n Oct. 27, 2011).

On December 7, 2012, Commerce issued a CVD order on solar cells from China following an affirmative CVD determination and an affirmative injury determination by the Commission. See <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: CVD Order</u>, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012).

In December 2020, certain interested parties requested that Commerce conduct an administrative review of the CVD order on solar cells from China.  On February 4, 2021, Commerce initiated the eighth administrative review of the CVD order covering the period January 1, 2019, through December 31, 2019.  See <u>Initiation of Antidumping and Countervailing Duty</u>

3

Administrative Reviews, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) (P.R. 12).

On March 29, 2021, Commerce selected two mandatory respondents: (1) JA Solar Technology Yangzhou Co., Ltd. and (2) Risen Energy Co., Ltd. ("Risen"). See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind, in Part; 2019, 87 Fed. Reg. 748 (Dep't of Commerce Jan. 6, 2022) ("Prelim. Results") (P.R. 361), and accompanying Decision Mem. at 3 ("Prelim. Dec. Mem.") (P.R. 353).

Between March 25, 2021, and October 29, 2021, JA Solar timely submitted answers to Commerce's CVD Questionnaire and supplemental questionnaires. See Prelim. Dec. Mem. at 3-4 (P.R. 353).

On November 17, 2021, JA Solar timely submitted benchmark data. See id. at 6, n. 45. On November 29, 2021, JA Solar submitted rebuttal factual information. Id. at 6, n. 46. On December 9, 2021, JA Solar submitted a revised version of the rebuttal factual information to address the issue of untimely submitted new factual information. See id. at 6, n. 48. On December 21, 2021, upon Commerce's further request on the same issue, JA Solar submitted a final revised version of its rebuttal factual information submission. See id. at 6, n. 50.

In the Preliminary Results, Commerce imputed a benefit to JA Solar under the EBCP program based on the application of APA, calculated the land benchmark by averaging the outdated 2010 CBRE Report and the contemporaneous Malaysian Investment Development Authority Report ("MIDA Report"), reused the benefit streams from the land leases and land purchase reported in the 2017 administrative review, and deemed the Tax Exemptions under Article 26(2) of the Enterprise Income Tax Law Program ("Article 26(2) Tax Exemption Program") as countervailable and a recurring program. See id.

On May 16, 2022, JA Solar submitted a case brief for Commerce's consideration prior to issuing the Final Results.  See Final IDM. at 4, n. 21 (P.R. 429).  JA Solar made various arguments for Commerce's consideration, including contesting Commerce's treatment of the EBCP and the Article 26(2) Tax Exemption Program, as well as Commerce's benefit calculations concerning the provision of land for LTAR program ("land program").  See id. at 2, Cmts. 1, 17-18, 20.  On May 25, 2022, JA Solar submitted a rebuttal case brief.  See id. at 4, n. 26.

On July 7, 2022, Commerce published the Final Results, calculating a CVD rate of 18.58 percent for JA Solar.  Final Results, 87 Fed. Reg. at 40,492 (P.R. 437).  On August 15, 2022, in response to allegations of ministerial errors, Commerce published the Amended Final Results.  See Am. Final Results, 87 Fed. Reg. at 50,070 (P.R. 452).  Therein, Commerce amended the CVD rate to 18.55 percent for JA Solar.  See id

In the Final Results, Commerce continued to use AFA to impute a benefit under the EBCP to JA Solar, even though no information is missing on the record where JA Solar reported that its sole affiliated importer customer, JA Solar USA, Inc.,[1] did not receive support through this mechanism.  See Final IDM at Cmt. 1 (P.R. 429).  Commerce also recognized that its application of AFA contravened numerous recent cases from the Court. See id

To construct its benchmark to measure the benefit received under the land program, Commerce continued to include the 2010 CBRE Report and averaged land prices from the 2010 CBRE Report and prices from the MIDA Report.  See id. at Cmt. 17.  During Commerce's proceeding in the current administrative review, the Court remanded Commerce's use of the 2010 CBRE Report in the 2017 administrative review under nearly identical facts.  See Risen Energy

---

[1] JA Solar treats as public certain information regarding its import structure that was submitted confidentially during the administrative proceedings in response to Commerce's questionnaires, namely that its affiliated U.S. importer is JA Solar USA Inc., which was also made public in related litigation concerning the 2017 solar cells review.  The information disclosed is solely its own and contains no third-party business proprietary information.

Co. v. United States, __ CIT __, __, 570 F. Supp. 3d 1369, 1374-76 (2022).

In the Final Results, Commerce agreed with JA Solar that benefits from land leases are recurring benefits.  See Final IDM at Cmt. 18 (P.R. 429).  Commerce used the lease rates for factories in Bangkok from the 2010 CBRE Report to measure the benefits from JA Solar's reported land leases.  See id.  Commerce, however, denied JA Solar's request to expense the benefits of the 2017 land leases reported in the 2017 administrative review, even though Commerce treated benefits from land leases as a recurring program.  See id.  Commerce also refused to revise the benchmark used to create the benefit streams for the land purchases reported in the 2017 review which used the outdated 2010 CBRE Report only.  See id.

In the Final Results, Commerce also determined that the Article 26(2) Tax Exemption Program is specific because the recipients are limited to enterprises that received investment income from other resident enterprises.  See id. at Cmt. 20.  Further, Commerce determined that the Article 26(2) Tax Exemption Program provides a financial contribution even though it was designed to avoid double taxation.  See id.  Finally, Commerce determined that benefits from this program are recurring.  See id.

## SUMMARY OF ARGUMENT

Commerce's decision to impute a benefit to JA Solar under the EBCP based on the application of AFA to the GOC was unsupported by substantial evidence or otherwise not in accordance with law because Commerce refused to use accurate and substantial information available on the record to verify non-use.  Commerce went against precedent established in numerous other recent cases when it determined that, because it would rather have additional information from the GOC, it would decline to analyze accurate information on the record that it could use – and had used in past reviews – to verify non-use of the EBCP.

Commerce's inclusion of the 2010 CBRE Report in the land benchmark calculation was unsupported by substantial evidence and not in accordance with law because the report was outdated and, thus, inaccurate to assess land price benefits realized in the 2019 POR.  Commerce ran afoul of its own established practice of excluding non-contemporaneous data when contemporaneous data are available on the record.  Commerce relied on even older data in determining that Thailand is economically comparable to China for purposes of selecting a land benchmark.  Based on the record, the only reasonable choice was for Commerce to use the contemporaneous MIDA Report as the sole benchmark source for the land purchase benchmark.

Commerce's refusal to revise the land benefits calculated in the 2017 review was unsupported by substantial evidence and not in accordance with law in two respects.  First, Commerce refused to expense the benefits from the 2017 leases even though Commerce definitively found in this review that the same land lease in 2019 is a recurring program.  Second, Commerce acted contrary to its regulation when it refused to update the benchmark for the land purchases reported in the 2017 review even though that benchmark was revised by Commerce itself on remand in the 2017 review and is unsupported by substantial evidence based on the record of this proceeding.  It is irrelevant that those benefit streams were already established when the record evidence in this review and the law, as evolved through the appeal of the 2017 review, establish that Commerce's earlier benefit stream calculation was clearly erroneous and would lead to the overcollection of duties, a manifest injustice.

Additionally, Commerce wrongfully treated the Article 56(2) Tax Exemption program as countervailable.  Commerce's determination was not in accordance with law because it wrongfully interpreted 19 U.S.C. § 1677(5A)(D)(i), which allowed it to find that the program was specific despite Commerce's decision not to identify a specific enterprise or industry.  Further, even if the

program was specific, no benefit was conferred because it was merely a program designed to prevent double taxation.

Finally, Commerce acted without substantial evidence and contrary to law when it treated the tax exemption program as recurring contrary to its regulations and despite record evidence demonstrating that it was a one-time, non-recurring, investment return distributed to shareholders.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citation omitted). Substantial evidence requires "more than a mere scintilla," see, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal citation omitted), and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Huayin, 322 F.3d at 1374 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Moreover, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the record "fairly detracts from its weight."  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951)).  Disregarding record information with no explanation defies this requirement.  Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable."  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

Further, "{t}o be in accordance with law, a decision must not be arbitrary and capricious . . . and must be supported by substantial evidence and reasoned explanations." U.S. Steel Corp. v. United States, 37 CIT 1799, 1801-02, 953 F. Supp. 2d 1332, 1336 (2013) (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 41-43 (1983)). "{I}t is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" See SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

In reviewing Commerce's interpretation of statutes, the Court applies the two-prong standard established in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 842-43 (1984). First, the Court determines whether Congress' intent can be ascertained; if it can, the Court "must give effect to the unambiguously expressed intent of Congress." Id. at 843. Second, the Court determines whether the agency's interpretation of the statute is permissible. See id. at 843-44. The Court will only uphold agency interpretations that are reasonable. See id. at 844. The same standard applies for Commerce's interpretation of its own regulations. The Court follows the Chevron framework when reviewing Commerce's interpretation of its own regulations. See United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999) ("Haggar") ("{T}he Court of International Trade must, when appropriate, give regulations Chevron deference."); Aqua Prods., Inc. v. Matal, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (en banc) ("We use the same interpretive rules to construe regulations as we do statutes{.}").

## ARGUMENT

**I.   Commerce Had No Basis to Apply AFA To Impute a Benefit Under the Export Buyer's Credit Program**

Commerce wrongly determined that the GOC's lack of cooperation left it no choice but to apply AFA against the GOC and to impute a benefit to JA Solar for alleged use of the EBCP. See

Final IDM at Cmt.  1, p. 15, 21 (P.R. 429).  Commerce's determination to apply AFA lacked

substantial evidence and was otherwise contrary to law.  The basis of Commerce's finding – "that

the GOC has failed to cooperate by not acting to the best of its ability in responding to our requests

for information with respect to the EBCP" – ignores that Commerce disregarded record evidence

that would have allowed it to find non-use of the EBCP, as it did in the 2017 review involving JA

Solar's identical sales chain.  See Risen Energy, __ CIT at __, 570 F. Supp. 3d at 1373[2] (granting

Commerce's motion for voluntary remand to verify JA Solar's sole affiliated customer); Final

Results of Redetermination Pursuant to Court Remand at 7 (Oct. 7, 2022) (Public Version), Risen

Energy Co., Ltd. v. United States, Consol. Ct. No. 20-03912, ECF No. 94 ("2017 Remand

Redetermination")  (verifying non-use and removing the EBCP CVD rate for JA Solar).

　　　　Before applying AFA, Commerce must make two separate inquiries.  First, it must

determine if:

> (1) necessary information is not available on the record, or
> (2) an interested party or any other person—
> > (A) withholds information that has been requested by the administering
> > authority or the Commission under this subtitle,
> > (B) fails to provide such information by the deadlines for submission of
> > the information or in the form and manner requested . . .
> > (C) significantly impedes a proceeding under this subtitle, or
> > (D) provides such information but the information cannot be verified . . . .

19 U.S.C. § 1677e(a) (emphasis added).  If information is missing from the record, Commerce

may rely on "facts otherwise available."  Id.  Second, if and only if Commerce makes a finding of

noncooperation, then it may use an adverse inference in selecting from facts otherwise available

against that noncooperative party.  See id. at § 1677e(b).

　　　　As explained below, Commerce's use of AFA was unlawful because JA Solar provided

_____

[2] This CIT decision and all others cited herein are provided as well-reasoned persuasive authority.

extensive evidence of non-use leaving no gap in the record, Commerce's decision is inconsistent with recent court opinions, Commerce failed to support its determination with record evidence and Commerce could have conducted a verification but chose not to.

**A.  Commerce's Application of AFA Was Contrary to Law Because JA Solar Provided Extensive Evidence of Non-Use That Left No Information Gap**

Contrary to Commerce's Final Results, the GOC's lack of cooperation did not create a gap in the record warranting the application of AFA to the GOC to impute a benefit to JA Solar because JA Solar provided ample evidence establishing non-use of the program.  See Final IDM at Cmt. 1, p. 21 (P.R. 429).  It is well established that Commerce cannot ignore evidence that undermines its determination, and yet, Commerce did just that when it ignored evidence of non-use on the record, particularly a non-use certificate for JA Solar's sole U.S. importer.  See Diamond Sawblades Mfrs. Coal. v. United States, 986 F.3d 1351, 1361 (Fed. Cir. 2021); Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (establishing that Commerce cannot disregard all record information even when applying AFA).  Commerce imagines a gap in the record that does not exist.

Commerce claimed that the GOC is the best party to supply information regarding EBCP use and "claims of non-use by the respondent companies and even partial non-use certifications submitted by the respondents' U.S. customers are of dubious utility for purposes of verification and an ultimate determination."   See Final IDM at Cmt. 1, p. 21 (P.R. 429).  Despite its claim, Commerce did not contend with the myriad data that JA Solar provided to verify non-use.  First, JA Solar submitted a certified statement and declaration demonstrating that neither JA Solar USA, JA Solar's sole affiliated importer and reseller in the United States, nor any of its unaffiliated customers "received assistance under the {EBCP}."  Letter on Behalf of JA Solar to Dep't of Commerce re: Section III Response Part IV at Vol. I, p. 47-48 (June 29, 2021) (Confidential

Version) ("Section III Part IV") (C.R. 330-357).   Second, without request from Commerce, JA Solar provided numerous non-use certifications from JA Solar USA's downstream unaffiliated customers corroborating its claim, going beyond what was necessary to verify non-use.  Id. at Vol. I, Ex. 23 (Business Proprietary Document).   As recognized by Commerce in the remand proceeding of the 2017 administrative review appeal, the only certification necessary to verify non-use of the program is that of JA Solar's U.S. importer customer.   See 2017 Remand Redetermination at 7.   Although JA Solar submitted declarations from unaffiliated downstream customers of its first U.S. customer, JA Solar USA, it is now clear from the facts and law developed in the 2017 appeal that those downstream customer declarations are completely unnecessary since only the customer of the exporter is eligible to participate in the EBCP program and not downstream buyers.   For this reason, all that matters is that JA Solar's importer customer – JA Solar USA – did not use the program.   JA Solar USA's declaration is on the record here and JA Solar USA stands ready to verify its 2019 non-use claims as it did in the course of the 2017 remand proceeding.

Third, although Commerce claimed that the GOC did not cooperate, the GOC did respond to Commerce that "none of the respondents applied for, used, or benefited from, this alleged program during the POR."   See Letter on Behalf of GOC to Commerce re: GOC's Initial Questionnaire Response at 135-36 (June 22, 2021) (Public Version) ("GOC QR") (P.R. 192-204). All of these statements and facts were accompanied by signed certifications of accuracy by the submitter.   As explained in JA Solar's case brief, the GOC also provided additional information supporting its claim that respondents did not use the EBCP.   See Letter on Behalf of JA Solar to Commerce re: Case Brief at 54-55 (May 16, 2022) (Public Version) ("Admin. Case Br.") (P.R. 407).   Additionally, all of the information on the record demonstrating non-use was amplified by

the lack of contradictory evidence.  <u>See generally</u> Final IDM at Cmt. 1 (P.R. 429).  Commerce had

no basis to doubt the veracity of the extensive evidence of non-use and its decision to impute a

benefit was not supported by substantial evidence.

**B. Commerce's Decision to Apply AFA Is Inconsistent with Recent Decisions From This Court Requiring Commerce to Verify Non-Use**

The CIT has repeatedly condemned Commerce's refusal to verify non-use based on

information available on the record.  <u>See, e.g.,</u> <u>Risen Energy</u>, __ CIT at __, 570 F. Supp. 3d at

1373; <u>Both-Well Taizhou Steel Fittings v. United States</u>, __ CIT __, __, 557 F. Supp. 3d 1327,

1335 (2022).  Instead of attempting to verify non-use of the EBCP using information available on

the record, Commerce continued to insist that the GOC is in the best position to provide EBCP use

information.  The <u>Both-Well</u> court, facing a similar application of AFA by Commerce, put it

succinctly: "although Commerce explains why it wants the information it seeks, it fails to explain

why that information is necessary, i.e., why it is the only information that can verify the U.S.

customers' non-use certifications."  <u>Risen Energy</u>, __ CIT at __, 557 F. Supp. 3d at 1334.

Commerce brazenly acknowledged the "recent CIT decisions instructing Commerce to

attempt                        verification"                        and                        that                        have

"directed Commerce to consider whether any available information provided by respondents may

be sufficient to fill the gap of missing record information in considering claims of non-use for the

EBCP" but it continued to insist that it cannot do so here. Final IDM at Cmt. 1, 22 (P.R. 429).  In

large part, Commerce applies AFA to the GOC on the notion that JA Solar was not able to acquire

non-use certificates from every customer, thus it was unable to fill an information gap.  <u>See</u> <u>id.</u>

Commerce, however, has now changed course in the 2017 review and acknowledged that it can

verify JA Solar's non-use questionnaire response by verifying its sole U.S. importer customer, JA

Solar USA.  Commerce explained in its Remand Redetermination in the 2017 review that:

JA Solar provided complete information on behalf of JA Solar USA, Inc. (JA Solar USA), "the sole importer customer of {JA Solar} during the POR" . . . . {Commerce} thus, concluded that the "absence of any loans or financing during the POR of the only importer customer, JA Solar USA, definitely establishes that JA Solar did not use the EBCP because the EBCP benefits the importer customer in the form of a loan . . . ."

Given that JA Solar provided complete information on behalf of its sole importer/customer in response to the EBCP questionnaire, we then proceeded to verification of the customer's information. During verification, Commerce was able to corroborate JA Solar's claims that its sole importer/customer received no loans or other forms of financing during the POR and that it had no loans or other forms of financing outstanding during the POR . . . . Thus, while Commerce continues to maintain that the GOC's cooperation is necessary for a true understanding of the EBCP, the record on remand regarding usage of the EBCP does not contradict JA Solar's claimed non-use of the program. As a result, we find it appropriate to remove the EBCP subsidy rate from JA Solar's total ad valorem rate.

2017 Remand Redetermination at 6-7.

The facts are nearly identical here.  JA Solar exported subject merchandise "via their affiliated company in the United States, JA Solar USA, Inc., and resold subject merchandise to unaffiliated customers in the United States**.**"  Section III Part IV at Vol. I, p. 47 (C.R. 330-357).  Instead of verifying the sole U.S. customer – like it did in the 2017 review after remand – Commerce announced that the GOC was in a better position to furnish data, a claim unsupported by record evidence given that any use of the EBCP would be evident upon verification of the customer eligible for the program.  See Final IDM at Cmt. 1, 22 (P.R. 429).  The Court should not be misled by Commerce's claim that it did not have certifications from all customers. Only one customer mattered, JA Solar USA, which did submit a non-use certification.  See id. Other "customers" were unaffiliated downstream purchasers ineligible to participate in the EBCP. Commerce had all of the information it needed verify JA Solar's non-use of the EBCP.

It is arbitrary for Commerce to not treat JA Solar in the current review the same as it did in the remand verification proceeding in the 2017 review and the Court should remand for that

purpose.  <u>SKF USA</u>, 263 F.3d at 1382 (explaining that a decision is arbitrary when an agency treats a similar situation differently without providing sufficient reasoning); <u>see</u> <u>also</u> <u>RHP Bearings v. United States</u>, 288 F.3d 1334, 1347 (Fed. Cir. 2002) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently" (citation omitted). While a final opinion in the <u>Risen Energy</u> case is still pending, Commerce has already ceded its position regarding its refusal to even attempt to verify non-use with information available and the Court must remand to allow Commerce to bring the Final Results here in line with its current practice  <u>See</u> 2017 Remand Redetermination (finding that the "absence of any loans or financing during the POR of the only importer customer, JA Solar USA, definitely establishes that JA Solar did not use the EBCP"); <u>see also</u> <u>Guizhou Tyre Co. v. United States</u>, __ CIT __, __, 415 F. Supp. 3d 1335, 1344 (2019) ("The Department must use these tools to attempt to verify the non-use declarations <u>before</u> concluding that the evidence is unverifiable, and a gap exists in the record.").

## C. Commerce's Lengthy Explanation of the GOC's Lack of Cooperation Does Not Provide Substantial Evidence of Gap in the Record

This Court should also not be misled by Commerce's lengthy explanation of the GOC's alleged non-cooperation.  <u>See</u> Final IDM at Cmt.  1, p. 23-33 (P.R. 429).  As the Court has already pointed out, Commerce must address why the information on the record is not sufficient even if it prefers other information, such as more extensive documentation from the GOC.  <u>See</u> <u>Both-Well</u>, __ CIT at __, 557 F. Supp. 3d at 1334.  Commerce continued to wrongly focus on the GOC, but it refused to contend with all of the information that was available on the record.

As explained above, Commerce had myriad evidence that it could have relied on to verify non-use.  Additionally, Commerce's non-use findings in the second, third, fourth and sixth reviews show that Commerce has a history of eliminating the EBCP in solar cells order administrative reviews where there are declarations of non-use or customer verification and yet Commerce

inexplicably has decided that information it typically would rely on is no longer sufficient.  <u>See</u> <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the</u> <u>People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013</u>, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying Issues and Dec. Mem. at Cmt. 1 (second review); <u>Changzhou Trina Solar Energy Co. v. United States</u>, __ CIT __, __, 466 F. Supp. 3d 1287, 1291 (2020) (third review); <u>Canadian Solar, Inc. v. United States</u>, No. 18-00184, 2020 Ct. Intl. Trade LEXIS 157, at *6-8 (Oct. 19, 2020) (fourth review); 2017 Remand Redetermination at 7 (sixth review). Commerce is uninterested in analyzing information available on the record and instead imagined a gap that does not exist.  Its lengthy criticism of the GOC and history of the EBCP does not create record evidence supporting its determination to ignore JA Solar's extensive evidence of non-use of the EBCP.  <u>See</u> <u>Zhejiang Dunan</u>, 652 F.3d at 1348.

### D.  Commerce Could Have Conducted a Verification

Commerce could have also taken the myriad information it had available and attempted to verify the information.  Instead, it refused.  <u>See</u> <u>id.</u> at 23 (claiming it had no "path" to verify the information without more evidence from the GOP).  Commerce claimed that in some other cases it was able to go to great lengths and verify non-use where it had a non-use certificate for every last customer.  Its determination is, however, inconsistent with the opinions discussed above, in which the Court criticized Commerce for refusing to attempt verification on the unsupported conclusion that without more evidence from the GOC, verification was impossible.  <u>See</u> <u>Guizhou</u> <u>Tyre Co. v. United States</u>, __ CIT at __, 415 F. Supp. 3d 1335 (instructing Commerce to verify data before claiming its impossible); <u>Both-Well</u>, __ CIT at __, 557 F. Supp. 3d at 1337 (explaining that Commerce must attempt to verify).

Most notably, Commerce acknowledged in its appeal of the 2017 review that it could verify

non-use of JA Solar's U.S. importer and <u>did</u> verify non-use.  <u>See</u> 2017 Remand Redetermination at 7.  As explained above, <u>see</u> <u>supra</u> Section I.B., "{C}ommerce found the EBCP to be not used for one of the two respondents in this review, JA Solar, pursuant to our verification of the loan information provided by JA Solar.  {Commerce}, therefore, removed the EBCP rate from JA Solar's total subsidy rate calculation."  <u>See</u> 2017 Remand Redetermination at 7.  Commerce had a clear path to verify JA Solar's non-use of the EBCP, as it created a path in the 2017 review on nearly identical facts to the case at bar.

JA Solar provided Commerce with numerous options to complete verification in advance of the Final Results.  <u>See</u> Admin. Case Br. at 57-63 (Public Version) (P.R. 407).  Instead, Commerce elected to make no effort to verify information on the record despite being presented with only a single affiliated U.S. importer that it could have verified on-site.  Commerce's conclusion that a gap in the record allowed it to apply AFA is unsupported by record evidence and otherwise contrary to law because Commerce made no effort to verify that <u>necessary</u> information was missing or inaccurate.

**E.  Conclusion**

Commerce's EBCP determination was unsupported by substantial evidence and otherwise contrary to law because the overwhelming evidence on the record supported non-use of the EBCP, yet Commerce made no effort to verify the information.  Commerce did not provide sufficient reasoning for why the information was not usable and instead obfuscated the reality of the record by focusing on additional information it would have preferred to have received from the GOC.  No gap existed in the record regarding JA Solar's non-use of the EBCP.

II.   **COMMERCE'S USE OF THE 2010 CBRE REPORT IN THE LAND BENCHMARK WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW**

In its benchmark calculation for the land program, Commerce included the 2010 CBRE Report by averaging the 2010 CBRE Report and the MIDA Report.  See Final IDM at Cmt.  18, p. 70-71 (P.R. 429).  As explained below, Commerce's inclusion of the 2010 CBRE Report was unsupported by substantial evidence and not in accordance with law because (1) the 2010 CBRE Report contains vastly outdated land prices that do not reflect the 2019 POR and (2) the 2010 CBRE Report was selected based on Commerce's flawed and stale analysis of the economic comparability of China and Thailand.

A.   **The 2010 CBRE Report is Grossly Outdated**

Commerce's continued reliance on the grossly outdated 2010 CBRE Report was not supported by substantial evidence and not in accordance with law because it contradicts Commerce's preference for using contemporaneous benchmark data, as affirmed by the Court.

Commerce has an established practice of excluding non-contemporaneous data in benchmark calculations when contemporaneous data are available on the record.  See, e.g., Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020), and accompanying Issues and Dec. Mem. at Cmt.  7, pp. 41-42 ("Wood Flooring 2017 CVD"); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2016, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019), and accompanying Dec. Mem. at Cmt.  7, p. 62 ("Solar Cells 2016 CVD"); see also Granular Polytetrafluoroethylene Resin From India: Preliminary Affirmative

Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination, 86 Fed. Reg. 35,479 (Dep't of Commerce July 6, 2021), and accompanying Dec. Mem. at 30 (rejecting the non-contemporaneous natural gas benchmark source).  In the 2017 CVD review of Wood Flooring from China, Commerce used the contemporaneous 2017 Descartes data for the ocean freight benchmark and rejected the 2015 Maersk data indexed to the POR.  Wood Flooring 2017 CVD at Cmt.  7, pp. 41-42.  Commerce stated that: "{i}t is Commerce's practice not to use non-contemporaneous data when contemporaneous data for benchmarking purposes are otherwise available."  Id. (emphasis added).  Commerce reasoned further that when usable, contemporaneous benchmark data exist on the record, there is no reason to rely on non-contemporaneous data.  See id.  Similarly, for the ocean freight benchmark calculation in the 2016 CVD review of Solar Cells from China, Commerce refused to use the non-contemporaneous benchmark for part of the POR, preferring instead the contemporaneous benchmark source covering the same period.   Solar Cells 2016 CVD at Cmt.  7, pp. 61-62.  As Commerce itself explained: "Commerce views contemporaneity as an important factor when determining whether a data point is comparable for purposes of the LTAR benchmark, since contemporaneous data are more likely to reflect the same prevailing market conditions."  Final Results of Redetermination Pursuant to Court Remand at 8 (Feb. 13, 2015) (Public Document), Toscelik Profil ve Sac Endustrisi A.S. v. United States, Ct. No. 13-00371, ECF No. 60.

This Court has also sustained Commerce's practice of excluding non-contemporaneous data and using contemporaneous data only.  See Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 255 F. Supp. 3d 1312, 1323 (2017).  Specifically, this Court in Changzhou Trina sustained Commerce's decision to use only the contemporaneous data provided by the

respondent for the ocean freight benchmark and to reject Petitioner's request to include the non-contemporaneous data.  Id.  The Court reasoned that even though Commerce has used price inflators to adjust data to be contemporaneous with the POR in past proceedings, Commerce only does so when there is no contemporaneous data available on the record.  Id.  As explained below, the Court's reasoning is persuasive because the facts here are similar – Commerce should have excluded the outdated 2010 CBRE Report and used the contemporaneous MIDA Report only.

In this case, Commerce acknowledged that the MIDA Report containing contemporaneous Malaysian prices is an accurate land benchmark source.  Final IDM at Cmt.  17, p. 70 (P.R. 429).  Even with this contemporaneous benchmark, Commerce still included the non-contemporaneous 2010 CBRE Report by averaging the two sources and claimed that the use of two sources is "more robust."  Id. at p. 71.  More data points do not equal robustness, however, when such data are flawed.  Commerce failed to explain how the inclusion of the grossly outdated 2010 CBRE Report makes the overall land benchmark "more robust," when Commerce itself and the Court have consistently decided against including non-contemporaneous data when contemporaneous data is on the record.  See Wood Flooring 2017 CVD; Solar Cells 2016 CVD; see also Changzhou Trina, __ CIT at __, 255 F. Supp. 3d at 1323.  Without a reasonable explanation for the deviation from its practice of selecting contemporaneous benchmarks, Commerce's inclusion of the outdated 2010 CBRE Report must be overturned by this Court as arbitrary.  See SKF USA, 263 F.3d at 1382 ("{I}t is well-established that 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'").

In addition to Commerce's established practice of favoring contemporaneous data, the Court has remanded Commerce's use of the same exact report in the 2017 review of the same case, appealed by the same respondent.  See Risen Energy, __ CIT at __, 570 F. Supp. 3d at 1375-76.

The Court's rationale is directly applicable to this case and highly persuasive because the Court's concern with the staleness of same report and with Commerce's lack of analysis remains the same in this review.  See id.  The Court concluded that "Plaintiffs properly note that the 2010 CBRE Report is stale compared to more contemporaneous benchmark data and becomes staler with each successive administrative review."  Id. at 1375.  The Court further reasoned that "since the 2010 CBRE Report was released, it appears that Thailand and China have diverged in terms of comparable national income levels and population density."  Id.  Commerce has not adequately explained how long it can continue to rely on 2010 CBRE Report while the gap between Thailand and China's comparability metrics widen each successive year."  Id. at 1375-76.  In the current review, Commerce similarly failed to explain why it continued to rely on the 2010 CBRE Report when the POR is 2019, making the report nine years out of date.  Just as the Court noted, the 2010 CBRE Report in this review is even "staler" compared to the 2017 review.  See Id.  The Risen Energy Court's concern with the stale 2010 CBRE Report, therefore, is not only directly applicable to the current case, but also more apposite, with the current POR being two years further out.  In addition, the current review partly used MIDA Report as a contemporaneous source when the underlying 2017 review in Risen Energy did not include any contemporaneous benchmark source. The existence of the contemporaneous MIDA Report, therefore, presents a stronger factual scenario for the Court to remand to Commerce to exclude the outdated 2010 CBRE Report.

In sum, Commerce arbitrarily included the 2010 CBRE Report here contrary to its established practice of excluding non-contemporaneous data when contemporaneous data are available on the record without a reasoned explanation.  See SKF USA, 263 F.3d at 1382.  The Court, therefore, must remand this issue to Commerce to exclude the grossly outdated 2010 CBRE Report.

**B. Commerce's Comparability Analysis in Selecting Thailand as the Benchmark Country Was Unsupported by Substantial Evidence**

Not only are the data in the 2010 CBRE Report nine years removed from the POR, but Commerce's supposed "support" for selecting Thailand as the benchmark country was even older, further rendering Commerce's use of Thai land benchmark data unsupported by substantial evidence. As explained below, Commerce unreasonably relied on data that were almost twenty years old in some instances and that provided no insight into the per capita income, regional population density and economic development of Thailand and China during the 2019 POR.

Under the tier-three benchmark analysis for the land program, Commerce cited to the 2018 Land-Use Rights Memorandum and stated that it considered the "geographic location, per capita income, regional population density, and economic development" of Thailand in selecting the 2010 CBRE Report. Final IDM at Cmt. 17, p. 70 (P.R. 429) (citing Mem. from Lingjun Wang to the File re: Land-Use Rights Analysis at Attach. I, p. 30 (Apr. 28, 2021) ("2018 Land-Use Rights Mem.") (P.R. 104)). In concluding that Thailand and China are economically comparable, Commerce relied on the 2018 Land-Use Rights Memorandum, which did not provide updated data but rather merely referenced the 2007 LWS from China decision. See Final IDM at Cmt. 17, p. 71 (P.R. 429); 2018 Land-Use Rights Mem. at 30 (citing Laminated Woven Sacks From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination, 72 Fed. Reg. 67,893 (Dec. 3, 2007) ("LWS from China")) (P.R. 104). The underlying data referenced in the 2007 LWS from China decision were in fact even older than 2007. Some data were from 2000, making them almost twenty years out of date compared to the current POR and failing to establish that Thailand and China were still economically comparable in 2019.

Specifically, Commerce claimed that "Thailand and China have had similar levels of economic development, population density (141 and 127 persons per square kilometer), and regional per capita income levels." Final IDM at Cmt. 17, p. 71 (P.R. 429) (citing 2018 Land-Use Rights Mem. at 30 (P.R. 104)). The population density data referenced in the 2018 Land-use Rights Memorandum were originally from the 2007 LWS from China decision, which further referenced 2000 and 2004 data. See LWS from China, 72 Fed. Reg. at 67909. Similarly, the per capita income data referenced in the 2018 Land-Use Rights Memorandum were from the same 2007 LWS from China decision, which further referenced 2006 data. See id. The economic comparability data cited by Commerce to compare Thailand and China, therefore, are actually from 2000, 2004 and 2006, while the current POR is 2019. In contrast, Commerce relied on the up-to-date 2019 per capita national income figures for both Malaysia and China in selecting the MIDA Report containing Malaysian prices. See Prelim. Dec. Mem. at 22-23 (P.R. 353).

Further, gross national income ("GNI") data from 2019 stand in direct contrast to the stale economic comparability data from the early 2000s that Commerce relied on and suggest that Thailand was not economically comparable to China during the POR. Specifically, in the parallel antidumping ("AD") reviews of the same case, Commerce determined that Thailand is not comparable to China during the POR in terms of national income level. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2018-2019, 86 Fed. Reg. 21,277 (Dep't of Commerce Apr. 22, 2021), and accompanying Dec. Mem. at 17; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review,

Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2019–2020, 86 Fed. Reg. 72,923 (Dep't of Commerce Dec. 23, 2021), and accompanying Dec. Mem. at 17; see also Letter on Behalf of Risen Energy Co., Ltd. to Commerce re: Benchmark Submission at Ex. 10 (Nov. 17, 2021), Mem. from Carole Showers to James Maeder re: List of Surrogate Countries for Antidumping Investigations and Reviews from the People's Republic of China ("China") (Aug. 25, 2020) (Public Version) ("Risen Benchmark") (P.R. 304) (The surrogate country list for China in 2019 includes Malaysia but not Thailand). Commerce's own parallel determinations in the AD reviews covering the entire POR here cannot be ignored.  The Court in Risen Energy explained that Commerce's surrogate country decision in a separate AD proceeding was a relevant reference for Commerce's economical comparability decision in the CVD proceeding, especially with regard to GNI levels.  Risen Energy, __ CIT at __, 570 F. Supp. at 1375.  The absence of Thailand on the surrogate country list covering the POR, therefore, further establishes that Commerce's reliance on the Thai Report was unsupported by substantial evidence.

In addition, in claiming that the geographic proximity of Thailand and China make them comparable targets for foreign investment, Commerce relied on extremely outdated data similarly buried in citations within citations in the Final Results.  See Final IDM at Cmt. 17, p. 71 (P.R. 429) (citing 2018 Land-Use Rights Memorandum at 30 (P.R. 104) that in turns cites LWS from China).  Commerce similarly only cited to the 2018 Land-use Rights Memorandum in the Final Results and conclusively stated that "China and Thailand have also in the past competed for the same foreign direct investment opportunities."  Id.  The 2018 Land-use Rights Memorandum again referenced the 2017 LWS from China decision in concluding that "Thailand and China competed as production and export platform for foreign direct investment."  2018 Land-use Rights Mem. at

30 (P.R. 104).   The LWS from China decision in turn cited to the Japan External Trade Organization (JETRO) reports which were published in 2005 and 2006.  See LWS from China, 72 Fed. Reg. at 67909.  The only reasonable conclusion was for Commerce to determine that this extremely old data were irrelevant to assessing the comparable level of investment opportunities in China and Thailand in 2019 and to reject the Thai CBRE report accordingly.

Moreover, Commerce's hands were not tied; it had other good data from Malaysia.  In particular, Commerce had data supporting economic comparability of Malaysia to China, supporting its use as the sole land benchmark.  In selecting the MIDA Report that contain Malaysian prices, Commerce relied on the "2019 per capita GNI figures for both Malaysia and China" and "articles published by Boston Consulting Group which contain comparisons of the economic competitiveness and production costs {of China and Malaysia}."  Prelim. Dec. Mem. at 22-23 (P.R. 353) (citing Risen Benchmark at Ex. 10 (Public Version) (P.R. 304)).  Commerce's selection of the MIDA Report, therefore, was supported by substantial evidence and in fact was the only reasonable choice because it properly relied on the 2019 national income data and updated economic competitiveness between China and Malaysia.

In sum, Commerce lacked factual support in selecting Thailand as the tier-three benchmark country because the underlying data supporting its comparability analysis are from 2000 to 2006, while the POR is 2019.  Commerce's decision to treat Thailand as a comparable to China based on the extremely outdated data and analysis in LWS from China, therefore, was unsupported by substantial evidence and not in accordance with law.

## III.  COMMERCE'S REFUSAL TO REVISE BENEFIT CALCULATIONS FROM THE 2017 REVIEW WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS NOT OTHERWISE IN ACCORDANCE WITH LAW

Commerce acted unreasonably in continuing benefit streams in this proceeding that are

NONCONFIDENTIAL DOCUMENT
CONFIDENTIAL INFORMATION REMOVED

patently erroneous and result in the unjust overcollection of duties. Commerce asserted that "we have not made such changes because those benefit streams have already been established and duties have been put in place based on those streams." Final IDM at Cmt. 18, p. 73 (P.R. 429). Commerce's refusal to expense the benefits of the 2017 leases, however, was unsupported by substantial evidence and not in accordance with law because the land lease program is recurring. Moreover, Commerce's refusal to revise the benchmark used for the land purchases from the 2017 review was unsupported by substantial evidence and not in accordance with law because the benchmark from the 2017 review was revised by Commerce on remand in the Risen Energy appeal.

### A. Commerce Failed to Expense the Benefits from the 2017 Leases Even Though This Is a Recurring Program

Commerce contradicted its own regulation governing recurring benefits when it refused to expense the benefits of the 2017 leases to year 2017. Id. (agreeing with JA Solar that benefits from leases should be treated as recurring benefits). 19 C.F.R. § 351.524(a) states that "{Commerce} will allocate (expense) a recurring benefit to the year in which the benefit is received." Commerce properly recognized the recurring nature of land leases when it expensed the 2018 and 2019 lease payments in their respective years, but then arbitrarily treated the 2017 leases differently. Mem. from Robert Copyak to the File re: JA Solar's Amended Final Calculations at Attach. II, [ ▇▇▇▇▇▇▇▇▇ ] Tab (Aug. 8, 2022) (Business Proprietary Document) ("Am. Calcs.") (C.R. 573). Here, the land leases, signed by [ ▇▇▇▇▇▇ ] on [ ▇▇▇▇ ], cover year 2017 and the lease payments also occurred in 2017. See id. Commerce was obligated to expense the benefits from these 2017 leases to 2017 pursuant to 19 C.F.R. § 351.524(a), instead of allocating the benefits over multiple years as Commerce did in the Final Results. Here, Commerce acted contrary to law by following its erroneous decision in the 2017 review to treat the 2017 leases as non-recurring and allocating the benefits allocated to the current

2019 POR.  See id. at [ ███████████████ ] Tab and [ ███████████████ ] Tab.

Contrary to Commerce's claimed reliance on the benefit streams from the prior review, Commerce is not bound by its decision in the prior 2017 review because each administrative review is a distinct and separate proceeding.  See Shandong Huarong Mach. Co. v. United States, 29 CIT 484, 491 (2005) ("{E}ach administrative review is a separate segment of proceedings with its own unique facts."); see also Changzhou Trina Solar Energy Co., Ltd. v. United States, __ CIT __, __, 161 F. Supp. 3d 1343, 1348 (2016) ("{E}ach CVD proceeding is based on its own unique record of factual evidence and arguments presented to the agency").  Commerce concluded in the Final Results that the "benefit streams have already been established" in refusing to revise the benefit calculations of the 2017 leases.  Final IDM at Cmt. 18, p. 73 (P.R. 429).  Commerce, however, wrongly treated these 2017 leases as non-recurring in the 2017 review and incorrectly generated the benefit stream.  See Am. Calcs. at Attach. II, [ ███████████████ ] Tab (Business Proprietary Document) (C.R. 573).  As discussed above, Commerce corrected its analysis of land leases in this review and determined that benefits from leases are recurring.  Compare Final IDM at Cmt. 18, p. 73 (P.R. 429) with Solar Cells 2017 CVD at Cmt. 8.  Commerce cannot rely on the "benefit streams" from the 2017 review when the treatment of the 2017 leases was erroneous in that review and no benefit stream should have been established in the first place.  In short, Commerce is not bound by its erroneous decision in a prior review.  Commerce's refusal to treat the 2017 leases as recurring in the same manner with the other leases reported in the current review was, thus, unsupported by substantial evidence and not in accordance with law.

In addition, Commerce's concern with preserving the benefit stream is imagined because, in fact, no benefit would have been left unaccounted for had Commerce used the correct lease benchmark, as it did in the current review for the 2019 leases.  Not only did Commerce correct its

treatment of leases from non-recurring program to recurring program in this review, but Commerce also used a different benchmark for leases.  Final IDM at Cmt. 18, p. 73 ("We have calculated the recurring benefits from JA Solar's leases using CBRE's "Asia Marketview" industrial lease rates for factories in Bangkok, also consistent with our practice") (emphasis added) (P.R. 429).   In contrast, Commerce wrongly used the land purchase price, intended to measure benefits for land purchases, as benchmark for the 2017 leases in the 2017 review.  See Am. Calcs. at Attach. II, [ ███████████████ ] Tab (Business Proprietary Document) (showing that commerce applied the benchmark for land purchases as the benchmark for the 2017 leases) (C.R. 573).  The below chart shows that the benefit would have been zero if Commerce had correctly used the lease benchmark in 2017 for the 2017 leases:

| Company | S/N | Type | LUR Cert. | Area of land (m²) | Price paid during the POR (RMB) | Value (RMB/Year) | Duration | Benchmark Price RMB/Sq.M | Benchmark Price | Benefit |
|---|---|---|---|---|---|---|---|---|---|---|
| [██ | █ | ██ | ██ | ██ | ██ | ██ | ███ | | | |
| ██ | █ | ██ | ██ | ██ | ██ | ██ | ███ | | ██ | ██ |
| ██ | █ | ██ | ██ | ██ | ██ | ██ | ███ | ██ | ▪ | ██ |
| ██ | █ | ██ | ██ | ██ | ██ | ██ | ███ | | | |
| ██ | █ | ██ | ██ | ██ | ██ | ██ | ███ | | ██ | ██ |
| | | | | | | | | ██ | ██ | ████ ] |

See id. at "2019 Thailand Lease BM" Tab and [ ███████████ ] Tab.  In fact, as the [ ███████████ ] in the benefit column above shows, JA Solar actually [ ███████████ ███████████████████████████████████ ].

Expensing the benefits of the 2017 leases to year 2017, therefore, does not leave benefit unaccounted for because no benefit should have existed in the first place.  On the contrary, Commerce's erroneous use of benchmark for the 2017 leases has caused an overcollection of duties since the 2017 review.

In conclusion, Commerce's decision not to expense the benefits of the 2017 leases was unsupported by substantial evidence and not in accordance with law because the regulation demands that recurring benefits be expensed to the year of benefit receipt.  Commerce's reliance on the established benefit streams from the prior review in not expensing the 2017 leases was also unreasonable because each review is a separate segment and Commerce's decision in the prior review was erroneous.

**B. Commerce Failed to Revise the Benchmark for the Land Purchases Reported in the 2017 Review**

In addition to failing to expense the benefits of the 2017 leases to 2017, Commerce also failed to revise the land purchase benchmark for the land purchases reported in the 2017 review. See Am. Calcs. at Attach. II, [ ███████████ ] Tab (Business Proprietary Document) (C.R. 573) (reusing the benefit allocations of the land purchases from the 2017 review in the current review).  The 2017 benefit included in JA Solar's CVD rate here as allocated to 2019 was calculated without the MIDA report in the benchmark, which has now been used in the benchmark in both the 2017 review remand proceeding and the current review for 2019 benefits.  In light of the Court's remand of the 2010 CBRE Report in the 2017 review, the Court must remand the use of the same report for the same benefit streams to achieve consistent benefit allocations covering

different PORs.

As discussed in Section II, the Court in <u>Risen Energy</u>, 570 F. Supp. 3d at 1376 remanded Commerce's use of the outdated 2010 CBRE Report to measure the benefits of the land purchases reported in the 2017 review.  On remand in that appeal, Commerce averaged the 2010 CBRE Report and the MIDA Report as it did in the Final Results in this review.  <u>See</u> 2017 Remand Redetermination at 11.  Although that remand proceeding occurred after the Final Results on appeal here, Commerce has an obligation within the context of this appeal to revise its Final Results to be consistent with its directly applicable decisions in other cases.  <u>See</u> <u>SKF USA, Inc.</u> <u>v. United States</u>, 254 F.3d 1022, 1028 (Fed. Cir. 2001) ("A remand is generally required if the intervening event may affect the validity of the agency action.") (citation omitted); <u>see also</u> <u>Husteel</u> <u>Co. v. United States</u>, __ CIT __, __, 517 F. Supp. 3d 1342, 1347 (2021) (remanding Commerce's remand results when an intervening court opinion with analogous facts and discussions was issued after Commerce's remand results).  Even though parties in the <u>Risen</u> appeal continue to disagree on Commerce's use of the 2010 CBRE Report, Commerce revised the 2017 benchmark after the Court's finding that its original determination was unsupported by substantial evidence.  <u>Id.</u> Because the benefit stream from the land program, a non-recurring program, continues through the life of the land purchase agreement, here fifty years, JA Solar realized a benefit in this review from its 2017 purchases of land.  If the Court does not remand the benchmark use of the same land purchases as it did in the 2017 review, JA Solar's allocated benefit in 2019 from these benefit streams will be based on an unlawful benchmark.  JA Solar's position has remained the same in both the 2017 review and in this review – the MIDA Report is the only lawful land benchmark.

Commerce's regulation governing non-recurring benefits demands a consistent benefit allocation over time.  <u>See</u> 19 C.F.R. §351.524(d).  Commerce is required under this regulation to

"allocate{} a non-recurring benefit over {its average use life} and determin{e} the annual benefit amount that should be assigned to a particular year." Id. §351.524(d). As the Court recognized, the allocation of a non-recurring benefit will cover successive administrative reviews. See Toscelik Profil ve Sac Endustrisi A.S. v. United States, 38 CIT 1534, 1539 (2014) (citing Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1363 (Fed. Cir. 2006)) ("Amortization of a non-recurring subsidy is not inconsistent with preserving the integrity of separate PORs; it simply reflects that a non-recurring subsidy received in one POR may provide a 'benefit' in other PORs."). The Toscelik Court then cited to Commerce's regulations and concluded that the benefit allocation, once established, is not subject to recalculation unless clear error or manifest injustice is shown. See id. at 1539-40. The clear error in this case was Commerce's use of the 2010 CBRE Report in the 2017 review, as remanded by Risen Energy. The Court, therefore, must also remand the use of the 2010 CBRE Report in this review to achieve consistent benefit streams covering different PORs.

In short, Commerce's refusal to revise old benefit allocations ran afoul of Commerce's regulation on non-recurring benefits, rendering Commerce's decision unsupported by substantial evidence and not in accordance with law. Court should remand the calculations for the benefit allocations from the 2017 review in a consistent manner with its ruling in Risen Energy for the same land purchases. Finally, for the reasons set forth in Section II, Commerce on remand should exclude the 2010 CBRE Report and use the MIDA Report only for the 2017 review benefit streams.

## IV.    The Tax Exemption Program is Not Countervailable Under Section 19 of U.S. Code

Commerce's treatment of the Article 26(2) Tax Exemption program as a countervailable subsidy was unsupported by substantial evidence and not in accordance with law. See Final IDM

at Cmt. 20, p. 75, 77 (P.R. 429). To assess countervailing duties, Commerce is statutorily required to show that a subsidy from a government: "1) provides a financial contribution, 2) a benefit is thereby conferred, and 3) the subsidy is specific." Bethlehem Steel Corp. v. United States, 26 CIT 1003, 1009 (2002) (citing 19 U.S.C. § 1677(5)(A)-(B)). As explained below, the program 1) was not de jure specific and 2) did not confer a financial contribution or benefit.

## A. The Tax Exemption Program is Not Countervailable Because it is Not De Jure Specific

Commerce's tax exemption determination began with a fundamental mistake: it found that the Article 26(2) Tax Exemption was specific under 19 U.S.C. § 1677(5A)(D)(i). See Final IDM at Cmt. 20, p. 77 (P.R. 429). To find that a domestic subsidy program is de jure specific, Commerce must determine that the "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i) (emphasis added). As fully explained below, Commerce's determination is contrary to the plain language of the statute, as all evidence on the record regarding the tax exemption program establishes that it is broadly available throughout China regardless of enterprise type, industrial sector or geographical location and it uses objective criteria resulting in automatic eligibility for participants. See Final IDM at Cmt. 20, p. 77 (P.R. 429) (identifying no particular type of enterprise or industry). The Court has already found that uneven application of a subsidy does not make it specific to an "enterprise or industry." See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States, __ CIT __, __, 523 F. Supp. 3d 1393, 1403 (2021) (holding that Commerce's interpretation of 19 U.S.C. § 1677(5A) was impermissible because an agricultural subsidy law's particular "failure to provide uniform treatment in the distribution of subsidies is not equivalent to its explicit restriction of those benefits to a specific enterprise or industry"); AK Steel Corp. v. United States, 192 F.3d 1367, 1371-76

(Fed. Cir. 1999) (per curiam) (interpreting the slightly different 1986 version of the statute and holding that without evidence that a subsidy is targeted at an industry, Commerce cannot find the subsidy specific on circumstantial grounds).

To test the legality of Commerce's interpretation of statute, the Court determines (1) whether the statute is ambiguous and Congress' intent can be ascertained.  If it can, the Court gives full effect of the "unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843; see also Dalian Meisen Woodworking Co v. United States, __ CIT __, __, 571 F. Supp. 3d 1364, 1375-76 (2021) (providing that the Chevron framework "governs judicial review of Commerce's interpretation of the antidumping statute").  Otherwise, the Court moves on to (2) determine whether the agency's interpretation of the statute is permissible.  See Chevron, 467 U.S. at 843-44.  The Court will only uphold agency interpretations that are reasonable. See id. at 844.

Here, the statute is clear and Congress's intent can be ascertained. "Enterprise or industry" does not carry the meaning that Commerce gave it in the Final Results.  Commerce defined the allegedly specific enterprise as "enterprises with investment gains derived from direct investment in another resident enterprise, excluding investment gains obtained for holding listed and circulating shares issued by a resident enterprise for less than 12 months consecutively."  Final IDM at Cmt.  20, p. 77 (P.R. 429).  The finding is not consistent with the statute or previous findings by the court.  See Asociación de Exportadores, __ CIT at __, 523 F. Supp. 3d at 1403; AK Steel, 192 F.3d at 1371. Commerce's interpretation of "enterprise or industry" is unlawful because it was contrary to the clear meaning of the statute and its determination identifying a type of enterprise was unsupported by record evidence.

Applying Chevron step one, 19 U.S.C. § 1677(5A)(D)(i) is not ambiguous.  See Asociación de Exportadores, __ CIT at __, 523 F. Supp. 3d at 1403 ("There is no ambiguity in this reading.").

33

This Court should begin by looking at the statute's text to "employ{} the 'traditional tools of statutory construction.'" Id. (quoting Chevron, 467 U.S. at 843 n.9).   The Asociación de Exportadores Court dealt with the statute's text squarely:

> Section 1677(5A) provides that '{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to subsidy to an enterprise or industry, the subsidy is specific as a matter of law.' The dictionary definition of the adjective 'express' is 'directly, firmly, and explicitly stated.' Express, Merriam-Webster, https://www.merriam-webster.com/dictionary/express (last visited June 8, 2021). The dictionary definition of the adjective 'limit' is 'to assign certain limits to' or 'to restrict the bounds or limits of,' while the noun is defined as 'something that bounds, restrains, or confines.' Limit, Merriam-Webster, https://www.merriam-webster.com/dictionary/limit (last visited June 8, 2021). Thus, the plain meaning of the statute is that a subsidy is de jure specific when the authority providing the subsidy, or its operating legislation, directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry. There is no ambiguity in this reading.

Asociación de Exportadores, __ CIT at __, 523 F. Supp. 3d at 1403 (emphasis added).   The Asociación de Exportadores involved the accusation of an agricultural subsidy covered by 19 U.S.C. § 1677-2, but under that section of the statute, Commerce must still make a 19 U.S.C. § 1677(5A)(D)(i) specificity determination and, thus, the Asociación de Exportadores decision is illuminating and provides persuasive authority.

Commerce's determination falls apart upon a close reading of the statute.   Again, Commerce claims that the tax exemption is specific on the grounds that the "enterprise" in question is "enterprises with investment gains derived from direct investment in another resident enterprise, excluding investment gains obtained for holding listed and circulating shares issued by a resident enterprise for less than 12 months consecutively."   Final IDM at Cmt.   20, p. 77.   That determination plainly violates the statute because its contrary to the requirement that a subsidy can only be countervailed if it "directly, firmly, or explicitly assigns limits to or restricts the bounds of a particular subsidy to a given enterprise or industry."   Asociación de Exportadores, __ CIT at __,

523 F. Supp. 3d at 1403 (explaining 19 U.S.C. § 1677(5A)(D)(i)).  "Enterprises with investment

gains" cannot reasonably be viewed as a type of enterprise or industry especially when the record

here establishes that the program is broadly available across industries.  The GOC set forth that

the criterion for this program is automatic for any company that has "gains derived by a resident

enterprise through direct investment in another resident enterprise" and is "applicable to all legal

person enterprises within China without any bias as to enterprise type, industrial sector, or

geographical location."  Letter on Behalf of the GOC to Dep't of Commerce re: GOC's Post

Preliminary Supplemental Questionnaire Response at 15-16 (Feb. 14, 2022) (Public Document)

(P.R. 372); Letter on Behalf of JA Solar to Dep't Commerce re: Post Preliminary Supplemental

Questionnaire Response at Ex. PRSQ-1 (Apr. 25, 2022) (Public Version) ("Post-Prelim. SQR")

(P.R. 393).  The record reflects that the Article 26(2) Tax Exemption Program is not specific to an

enterprise type, industry sector or even geographic location.

Commerce's interpretation of the statute and its ultimate determination are impermissible

under its well-established and well-grounded statutory obligation to only countervail specific

subsidies.  Both the AK Steel, 192 F.3d at 1371 and Gov't of Québec v. United States, __ CIT __,

__, 567 F. Supp. 3d 1273, 1278 (2022) decisions make plain that Commerce must explicitly

identify a particular enterprise or industry—something it does not do here.

In AK Steel, the U.S. Court of Appeals for the Federal Circuit held that Commerce's de

jure specificity finding regarding "aggressive targeting" of certain steel companies for long-term

loans was unsupported by the record because there was no evidence supporting even a causal nexus

between the alleged "program and the benefit."  192 F.3d at 1371-1373 (holding certain de facto

determinations lawful also).  Likewise, in Gov't of Québec, the CIT upheld Commerce's

35

determination finding a program to be <u>de facto</u> specific,[3] however it explained in dicta regarding

<u>de jure</u> specificity that {"t}o <u>avoid</u> a designation of <u>de jure</u> specificity, the administering authority

must ensure that access to the subsidy is governed by <u>objective industry- or enterprise-neutral</u>

<u>criteria resulting in automatic eligibility</u>." 567 F. Supp. 3d at 1278 (emphasis added) (explaining

also that "that the criteria for eligibility are both strictly followed and clearly set forth in the

relevant official materials so as to be verifiable").  In other words, a finding of de facto specificity

requires that a particular enterprise or industry be identifiable, and that eligibility must not be

automatic.

Turning back to the case at bar, Commerce did not explicitly identify any specific

enterprise when it announced that the alleged subsidy was specific on the basis that it benefited

"enterprises with investment gains derived from direct investment in another resident enterprise,

excluding investment gains obtained for holding listed and circulating shares issued by a resident

enterprise for less than 12 months consecutively."  Final IDM at Cmt.  20, p. 77 (P.R. 429).

Commerce's determination violates the requirement explained by the <u>Gov't of Québec</u>, as

Commerce's determination provides no identifiable enterprise (or industry), a mistake

compounded by the fact that the Article 26(2) Tax Exemption program has automatic eligibility.

<u>See</u> 567 F. Supp. 3d at 1278.  <u>See</u> Letter on Behalf of the GOC to Dep't of Commerce re: GOC's

Post Preliminary Supplemental Questionnaire Response at 15-16 (Feb. 14, 2022) (Public

Document) (P.R. 372); Post-Prelim. SQR at Ex. PRSQ-1 (Public Version) (P.R. 393).

Commerce's misunderstanding of the word "enterprise" is no different than Commerce's

---

[3] The statute provides that a subsidy program lacking jure specificity may be countervailable if it
is de facto specific.  <u>See</u> 19 U.S.C. § 1677(5A)(D); <u>compare</u> 19 U.S.C. § 1677(5A)(D)(i) <u>with</u> 19
U.S.C. § 1677(5A)(D)(iii).  <u>See also</u> <u>Gov't of Québec</u>, 567 F. Supp. 3d at 1278 (explaining the
statute).

impermissible notion of "aggressive targeting" in <u>AK Steel.</u> 192 F.3d at 1371-1373.  Commerce did not identify a specific enterprise and as in <u>AK Steel</u>, its determination should be remanded. <u>See</u> <u>id.</u>

Commerce's violation of the plain language is also reinforced by the purpose of the specificity test, which is to ensure "that subsidies that are distributed very widely throughout an economy are not countervailed." <u>Countervailing Duties; Final Rule</u>, 63 Fed. Reg. 65,348, 65,357 (Nov. 25, 1998).  The plain language of the statute stands on its own, but when combined with an appreciation for the purpose of the statute, it is evident that Commerce's decision not to identify a specific enterprise or industry left its CVD determination unsupported by substantial evidence and otherwise contrary to law.

Even if, <u>arguendo</u>, the court finds the statute's language ambiguous, there can be no doubt that Commerce's interpretation of the statute is not reasonable because Commerce's definition of the enterprise has no limits as commonly understood and as required by statute.  <u>See</u> 19 U.S.C. § 1677(5A)(D)(i).  As previously explained, the "definition of the adjective 'limit' is 'to assign certain limits to' or 'to restrict the bounds or limits of,' while the noun is defined as 'something that bounds, restrains, or confines.'  <u>Limit, Merriam-Webster</u>, https://www.merriam-webster.com/dictionary/limit (last visited June 8, 2021). Additionally, the definition of the word enterprise relevant here is "a unit of economic organization or activity," "<u>especially</u> : a business organization.  "    <u>Enterprise,    Merriam-Webster</u>,    https://www.merriam-webster.com/dictionary/enterprise (last visited Jan. 22, 2023).  Commerce's finding of specificity is boundless because its use of the word enterprise has practically no limits; a business organization with investment gains derived from another resident enterprise could be found in any industry, from a solar panel manufacturer to a restaurant business, and as explained above, there is no

eligibility requirement. Commerce's interpretation is unreasonable because it is not grounded in fact and Commerce's path of its decision making is not discernible. See NMB Singapore Ltd., 557 F.3d at 1319.

The Article 26(2) Tax Exemption program is not countervailable because it is not specific, and Commerce's specificity finding was impermissible because it was unsupported by substantial evidence and otherwise contrary to law.

### B. The Tax Exemption Programing Did Not Confer a Financial Contribution Or Benefit

Commerce also acted contrary to law in finding the Article 26(2) Tax Exemption program countervailable because record evidence established that the program does not provide a financial contribution nor confer a benefit to a respondent. The basis for Commerce's determination appears to be that "respondents reported investment income and received benefits under this program by claiming an exemption for their investment gains on their tax return." Final IDM at Cmt. 20, p. 77-78 (P.R. 429). Its determination, however, is not supported by substantial evidence because record evidence does not support Commerce's determination that JA Solar, by means of [ ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬ ], received a benefit. See generally Admin. Case Br. at 38 (Confidential Version) (C.R. 547). Rather, the program was merely designed to avoid double taxation on qualified gains from dividends, bonus issues or other returns on equity investment between resident enterprises.

Commerce's determination was unreasonable because it misunderstood how the program operates and made a determination contrary to record evidence establishing that the program provided no benefit to JA Solar. Commerce may only countervail an alleged subsidy program where it provides a "financial contribution." 19 U.S.C. § 1677(5)(B)(i). A financial contribution consists of:

(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the

potential direct transfer of funds or liabilities, such as loan guarantees,
(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax
credits or deductions from taxable income,
(iii) providing goods or services, other than general infrastructure, or
(iv) purchasing goods.

Id. at § 1677(5)(D).  Here, Commerce determined that:

> the gains derived from a JA Solar company's investment (the "investor") in another
> resident enterprise (the "investee") correspond to the profits of that investee that
> are attributable to the investment shares of the investor. The profits of the investee,
> however, are taxed separately at the investee level. Without the investment
> provided by the investor, the taxable income of the investee would be lower. In
> essence, Article 26(2) Tax Exemption is designed such that the income – whether
> on the books of the investor or the investee – is only taxed once.

Admin. Case Br. at 40 (Public Version) (P.R. 407).  Commerce refused to contend with the reality

of the tax exemption program and instead focused on the oversimplification that the GOC chose

not to collect taxes on the one-time investment gains that [██████████████] realized

during the period of review.  See Final IDM at Cmt. 20, p. 78 (P.R. 429).  The record reflects

accurately that the investee [██████████] paid income taxes on gross profit before the net profit

was distributed to Jing Tai Fu.  See Section III Part IV at Vol. X, Ex. 2 (C.R. 330-357).

Consequently, Commerce's determination that JA Solar's ability to avoid paying double was a

countervailable benefit is not supported by record evidence and is contrary to law.

Commerce unreasonably ignored the reality of the tax program that was laid out in the

administrative record by way of explaining Chinese tax law and demonstrating JA Solar's

accounting practices compliance.  Beginning with the Chinese tax law, Article 10.1 of the

Enterprise Income Tax Law of the PRC sets forth that "{t}he following expenses shall not be

deducted from taxable income: 1. income from equity investment paid to investors such as the

dividends and bonuses."  Post-Prelim. SQR at Ex. PRSQ-1 (Public Version) (P.R. 393).  This

baseline requirement means that when JA Solar received the one-time benefit from its investment,

the investee entity <u>had already paid</u> income tax on any gains derived from a JA Solar company's investment prior to the investee distributing a portion of this profit back to the investor (JA Solar). The tax law is written so that an entity's gains are not taxed twice.  To Commerce's point that JA Solar's tax return shows that it claimed a tax exemption, JA Solar agrees, but only because taxes had already been paid, not because it was claiming a benefit.  <u>See</u> Final IDM at Cmt. 20, p. 78 (P.R. 429).  As for the accounting evidence, JA Solar demonstrated in its case brief in a [ █████

████████████████████████████████████████████████████████████████████████

██████████ ].  <u>See</u> Admin. Case Br. at 40-42 (Confidential Version) (C.R. 547).  Commerce ignored the absurd implications of its determination.   In Commerce's framing, [ ██████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ] <u>See</u> <u>id.</u> at 42.

The Article 26(2) Tax Exemption is simply avoiding double taxation and Commerce's misunderstanding of the Chinese tax exemption program is further mystifying because the Chinese tax exemption program is consistent with U.S. legal interpretation principles that discourage interpreting law to create double taxation, as the CIT has repeatedly explained. <u>See</u> <u>Porsche Motorsport N. Am., Inc. v. United States</u>, No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115, *26 (Aug. 22, 2018)  ("Double taxation may be said to exist when both taxes have been imposed in the same year, for the same purpose, upon property owned by the same person, and by the same taxing authority."); <u>Atlas Copco, Inc. v. United States</u>, 10 CIT 790, 792, 651 F. Supp. 1446, 1448 (1986) ("Although double taxation is not <u>ipso facto</u>, a defective or unconstitutional exercise of power, it is not a preferred result.").  Commerce's statutory and regulatory provisions concerning a financial contribution and conferral of a benefit, therefore, must be interpreted in a way to avoid countervailing a program that is designed to avoid double taxation.  A law, such as the Article

26(2) Tax Exemption Program, that allows a company to avoid double taxation does not confer a specific benefit, and therefore, is not countervailable.

The Court should remand Commerce's determination finding a benefit because Commerce's terse conclusion that JA Solar received a benefit is unsupported by record evidence and contrary to law.  Commerce invented a benefit and disregarded the way in which Chinese law merely operates like U.S. law, avoiding double taxation.

## V.   Commerce's Treatment of the Article 26(2) Tax Exemption Program as Recurring Was Unlawful

If the Court upholds Commerce's decision to countervail the tax exemption program, the Court must still overturn Commerce's determination to treat the Article 26(2) Tax Exemption Program as a non-recurring program because the only lawful path would be to treat the subsidy as non-recurring and to correct its denominator calculation.  Commerce claims that it "normally treat{s} tax benefits as recurring subsidies under 19 C.F.R. § 351.524(c)(1)."  Final IDM at 20, p. 78 (P.R. 429).  JA Solar agrees with regard to Commerce's normal practice, but the record did not support the normal treatment here.   JA Solar received a one-time investment return that it distributed to shareholders, which is only reasonably explained as non-recurring.

The record established that the exemption is directly tied to a company's capital structure and a company normally would not expect to receive an exemption on an ongoing basis from year to year. Article 26(2) provides that qualified gains from dividends, bonuses or other returns on equity between resident enterprises are tax exempt. See Post-Prelim. SQR at Ex. PRSQ-1 (Public Version) (P.R. 393).  A company only claims this exemption when it decides to distribute its profits. As the exemption is fully dependent on the distribution of a company's profits, the subsidy is directly tied to a company's "capital structure." 19 C.F.R. § 351.524(c)(2)(iii); see also Countervailing Duties; Final Rule, 63 Fed. Reg. at 65,393 (setting forth that capital structure

includes common equity). Commerce ignored its own regulation and record evidence of the program, leaving its determination unsupported by record evidence and unlawful.

The record supports that JA Solar's use of the Article 26(2) Tax Exemption program was not recurring, and its distribution of profits was a singular event. See Admin. Case Br. at 48 (Confidential Version) (C.R. 547). For example, JA Solar explained to Commerce during the administrative proceeding that the investment income claimed by [ ███████ ] was derived from the profit of [ ██████ ] for the years between [ ██████ ], and the amount distributed [ ██████████████████████████████████████████ ]. See Admin. Case Br. at 48 (Confidential Version) (C.R. 547). Commerce's determination was all the more unreasonable because JA Solar presented two viable alternatives in its case brief to properly capture the benefit within its nonrecurring framework. See id. at 49 (Public Version) (P.R. 407) (suggesting that Commerce could "allocate any alleged benefits under the Article 26(2) Tax exemption program over 10 years (the AUL period). Or, in the alternative, Commerce could allocate any alleged benefit over the years when the investee accumulated its profits before distributing to the investor"). In sum, JA Solar did not and could not have claimed the tax exemption year to year, making Commerce's "normal" treatment nonsensical and unsupported by record evidence.

## CONCLUSION

For the forgoing reasons, JA Solar requests that the Court grant its Motion for Judgment Upon the Agency Record because the Final Results was unsupported by substantial record evidence and not in accordance with law. To remedy these errors, JA Solar requests the Court remand the Final Results to Commerce for a determination in accordance with the points of law discussed above and with the specific declarations and instructions enumerated in JA Solar's Motion for Judgment Upon the Agency Record.

## REQUEST FOR COURT ORDER AND RELIEF SOUGHT

For the reasons elaborated above, JA Solar respectfully moves this Court for an order granting judgment on the agency record including, but not limited to, the following relief:

1. Declaring that Commerce's decision to impute a benefit to JA Solar under the EBCP, based on the application of AFA to the GOC was not supported by substantial evidence and not in accordance with law and was otherwise not in accordance with law;

2. Declaring that Commerce's decision to include the 2010 CBRE Report to calculate the benefits for the land program was not supported by substantial evidence and was otherwise not in accordance with law;

3. Declaring that Commerce's decision not to expense the benefits of the 2017 land leases reported in 2017, when Commerce treats land lease as a recurring program, was not supported by substantial evidence and was otherwise not in accordance with law;

4. Declaring that Commerce's decision not to revise the calculations for the land purchases reported in the 2017 review was not supported by substantial evidence and was otherwise not in accordance with law;

5. Declaring that Commerce's decision to treat the Article 26(2) Tax Exemption Program as countervailable, when the program is not specific and does not provide a financial contribution, was not supported by substantial evidence and was otherwise not in accordance with law; and

6. Declaring that Commerce's decision to treat the benefits under the Article 26(2) Tax Exemption program as recurring, when a company normally would not receive an exemption on an ongoing basis from year to year, was not supported by substantial evidence and was otherwise not in accordance with law.

A proposed order is attached for the Court's consideration.


                                        Respectfully submitted,


Dated: January 30, 2023                 /s/ Jeffrey S. Grimson
                                        Jeffrey S. Grimson
                                        Sarah M. Wyss
                                        Bryan P. Cenko
                                        Yixin (Cleo) Li
                                        Jacob M. Reiskin
                                        Mowry & Grimson, PLLC
                                        5335 Wisconsin Avenue, NW, Suite 810
                                        Washington, D.C. 20015
                                        202-688-3610
                                        trade@mowrygrimson.com
                                        *Counsel to JA Solar Technology Yangzhou
                                        Co., Ltd., Shanghai JA Solar Technology Co.,
                                        Ltd., JA Solar Co., Ltd. (a.k.a JingAo Solar
                                        Co., Ltd.) and JA Solar (Xingtai) Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,833 words.

Dated: January 30, 2023

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd. (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd.*