UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD., <br><br> Plaintiff, <br><br> and <br><br> JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *et al.*, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Consol. Court No. 22-00231 |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment on the agency record, defendant's response thereto, the administrative record, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's determination regarding JA Solar's use of the Export Buyer's Credit Program is remanded for further consideration, and it is further

ORDERED that plaintiffs' motions are otherwise DENIED; and it is further

ORDERED that judgment is entered in favor of the United States.

_____
                                                                JUDGE

Dated: _____, 2023
          New York, NY

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| RISEN ENERGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *et al.*, | ) | Consol. Court No. 22-00231 |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                JOSHUA E. KURLAND
SPENCER NEFF                           Senior Trial Counsel
Attorney                                          Commercial Litigation Branch
Office of the Chief Counsel          Civil Division
for Trade Enforcement and Compliance    U.S. Department of Justice
U.S. Department of Commerce      P.O. Box 480, Ben Franklin Station
                                                      Washington, D.C. 20044
                                                      Telephone:  (202) 616-0477
                                                      Email:  Joshua.E.Kurland@usdoj.gov

May 23, 2023                               *Attorneys for Defendant United States*

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ................................................................2

I.      Administrative Determination Under Review ....................................................2

II.     Issues Presented For Review ...........................................................................2

STATEMENT OF FACTS ...............................................................................................3

I.      Commerce's Order And Administrative Review ..............................................3

II.     Export Buyer's Credit Program (EBCP) .........................................................4

III.    Article 26(2) Tax Exemptions ........................................................................5

IV.     Land For Less Than Adequate Renumeration ..................................................6

V.      Ocean Freight Benchmarks..............................................................................9

SUMMARY OF THE ARGUMENT .................................................................................10

ARGUMENT ...............................................................................................................12

I.      Standard Of Review........................................................................................12

II.     The Court Should Remand Commerce's Use Of An Adverse Factual Inference In Selecting Among The Facts Otherwise Available To Find That JA Solar Used The Export Buyer's Credit Program ...............................................................................13

III.    Commerce's Use Of An Adverse Inference In Selecting Among The Facts Otherwise Available To Find That Risen Used The Export Buyer's Credit Program Is Supported By Substantial Evidence And Otherwise Lawful...............................................16

        A.  Commerce Lawfully Applied An Adverse Factual Inference Based On The Government Of China's Lack Of Cooperation...........................................16

        B.  Risen's Challenges To Commerce's Determination Lack Merit.................19

IV.     Commerce's Findings That The Article 26(2) Program Is A *De Jure* Specific, Countervailable Subsidy And That The Subsidy Is Recurring Are Supported By Substantial Evidence And Otherwise Lawful ....................................................24

        A.  Commerce Reasonably Found The Article 26(2) Program *De Jure* Specific .............24

        B.  Commerce Reasonably Found That The Article 26(2) Program Provides A Financial Contribution And Benefit...........................................................30

        C.  Commerce Reasonably Found That The Article 26(2) Program Is Recurring ...........31

V.  Commerce's Benefit Calculation For The Land-Use Rights For Less Than Adequate
    Renumeration Program Is Supported By Substantial Evidence And Lawful ...................34

    A.  Commerce's Selection Of The Thai CBRE Data As A Benchmark Source Is
        Supported By Substantial Evidence And Otherwise Lawful .......................................34

    B.  Commerce's Calculation Of The Allocation For JA Solar's Receipt Of Land-Use
        Rights Prior To 2018 Is Reasonable ..........................................................................39

VI.  Commerce's Reliance On Both The Descartes And Xeneta Data In Calculating An
     Ocean Freight Benchmark Is Supported By Substantial Evidence And Lawful .............. 42

CONCLUSION.....................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Acciai Speciali Terni S.p.A. v. United States*,
    120 F. Supp. 2d 1101 (Ct. Int'l Trade 2000) .......................................... 23

*Ad Hoc Shrimp Trade Action Committee v. United States*,
    882 F. Supp. 2d 1377 (Ct. Int'l Trade 2013) .......................................... 15

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)........................................................ 27, 28

*Arizona v. California*,
    460 U.S. 605 (1983)............................................................................ 41

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984)........................................................... 13

*Atlas Copco, Inc. v. United States*,
    651 F. Supp. 1446 (Ct. Int'l Trade 1986) .............................................. 31

*Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*,
    925 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) .......................................... 15

*BGH Edelstahl Siegen GmbH v. United States*,
    600 F. Supp. 3d 1241 (Ct. Int'l Trade 2022) ............................... 25, 26, 30

*Canadian Solar Inc. v. United States*,
    537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ................................... 35, 38

*Changzhou Trina Solar Energy Co. v. United States*,
    359 F. Supp. 3d 1329 (Ct. Int'l Trade 2019)
    *aff'd* 975 F.3d 1318 (Fed. Cir. 2020) .................................................. 24

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)........................................................... 13

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)........................................................................... 13

*Cooper Kunshan Tire Co., Ltd. v. United States*,
    610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ............................. 20, 21, 22

*Dalian Meisen Woodworking Co., Ltd. & Cabinets to Go, LLC*,
    No. 20-00110, 2023 WL 3222683 (Ct. Int'l Trade Apr. 20, 2023) ......... 22

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012)........................................................... 34

*Fine Furniture (Shanghai) Ltd. v. United States*,
    748 F.3d 1365 (Fed. Cir. 2014)........................................................................... 19

*Fujian Yinfeng Import & Export Trading Co. v. United States*,
    No. 21-00088, 2022 WL 4180886 (Ct. Int'l Trade Sept. 13, 2022) ................................. 36, 43

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)........................................................................... 12, 36

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ............................................................. 13

*Gov't of Québec v. United States,*
    567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ......................................................... 28, 29

*Guizhou Tyre Co. v. United States*,
    523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ............................................................. 19

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
    523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) .................................................. 26, 27, 28

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992)...................................................................................... 13

*Norsk Hydro Canada, Inc. v. United States*,
    472 F.3d 1347 (Fed. Cir. 2006)........................................................................ 40, 41

*Porsche Motorsport N. Am., Inc. v. United States*,
    No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115 (Aug. 22, 2018)......................................... 31

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012)........................................................................ 23, 24

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014)........................................................................... 38

*QVD Food Co. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011)........................................................................... 20

*Risen Energy Co. v. United States*,
    570 F. Supp. 3d 1369 (Ct. Int'l Trade 2022) ............................................................. 20

*Risen Energy Co., Ltd. v. United States*,
    No. 20-3912, 2023 WL 2890019 (Ct. Int'l Trade Apr. 11, 2023) .................................... *passim*

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
    No. 13-00371, 2014 WL 5462542 (Ct. Int'l Trade Oct. 29, 2014).................................... 39, 40

*SeAH Steel Corp. v. United States*,
    704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) ............................................................. 15

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................................................ 13

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001)............................................................ 13, 14, 15

*Thai Pineapple Pub. Co. v. United States,*
    187 F.3d 1362 (Fed. Cir. 1999)................................................................ 36, 43

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009).......................................................................... 12

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978).......................................................................... 40

*Yantai Timken Co. v. United States,*
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ........................................................ 23

## STATUTES

19 U.S.C. § 1677(5)(C) ................................................................................ 30

19 U.S.C. § 1677(5)(D) .......................................................................... 6, 30

19 U.S.C. § 1677(5)(E) .......................................................................... 6, 19

19 U.S.C. § 1677(5A) ........................................................................ *passim*

19 U.S.C. § 1677e ............................................................................ *passim*

19 U.S.C. § 1677m(d) ................................................................................ 21

## REGULATIONS

19 C.F.R. § 351.104(a) ................................................................................ 23

19 C.F.R. § 351.301(c) ................................................................................ 23

19 C.F.R. § 35l.308(c) ................................................................................ 17

19 C.F.R. § 351.509(a) ...................................................................... 6, 30, 31

19 C.F.R. § 351.511(a) ...................................................................... *passim*

19 C.F.R. § 351.524(b) ................................................................................ 39

19 C.F.R. § 351.524(c) ................................................................... 8, 32, 33

19 C.F.R. § 351.524(d) ...................................................................... 8, 39

# ADMINISTRATIVE DECISIONS

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*,
  86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) ........................................................21

*Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)........................................29, 33, 37

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*,
  77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012) ............................................................3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  85 Fed. Reg. 7,727 (Dep't of Commerce Feb. 11, 2020) ........................................................40

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019)........................................................37

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*,
  85 Fed. Reg. 79,163 (Dep't of Commerce Dec. 9, 2020) ...............................................7, 8, 40

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  87 Fed. Reg. 748 (Dep't of Commerce Jan. 6, 2022) ...............................................................3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*,
  87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022)........................................................2

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  87 Fed. Reg. 50,069 (Dep't of Commerce Aug. 15, 2022)....................................................2, 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  87 Fed. Reg. 55,782 (Dep't of Commerce Sep. 12, 2022) ........................................................3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*,
  88 Fed. Reg. 1,355 (Dep't of Commerce Jan. 10, 2023) ........................................................20

*Forged Steel Fittings from the People's Republic of China*,
  87 Fed. Reg. 35,498 (Dep't of Commerce June 10, 2022)........................................................21

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021) ...........................................................3

*Laminated Woven Sacks from the People's Republic of China*,
   74 Fed. Reg. 67,893 (Dep't of Commerce Dec. 3, 2007)........................................................35

*Multilayered Wood Flooring From the People's Republic of China*,
   85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020)....................................................37

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| RISEN ENERGY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., *et al.*, | ) | Consol. Court No. 22-00231 |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' RULE 56.2
MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the motions for judgment upon the agency record filed by plaintiff, Risen Energy Co., Ltd. (Risen), and by consolidated plaintiffs, JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., and JingAo Solar Co., Ltd. (collectively, JA Solar).  Risen Br., ECF No. 27; JA Solar Br., ECF No. 28-29.  Risen and JA Solar challenge aspects of the Department of Commerce's final affirmative determination in Commerce's 2019 administrative review of its antidumping duty order concerning solar cells from China.  We seek a voluntary remand of Commerce's determination that JA Solar benefitted from China's Export Buyer's Credit Program.  On all other issues, Commerce's final determination should be sustained because it is supported by substantial evidence and otherwise lawful.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.      <u>Administrative Determination Under Review</u>**

The administrative determination under review is *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) (*Final Results*), and the accompanying Issues and Decision Memorandum (IDM), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 50,069 (Dep't of Commerce Aug. 15, 2022) (*Amended Final Results*).  The review period covers calendar year 2019.

**II.     <u>Issues Presented For Review</u>**

1.      Whether the Court should grant a remand of Commerce's determination, based on the use of an adverse factual inference in selecting among the facts otherwise available on the record, that JA Solar benefitted from China's Export Buyer's Credit Program.

2.      Whether Commerce's use of an adverse factual inference in selecting among the facts otherwise available on the record in finding that Risen benefitted from the Export Buyer's Credit Program is supported by substantial evidence and otherwise lawful.

3.      Whether Commerce's finding that the Article 26(2) program is a countervailable, recurring subsidy is supported by substantial evidence and otherwise lawful.

4.      Whether Commerce's reliance on Thai CBRE data as a source for its benchmark for land in the present review, and Commerce's determination not to alter the land benchmarks established in the 2017 review, is supported by substantial evidence and otherwise lawful.

5.      Whether Commerce's reliance on both Descartes and Xeneta data in determining ocean freight benchmarks is supported by substantial evidence and otherwise lawful.

## STATEMENT OF FACTS

### I.     Commerce's Order And Administrative Review

In December 2012, Commerce published its countervailing duty order concerning solar cells from China, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 77 Fed. Reg. 73,017 (Dep't of Commerce Dec. 7, 2012).  In February 2021, Commerce initiated an administrative review of the order for the period from January 1 to December 31, 2019.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166 (Dep't of Commerce Feb. 4, 2021).

In March 2021, Commerce selected Risen and JA Solar as the mandatory respondents for the review.  Respondent Selection Memorandum (Mar. 29, 2021) (P.R. 46).  In January 2022, Commerce published the preliminary results of the review.  C*rystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 748 (Dep't of Commerce Jan. 6, 2022) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).  Commerce calculated a preliminary subsidy rate of 18.49 percent *ad valorem* for JA Solar, and 15.71 percent *ad valorem* for Risen.  *Id.* at 749.  In July 2022, Commerce published the final results of its review, in which it revised the subsidy rates it calculated for JA Solar and Risen, respectively, to 18.58 and 12.92 percent.  *Final Results*, 87 Fed. Reg. at 40,492.  In August 2022, Commerce published an amendment to its final results, reflecting corrections to ministerial errors and further revising the rates calculated for JA Solar and Risen to 18.55 and 13.18 percent *ad valorem*, respectively.  *Amended Final Results*, 87 Fed. Reg. 50,069.  In September 2022, Commerce published a further correction to address additional clerical errors.  C*rystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 87 Fed. Reg. 55,782 (Dep't of Commerce Sep.

12, 2022).  None of these corrections affected Commerce's determinations with respect to JA Solar or Risen.

Commerce addressed each of the issues that the plaintiffs raise in their motions for judgment on the administrative record as part of the review.  We describe them in turn below.

**II.**   **Export Buyer's Credit Program (EBCP)**

In April 2021, Commerce issued its initial countervailing duty questionnaire to the government of China, with instructions to forward the questionnaire to Risen and JA Solar. Initial Questionnaire (Apr. 27, 2021) (P.R. 48).  As part of the questionnaire, Commerce requested information pertaining to China's administration of the EBCP, including "a list of all partner/correspondent banks involved in disbursement of funds under" the program.  *Id*. at II-36-37.  Commerce also requested that each mandatory respondent provide a list of all United States customers to which they exported subject merchandise during the period of review.  *Id.*

On June 21, 2021, Risen reported a list of four customers to which it exported during the period of review.  Risen Initial Questionnaire Response at 40, Ex. 19 (June 21, 2021) (P.R. 187, 190; C.R. 211, 216).  Risen provided Commerce with EBCP non-use certifications for three of the four customers.[1]  *Id.* at Ex. 20.  JA Solar reported that it exported subject merchandise during the period of review using an affiliated United States company, JA Solar USA, Inc., through which it resold subject merchandise to unaffiliated United States customers.  JA Solar Initial Questionnaire Response Part IV at 47-48 (June 29, 2021) (P.R. 213; C.R. 330).  JA Solar also provided an EBCP non-use certification for that reseller.  *Id.* at Ex. 23 (P.R. 213; C.R. 336-37). Both respondents stated that they did not provide assistance to their customers in obtaining export buyer's credits and were not aware of any usage of such credits on their customers' part.

---

[1] This information is disclosed publicly in Risen's opening brief.  *See* Risen Br. 5.

Risen Initial Questionnaire Response at 41 (P.R. 187); JA Solar Initial Questionnaire Response

Part IV at 47-48 (P.R. 213; C.R. 330).  Risen further claimed that it contacted each of its

customers and confirmed that they did not use the EBCP during the review period.  Risen Initial

Questionnaire Response at 41 (P.R. 187).  The government of China responded to Commerce's

request for a list of all partner/correspondent banks involved in the EBCP by stating that the

question is "not applicable," because "none of the respondents applied for, used, or benefited

from this alleged program."  GOC Initial Questionnaire Response at 136 (Jun. 22, 2021) (P.R.

192).  The government of China also reported that it contacted the Export-Import (EXIM) Bank

of China to confirm that neither respondent's United States customers used the EBCP.  *Id.*

Applying its modified EBCP methodology, Commerce preliminarily applied an adverse

factual inference to the government of China to find that Risen and JA Solar benefitted from the

EBCP, assigning a 5.46 *ad valorem* rate for the program to both respondents.  PDM at 49.

Commerce made no changes to its EBCP finding in its final results.  IDM at Cmt. 1.

### III.   <u>Article 26(2) Tax Exemptions</u>

In June 2021, Risen reported that its cross-owned company, Risen Ningbo Electric Power

Development Co., Ltd., received benefits during the review period from a program it referred to

as "{i}ncome tax preference for dividends, bonuses and other equity investment income between

eligible resident companies."  Risen Ningbo Questionnaire Response at 8 (Jun. 17, 2021) (P.R

181).  According to Risen, the benefit it received from this program was under Article 26(2) of

China's Enterprise Income Tax Law and Article 83 of the law's implementing regulations.  *Id.*

The government of China included the Enterprise Income Tax Law in its initial questionnaire

response.  GOC Initial Questionnaire Response at Ex. B-2 (P.R. 192).  In its preliminary results,

Commerce identified the program as a potentially countervailable program for which it needed

more information and stated that it would request further information from the government of China.  PDM at 68.  In response to Commerce's supplemental questionnaire, the government of China provided the text of the Enterprise Income Tax Law's implementing regulations.  GOC Post-Preliminary Questionnaire Response at Ex. NSA-25 (Feb. 14, 2022) (P.R. 372)

In May 2022, Commerce published a post-preliminary analysis memorandum in which it determined that the "Tax Exemptions under Article 26(2) of the Enterprise Income Tax Law" program (the Article 26(2) Tax Program) is specific as a matter of law pursuant to 19 U.S.C. § 1677(5A)(D)(i) because it is limited by law to "enterprises with gains from direct investments in qualified resident enterprises, excluding investment gains obtained for holding listed and circulating shares issued by a resident enterprise for less than 12 months consecutively."  Post-Preliminary Analysis Memorandum at 5-6 (May 6, 2022) (P.R. 394).  Commerce also found that the program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) in the form of revenue foregone, and thus provided a benefit in the form of the tax exemption to JA Solar and Risen under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.509(a)(1).  *Id.*  Commerce did not make any changes to its preliminary finding in its final results.  IDM at Cmt. 20.

## IV.    Land For Less Than Adequate Renumeration

In its initial questionnaire, Commerce requested that respondents report information pertaining to land purchases made from December 2001 to the time of reporting.  Initial Questionnaire at III-34-35 (P.R. 48).  JA Solar reported that several of its cross-owned affiliates either purchased or leased land in 2018 or 2019.  *See* JA Solar Calculation Worksheet at 2019 LandSummary (Jul. 1, 2022) (C.R. 564) (listing leases and purchases reported by JA Solar).[2]  JA

---

[2] JA Solar reported its receipt of land leases and purchases in a series of questionnaire responses. For an example of one such response pertaining to one of the JA Solar companies, see JA Solar Initial Questionnaire Response Part IV at Vol. X, pg. 46-49 (P.R. 215; C.R. 345).

Solar also incorporated by reference its responses to Commerce's 2017 administrative review of this same order, in which JA Solar had reported all of its purchases of land from 2001 to 2017. JA Solar Initial Questionnaire Response Part IV at Vol. X, pg. 47 (P.R. 215; C.R. 345); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China*, 85 Fed. Reg. 79,163 (Dep't of Commerce Dec. 9, 2020) (*2017 Final Results*), at IDM Cmt. 8 (remanded, final disposition pending).

Relevant to this issue, Commerce placed on the record a memorandum containing a 2018 analysis of government provision of land-use rights in China. Land-Use Rights Memorandum (Apr. 28, 2021) (P.R. 104-116). Commerce also placed on the record as benchmark information 2010 land valuation information for Thailand from "Asian Marketview" reports by CB Richard Ellis (CBRE). Asian Marketview Reports (Apr. 28, 2021) (P.R. 118). Risen likewise submitted benchmark data, including a report entitled "Malaysia: Costs of Doing Business" published by the Malaysian Investment Development Authority (referred to below as the MIDA data). Risen Benchmark Submission at Ex. 9 (Nov. 17, 2021) (P.R. 304). Risen additionally submitted a memorandum containing 2019 gross national income (GNI) figures for both Malaysia and China, and articles containing comparisons of the economic competitiveness of various Southeast Asian countries, including Malaysia, Thailand, and China. *Id.* at Ex. 10.

Commerce preliminarily found that it could not use Chinese land prices as a benchmark because of distortion in the Chinese market for land. PDM at 21-22. Commerce also found that it could not rely on world market prices for land. *Id.* Commerce therefore selected a benchmark for land pursuant to 19 C.F.R. § 351.511(a)(2)(iii) (also called "tier three"), which directs Commerce to select benchmarks in a manner consistent with market principles. Commerce found that the Thai CBRE data was an appropriate benchmark for 2019 land purchases, citing

Thailand's similarity to China in national income levels and population density, as well as "producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production." PDM at 22-23. Citing the same reasons, Commerce also selected the MIDA data for use as a benchmark. *Id.* Commerce averaged the data from both sources to obtain a single benchmark price for land, which Commerce used to measure the benefit that companies received for their purchases or leases of land for less than adequate remuneration. *Id.* at 23, 62.

Consistent with its approach to the issue in the 2017 review of the order, Commerce preliminarily found JA Solar's leases and purchases of land in 2018 and 2019 to be non-recurring subsidies pursuant to 19 C.F.R. § 351.524(c)(2), meaning that the benefit would be allocated over the terms of the land-use agreements. JA Solar Preliminary Calculation Memorandum at 6-7 (Jan. 6, 2022) (P.R. 364). With respect to the "benefit streams" stemming from subsidies during previous review periods,[3] Commerce continued to treat JA Solar's purchases of land-use rights in years prior to 2018 as it did in the 2017 final results, calculating the benefit based solely on Thai CBRE data. *Id.*; *see 2017 Final Results*, 85 Fed. Reg. 79,163, at IDM Cmt. 8. Commerce allocated the benefit from each purchase of land-use rights to the 2019 review period based on the formula prescribed by 19 C.F.R. § 351.524(d). JA Solar Preliminary Calculation Memorandum at 6-7 (P.R. 364); *see also* JA Solar Preliminary Calculation Worksheet at Tabs 2019 Land Summary to Land BM AR 2017 (Jan. 6, 2022) (C.R. 508).

In the final results, Commerce changed its finding from the preliminary determination with respect to JA Solar's land leases from 2018 and 2019, and found that those leases are recurring benefits to be allocated to the year of receipt. IDM at 73. Commerce did not make

---

[3] Commerce refers to the benefit derived from the allocation of a non-recurring subsidy as a "benefit stream." Hence, we refer to the benefit derived from land leases and purchases made in years through 2017—the most recent year in which JA Solar was a mandatory respondent, and the year that the benefit streams were put in place—as the "2017 benefit streams."

changes to JA Solar's land leases from the years prior to 2018, finding that the benefit streams imposed by those leases to already be in place. *Id.* Commerce did not make any other changes to its calculation of the benefits from the land for less than adequate remuneration program.

## V.   Ocean Freight Benchmarks

Regarding the ocean freight benchmark for the review, the American Alliance for Solar Manufacturing (the Alliance) in November 2021 submitted benchmark information to the record. Alliance Benchmark Submission (Nov. 17, 2021) (P.R. 306; C.R. 444). The Alliance's submission included a list of container shipping rates provided by Descartes, which cover routes from several United States ports to Shanghai, and which cover several different commodities. *Id.* at 5-6 and Ex. NFI-10 (P.R. 306-07; C.R. 444-45). Risen and JA Solar both provided ocean freight pricing data from Xeneta, which contains monthly prices for various ports around the world to Shanghai. JA Solar Benchmark Submission at 4-5, Ex. 4B (Nov. 17, 2021) (P.R. 313; C.R. 448-49); Risen Benchmark Submission at 1, Exs. 4-5 (Nov. 17, 2021) (P.R. 304; C.R. 439, 442-443). Risen also provided information from Xeneta regarding that company's ocean freight pricing methodology. Risen Benchmark Submission at Ex, 6 (P.R. 304).

Commerce preliminarily calculated the benchmark for ocean freight, to be used in calculating the benchmark prices for inputs of polysilicon, aluminum extrusions, and solar glass,[4] by simple-averaging the benchmark prices derived from the Descartes and Xeneta data sets. PDM at 28. In the final results, Commerce changed course, recognizing that the Xeneta data provided by JA Solar and Risen consisted of significantly more data points than the Descartes

---

[4] Commerce's use of an ocean freight benchmark to calculate estimated price for certain inputs in determining whether they were provided for less than adequate renumeration is distinct from Commerce's calculation of a benchmark for international ocean services, which Commerce found in this review to be provided by the government of China for less than adequate remuneration. PDM at 29, 47-49; *see also* IDM at Cmt. 13.

data, and that the Xeneta data should thus be given greater weight in Commerce's calculation methodology.  IDM at 47.  Commerce therefore recalculated its ocean freight benchmark by calculating a monthly price for each ocean freight route, before simple-averaging all of the routes to determine a single ocean freight benchmark.  *Id.*

## <u>SUMMARY OF THE ARGUMENT</u>

This Court should sustain Commerce's contested determinations because they are supported by substantial evidence and otherwise lawful.

First, we respectfully request that the Court remand Commerce's finding that JA Solar benefitted from the EBCP, so that Commerce may apply its current practice and, if necessary, attempt to verify JA Solar's non-use of the EBCP based on the non-use certification provided for JA Solar's sole United States importer.  The remand request is justified because Commerce refined its practice relevant to JA Solar subsequent to the final results in this case.

Second, Commerce's determination that Risen benefitted from the EBCP is supported by substantial evidence and otherwise lawful.  Because the government of China failed to cooperate with Commerce's requests for information about the program, Commerce lawfully applied an adverse inference in selecting among the facts otherwise available on the record, even though the adverse inference had a negative effect on a cooperative respondent like Risen.  Further, although Commerce in other cases has verified non-use of the EBCP when respondents place non-use certifications on the record for each of their United States importers, the record in this case does not include non-use certifications for all of Risen's importers.  Despite Risen's arguments that Commerce could have verified non-use of the program without non-use certifications from each of Risen's customers, such an approach is inconsistent with Commerce's practice and would require Commerce to assume (without record evidence) that Risen's non-

responding importer did not use the EBCP.  Finally, Risen's claim that it provided non-use certifications for each of its United States importers is unsupported by the record, and Risen makes no effort to argue that its submission of an untimely non-use certification from the missing importer should have been accepted by Commerce or is otherwise part of the record.

Third, the Court should sustain Commerce's determination that the Article 26(2) program is a countervailable subsidy that is *de jure* specific and provided a financial contribution in the amount of revenue foregone by the government of China.  Commerce's finding that the program is *de jure* specific comports with the statute's definition of *de jure* specificity because the Article 26(2) program is limited to resident enterprises with income from investments in other resident enterprises, and excludes enterprises with income from such investments held for less than 12 consecutive months.  Further, the program provides a financial contribution that benefits JA Solar because it constitutes revenue foregone by the government of China, whereas JA Solar's arguments about the program's alleged purpose of avoiding double taxation are inapposite because Commerce is not required to consider the subsidy's effects in determining that it exists.  Finally, Commerce's determination to treat the Article 26(2) program as recurring is supported by substantial evidence and lawful because Commerce found that tax benefits under the program can be claimed annually and because investment gains can be received regularly.

Fourth, the Court should sustain Commerce's benefit calculation for JA Solar under the land for less than adequate renumeration program.  Commerce's reliance on a simple average of the Thai CBRE and MIDA data is reasonable because Commerce, while recognizing concerns about the Thai CBRE data's non-contemporaneity, determined that the Thai data (once indexed for inflation) remain probative for purposes of determining a benchmark.  Commerce further explained, consistent with its preference for using more than one source if possible, that

including the Thai CBRE data in its calculations produced a more robust benchmark—and its determination in this case is consistent with this Court's decision sustaining Commerce's use of the Thai data as the sole source for its benchmark in another CVD review for the year 2019. Further, JA Solar's arguments challenging Commerce's calculation of the benefit stream for land purchases deemed countervailable in the 2017 administrative review of Commerce's order are unavailing because that benefit stream was set pursuant to the 2017 review, and the interest in the finality of administrative proceedings precludes *post-hoc* recalculation of benefit streams.

Fifth, Commerce's calculation of a benchmark for ocean freight by averaging the Descartes and Xeneta data on a route-specific basis is supported by substantial evidence. Commerce's approach comports with the regulatory directive to average together world-market prices for benchmarks when more than one benchmark is available, and Commerce's calculation methodology is a reasonable means by which to address the relative lack of data points in the Descartes data. Risen's critiques of the Descartes data fail to establish that the Descartes data are inappropriate for use as an ocean freight adjustment benchmark.

## ARGUMENT

## I.   Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence on the record, or otherwise unlawful. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). Substantial evidence connotes "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking

into account the entire record, including whatever fairly detracts from the substantiality of the evidence. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and quotation marks omitted). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing "tremendous" deference to Commerce factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment for Commerce's in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it *de novo*." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006).

## II.   The Court Should Remand Commerce's Use Of An Adverse Factual Inference In Selecting Among The Facts Otherwise Available To Find That JA Solar Used The Export Buyer's Credit Program

We respectfully request a remand for Commerce to reconsider its application of an adverse factual inference in selecting among the facts otherwise available on the record regarding JA Solar's use of the EBCP. The Court should exercise its discretion to grant our request because Commerce's reasons for seeking a remand are "substantial and legitimate." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). As we describe above, JA

13

Solar provided Commerce with a non-use certification for its sole importer during the period of review, its affiliated reseller. JA Solar Initial Questionnaire Response Part IV at Ex. 23 (P.R. 213; C.R. 336-37). Nonetheless, Commerce determined to apply an adverse factual inference with respect to JA Solar's use of the EBCP based in part on Commerce's finding that JA Solar failed to provide non-use certifications for all of its *downstream* United States customers. *See* IDM at 23 ("the inability of Risen and JA Solar to provide non-use certifications from all of their U.S. customers meant that Commerce had an insufficient basis to take further steps . . . given that at least some of respondents' U.S. customers were apparently unwilling to cooperate").

Commerce has since refined this aspect of its practice regarding the EBCP, determining that it requires non-use certifications only for United States *importer* customers, and not for further downstream customers. Specifically, as JA Solar observes, in its remand redetermination concerning the 2017 administrative review of the solar cells from China order, which postdates Commerce's final results in this case by several months, Commerce found that JA Solar *did not* use the EBCP based on evidence similar to the record in this proceeding. *See Risen Energy Co., Ltd. v. United States*, Consol. Ct. Int'l Trade No. 20-3912, ECF No. 94 at 5-7 (2017 Remand Results), *remanded on other grounds by Risen Energy Co., Ltd. v. United States*, No. 20-3912, 2023 WL 2890019 (Ct. Int'l Trade Apr. 11, 2023) (*Risen CVD II*) (disposition on remand non-final); *see also* JA Solar Br. 10, 12.

Commerce may, without confessing error, ask the Court to remand a matter so that Commerce may reconsider its prior position. *SKF*, 254 F.3d at 1029. The Court of Appeals for the Federal Circuit has outlined multiple scenarios in which an agency may seek a remand, including (a) to reconsider its decision because of intervening events outside of the agency's control; (b) to reconsider its previous position in the absence of an intervening event; and (c)

because it believes that its original decision was incorrect on the merits and it wishes to change the result.  *Id.* at 1028.  A voluntary remand to an agency is generally appropriate if the agency's concern is "substantial and legitimate" and may be refused "if the agency's request is frivolous or in bad faith."  *Id.* at 1029; *see also*, *e.g.*, *Ad Hoc Shrimp Trade Action Committee v. United States*, 882 F. Supp. 2d 1377, 1381 (Ct. Int'l Trade 2013); *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1378 (Ct. Int'l Trade 2010).  "{C}oncerns are considered substantial and legitimate when (1) Commerce supports its request with a compelling justification, (2) the need for finality does not outweigh the justification, and (3) the scope of the request is appropriate." *Baroque Timber Industries (Zhongshan) Co., Ltd. v. United States*, 925 F. Supp. 2d 1332, 1338- 39 (Ct. Int'l Trade 2013) (citation omitted).  Clarifying and correcting a potentially inaccurate determination is a compelling justification for voluntary remand.  *Id.*

Our voluntary remand request fits within this framework.  The justification for the request is compelling because Commerce's determination in the final results for this case is contrary to Commerce's current practice, embodied in its subsequent determination in the 2017 Remand Results.  In that case, Commerce clarified that it requires non-use certifications from a company's United States importer customers, rather than from further downstream customers. Thus, the remand we are seeking will enable Commerce to bring its determination in this case into compliance with its current practice.  Nor is the remand request frivolous or in bad faith.  If the Court grants the request, Commerce intends to reconsider its application of an adverse inference to JA Solar regarding the EBCP and, if necessary, to proceed to verification of the non- use information that JA Solar provided.  Further, the need for finality does not outweigh the justification for remand because this is Commerce's first request for remand with respect to this issue and the final results in this case are contrary to Commerce's current practice.  Finally, the

scope of Commerce's request for remand is appropriate because Commerce is requesting remand only with respect to its determination that JA Solar used the EBCP, and its determination in this respect will not affect any additional aspects of Commerce's determination.

Therefore, the Court should grant our remand request, so that Commerce may apply its current practice and, if necessary, attempt to verify JA Solar's non-use of the EBCP based on the non-use certification provided for JA Solar's sole United States importer. We have advised JA Solar's counsel of our intention to seek a remand on this issue and understand that JA Solar does not object to our remand request.

**III.    Commerce's Use Of An Adverse Inference In Selecting Among The Facts Otherwise Available To Find That Risen Used The Export Buyer's Credit Program Is Supported By Substantial Evidence And Otherwise Lawful**

The Court should sustain Commerce's EBCP determination with respect to Risen because Commerce reasonably determined that it was appropriate to apply an adverse inference in light of the government of China's lack of cooperation in the review and that Risen had failed to close the record gap created by China's non-cooperation because Risen had not provided timely non-use certifications from all of its customers.

**A.    Commerce Lawfully Applied An Adverse Factual Inference Based On The Government Of China's Lack Of Cooperation**

Commerce uses the facts otherwise available to fill a gap in the record when necessary information is not available on the record, or when an interested party (1) withholds information that has been requested by Commerce, (2) fails to provide information by a deadline established by Commerce, (3) significantly impedes a proceeding, or (4) provides information that cannot be verified. *See* 19 U.S.C. § 1677e(a). Commerce may use an adverse inference when selecting among the facts otherwise available on the record when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with {Commerce's} request

for information{.}" 19 U.S.C. § 1677e(b)(1).  When applying an adverse inference in selecting

information, Commerce may rely on information derived from any stage of the proceeding,

including the petition, a final determination in the investigation, any previous review, or any

other information placed on the record.  *See* 19 U.S.C. § 1677e(b)(1); 19 C.F.R. § 35l.308(c).

Commerce's determination in this case, based on the government of China's failure to

provide necessary information, to apply an adverse factual inference to find that Risen used the

EBCP, is supported by substantial evidence.  Specifically, Commerce found that the government

of China had failed to respond adequately to Commerce's request for information, in particular

by refusing to provide a list of all partner banks involved in the disbursement of funds under the

EBCP.  IDM at 29-32; *see also* GOC Initial Questionnaire Response at 136 (P.R. 192).  Further,

Commerce found that the government of China, by failing to provide the list to Commerce of

intermediary banks, withheld information from Commerce and impeded Commerce's ability to

analyze the EBCP, warranting use of facts otherwise available pursuant to 19 U.S.C. § 1677e(a).

*Id.* at 31.  Additionally, Commerce found that the government of China had failed to cooperate to

the best of its ability in withholding the requested information, warranting imposition of an

adverse inference under 19 U.S.C. § 1677e(b).  *Id.*

More generally, Commerce found that the government of China's failure to provide

necessary information created a gap or deficiency in the record.  IDM at 21, 23, 31.  Indeed,

Commerce explained that "{t}he GOC is the only party that can answer questions about the

internal administration of this program."  *Id.* at 31.  In this regard, acknowledging decisions of

this Court instructing Commerce to attempt verification of customer information submitted by

respondents in connection with the EBCP, Commerce proceeded in line with its revised practice

on this issue.  *See* IDM at 22.  Commerce explained that, under its revised practice, Commerce

continues to apply an adverse inference for the government of China's failure to cooperate, but that when the full universe of a respondent's United States customers provides certifications of non-use, Commerce will take additional steps toward verification of those certifications. *See id.* at 22-23. Specifically, Commerce may issue supplemental questions seeking complete lending information from the United States customers and then take steps to verify the customers' responses when the information provided covers the full universe of financing for all of a respondent's United States customers, allowing Commerce to meaningfully conduct its tracing and completeness tests at verification. *Id.*

In this case, however, Commerce did not receive complete information from Risen's United States customers to cure the record deficiency created by China's non-cooperation. As described above, within the review's deadline for providing factual information, Commerce received non-use certifications from only three of Risen's four United States customers. Risen Initial Questionnaire Response at Ex. 20 (P.R. 190; C.R. 216). Commerce explained that "we continue to find that we cannot fully verify claims of non-usage, whether originating with the respondents or their U.S. customers, if only some of the U.S. customers are cooperating and if we do not know the names of the intermediary banks that might appear in the books and records of the recipient of the credit (*i.e.*, the loan) or the cash disbursement made pursuant to the credit." IDM at 31. In other words, absent non-use certifications for all of Risen's customers, necessary information remained missing from the record within the meaning of 19 U.S.C. § 1677e(a). Commerce thus concluded that "there is no basis to find that the respondents or their customers have sufficiently filled the gaps in the record caused by the GOC's non-cooperation and withholding of information." *Id.*; *see also id.* at 21 ("Furthermore, the respondents' voluntary efforts to overcome the GOC's deficiencies in this case have failed to produce information

sufficient to fill the gaps in the record resulting from the GOC's refusal to provide Commerce with the material requested and which Commerce deems essential to determine non-use.").

Consequently, Commerce applied an adverse inference as a result of the government of China's failure to cooperate to the best of its ability with respect to the EBCP.  As adverse facts, Commerce found that Risen used and benefited from the EBCP, despite its claims that its United States customers did not obtain export buyer's credits during the period of review.  IDM at 31. Commerce also found that these EBCP loans provide a benefit under 19 U.S.C. § 1677(5)(E)(ii) in the amount of the difference between the amounts the recipient paid and would have paid on comparable loans.  *Id.*  Although Risen may have cooperated with Commerce's requests for information pertaining to the EBCP, Commerce's use of an adverse factual inference based on the government of China's failure to cooperate is lawful.  *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) (holding that application of adverse factual inference based on a government's failure to cooperate "is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent"); *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1357 (Ct. Int'l Trade 2021) (citing *Fine Furniture*).[5]

B.  **Risen's Challenges To Commerce's Determination Lack Merit**

In challenging Commerce's determination, Risen asserts that Commerce was required to request non-use certifications from Risen if it would have led Commerce to pursue verification, and that Risen had no basis to know to submit them when Commerce had used an adverse factual inference regarding the EBCP in prior cases, even when Risen provided non-use certifications

---

[5] Risen's efforts to distinguish *Fine Furniture* based on how Commerce filled the gap created by the government of China's non-cooperation in that case do not undermine the principal that Commerce may apply an adverse inference based on foreign government non-cooperation in a CVD case that has collateral consequences for a cooperating respondent.  *See* Risen Br. 10; *Fine Furniture*, 748 F.3d at 1372-73 (describing collateral consequences as "unfortunate" but lawful).

for all of its customers.  Risen Br. 5-6.  Contrary to this claim, it is well-established that "the burden of creating an adequate record lies with interested parties and not with Commerce."  *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (cleaned up).  Moreover, given Commerce's repeated findings over multiple years that the government of China has failed to cooperate in providing necessary information about the EBCP, Risen was well aware that the record contained a gap that it could seek to cure by submitting non-use certifications, as it did in past reviews.  *See Risen Energy Co. v. United States*, 570 F. Supp. 3d 1369, 1373 (Ct. Int'l Trade 2022) (*Risen CVD I*) (observing that Risen had submitted non-use certifications for its customers in 2017 administrative review); *cf. Cooper Kunshan Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287, 1317 (Ct. Int'l Trade 2022) ("{T}he statute does not require that Commerce ask the respondents for supplemental information due to the GOC's noncooperation.").

Further, the preliminary Commerce determination that Risen cites in support of this argument does not support its position.  *See* Risen Br. 5-6 (citing *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 88 Fed. Reg. 1,355 (Dep't of Commerce Jan. 10, 2023), and PDM at 43 (*Solar CVD 2023 Prelim.*).  In that case—as in this one—Commerce preliminarily found that Risen had not provided non-use certifications for all of its customers.  *See Solar CVD 2023 Prelim.*, PDM at 43 ("Because Risen did not provide certifications of non-use from all of its customers, the record lacks information indicating that Risen did not use the program or that all of its customers are willing to cooperate in our inquiry.").  The cited determination is also non-final and post-dates Risen's submissions in this case.  Hence, it does not support Risen's claims about not needing non-use certifications.

Additionally, Risen's position that it did not need to submit non-use certifications for all of its customers disregards Commerce's revised practice regarding the EBCP.  *See* Risen Br. 6.

As Commerce stated in its final results, it has accepted and considered non-use certifications for the EBCP, leading to non-use findings, when respondents have provided non-use certifications for all of their United States customers and responded fully to Commerce's subsequent requests for information. *See* IDM at 23 (citing *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) (final admin. review), at IDM Cmt. 5; *Forged Steel Fittings from the People's Republic of China*, 87 Fed. Reg. 35,498 (Dep't of Commerce June 10, 2022) (final determ.), at IDM Cmt. 2). Thus, although Commerce is able to verify non-use of the EBCP based on complete information, it cannot confirm Risen's non-use based on partial non-use information. *See* IDM at 22.

Another flaw in Risen's argument that Commerce was required to request non-use certifications is that Commerce has characterized its past reliance on non-use certifications as "accommodative efforts" and indicated that requesting non-use certifications from unaffiliated customers in lieu of the government of China's cooperation is not a "viable alternative path" to investigating the program. IDM at 22 & n.94. For these reasons, and because Commerce does not view a lack of non-use certifications on the record as a reporting failure, Risen's suggestion that Commerce should have identified the lack of certifications for all customers as a deficiency in Risen's filing under 19 U.S.C. § 1677m(d) is inappropriate. *See* Risen Br. 5. The only party that failed to respond to Commerce's request for information is the government of China, not Risen. *See Cooper Kunshan*, 610 F. Supp. 3d at 1317 ("the language of the statute requires that Commerce give the GOC – not any other party – an opportunity to remedy the deficiency").

We acknowledge this Court's recent decision in *Risen CVD II*, in which it remanded Commerce's application of an adverse factual inference in finding that Risen used the EBCP for the 2017 review; however, that case is factually distinct from this one. *See* 2023 WL 2890019, at

21

*4 ("This case involves a specific agency record that drives the court's conclusion.").  Unlike in

*Risen CVD II*, in which Risen initially provided non-use certifications for all of its customers, in

this case the record does not contain a full set of certifications.  *Id.* at *5 (finding Commerce's

remand redetermination unsupported by substantial evidence in part because of "the still-relevant

initial complete set of nonuse declarations."); *see also Dalian Meisen Woodworking Co., Ltd. &*

*Cabinets to Go, LLC*, No. 20-00110, 2023 WL 3222683, at *7 (Ct. Int'l Trade Apr. 20, 2023)

(similar facts).  Commerce has established that it requires, at least, non-use certifications for each

of a respondent's United States importers in order to verify non-use of the EBCP, which is not

the case in this proceeding.  *See* IDM at 23.  Moreover, at the same time that the Court in *Risen*

*CVD II* found the presence of non-use certifications for all of Risen's United States customers

probative of whether Commerce could apply an adverse inference, the Court has also sustained

Commerce regarding the EBCP when the record lacked non-use certifications on behalf of the

respondents' United States customers.  *See Cooper Kunshan*, 610 F. Supp. 3d at 1317-18 (absent

non-use certifications, "Commerce's finding that the respondents did not provide information

that would allow Commerce to find non-use is reasonable").

    Likewise, we acknowledge that this Court has remanded Commerce's EBCP

determinations on a number of occasions.  *See* Risen Br. 7-9 (citations omitted).  However, the

cases that Risen cites pre-date Commerce's revision to its practice, under which Commerce will

accept and consider non-use certifications for a respondent's United States customers if it

receives certifications for all of the customers.  *See* IDM at 22-23 (discussing examples of

Commerce's practice).  Contrary to Risen's claim, Commerce's approach in this case is not

"substantially the same" as in past cases in which Commerce generally declined to consider non-

use certifications.  Risen Br. 9; *see also id.* at 11-12.

Risen additionally asserts that it provided non-use certifications for each of the United States customers to whom it exported during the review period.  Risen Br. 6-7.  This assertion is not supported by the record.  The administrative record is defined as "all information presented to or obtained by {Commerce} during the course of the administrative proceeding." 19 U.S.C. § 1516a(b)(2)(A)(i).  Under this framework, Commerce may exclude certain documents from the record, including documents rejected from the record as untimely.  *See*, *e.g.*, *Acciai Speciali Terni S.p.A. v. United States*, 120 F. Supp. 2d 1101, 1103-04 (Ct. Int'l Trade 2000) ("Commerce regulations limit the definition of the record by excluding material returned to the respondent as untimely." (citing 19 C.F.R. § 351.104(a)(2)).  In this case, Risen provided Commerce with non-use certifications for only three of its four customers.  *See* Risen Initial Questionnaire Response at Exs. 19-20 (P.R. 190; C.R. 216).  Although Risen later attempted to submit a further non-use certification, Commerce rejected the submission pursuant to 19 C.F.R. § 351.301(c)(5), which provides that all factual information not otherwise addressed by 19 C.F.R. § 351.301(c)(1)-(4) must be submitted 30 days before the scheduled date for the preliminary results.  *See* Rejection of Risen Preliminary Comments Submission (Dec. 20, 2021) (P.R. 342).  Commerce retained a copy of Risen's rejected factual information on the record solely for purposes of establishing the basis for its rejection, pursuant to 19 C.F.R. § 351.104(a)(2)(ii)(A).  *Id.* at 2.

Risen does not contest Commerce's exercise of discretion to reject untimely information, or otherwise argue that the information that Commerce rejected is part of the agency record.  *See* Risen Br. 3-13; *see also*, *e.g.*, *Yantai Timken Co. v. United States,* 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007) ("Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits." (citation omitted)); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) ("A

court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result if the evidence were considered.").  Therefore, the record before the Court supports Commerce's finding that Risen did not provide Commerce with the full universe of non-use certifications for each of its United States customers.  *See Avisma*, 688 F.3d at 761 ("The role of judicial review is limited to determining whether the record is adequate to support the administrative action.").

Finally, Risen's assertions that there is no evidence contradicting its claims that it did not benefit from the EBCP ignores the nature of adverse inferences under 19 U.S.C. § 1677e(b).  *See* Risen Br. 7, 9-10.  As this Court has held, "{t}hat Commerce resorts to facts available and/or imposes an adverse inference under 19 U.S.C. § 1677e to make {CVD} findings, does not mean that the required findings have not been made."  *Changzhou Trina Solar Energy Co. v. United States*, 359 F. Supp. 3d 1329, 1339 (Ct. Int'l Trade 2019), *aff'd*, 975 F.3d 1318 (Fed. Cir. 2020).  In this case, Commerce found pursuant to its adverse inference that Risen used and benefited from the EBCP, despite its claims to the contrary.  *See* IDM at 31.  Thus, Risen's assertions of uncontradicted non-use lack merit and Commerce's determination should be sustained.

**IV.    Commerce's Findings That The Article 26(2) Program Is A *De Jure* Specific, Countervailable Subsidy And That The Subsidy Is Recurring Are Supported By Substantial Evidence And Otherwise Lawful**

This Court should sustain Commerce's findings regarding the Article 26(2) program subsidy because Commerce lawfully applied the governing statute to find that the subsidy is *de jure* specific, provides a financial contribution, and is recurring.

**A.    Commerce Reasonably Found The Article 26(2) Program *De Jure* Specific**

Commerce's governing statute provides that "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the

subsidy to an enterprise or industry, the subsidy is specific as a matter of law." 19 U.S.C.

§ 1677(5A)(D)(i) (known as *de jure* specificity). The statute also provides, for purposes of the

specificity rules, that "any reference to an enterprise or industry is a reference to a foreign

enterprise or foreign industry and *includes a group of such enterprises or industries*." 19 U.S.C.

§ 1677(5A) (emphasis added). Thus, the applicable standard for determining *de jure* specificity

is whether a subsidy's enacting legislation or regulation "expressly limits access to the subsidy"

to a group of enterprises or industries. *See* 19 U.S.C. § 1677(5A)(D)(i); *see also BGH Edelstahl*

*Siegen GmbH v. United States*, 600 F. Supp. 3d 1241, 1264 (Ct. Int'l Trade 2022) ("the {*de jure*

specificity} standard employed by Commerce is found in the statute").

Further, the Statement of Administrative Action explains that "{t}he Administration

intends to apply the specificity test in light of its original purpose, which is to function as an

initial screening mechanism to winnow out only those foreign subsidies which truly are broadly

available and widely used throughout an economy." Statement of Administrative Action

accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, at 929

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242 (SAA). Moreover, "the specificity test was

not intended to function as a loophole through which narrowly focused subsidies provided to or

used by discrete segments of an economy could escape the purview of the CVD law." *Id.* at 930.

The statute also includes a safe harbor under which Commerce will not find a subsidy *de jure*

specific when, among other factors, the legislation governing the subsidy provides "objective

criteria or conditions governing the eligibility for, and the amount of, a subsidy" that are "neutral

and that do not favor one enterprise or industry over another." 19 U.S.C. § 1677(5A)(D)(ii); *see*

*also BGH Edelstahl*, 600 F. Supp. 3d at 1255.

Commerce's finding that the Article 26(2) program is *de jure* specific under this framework is supported by substantial evidence.  Article 26(2) of China's Enterprise Income Tax Law provides that "income from investment income such as dividend and bonus between qualified resident enterprises" is tax exempt.  GOC Initial Questionnaire Response at Ex. B-2 (P.R. 192).  Article 83 of the regulations implementing the Enterprise Income Tax Law defines such gains as "investment gains derived by a resident enterprise through direct investment in another resident enterprise" and further provides that "{g}ains from equity investments such as dividends and bonuses, *etc.* . . . shall exclude investment gains obtained for holding listed and circulating shares issued by a resident enterprise for less than 12 months consecutively."  GOC Post-Preliminary Questionnaire Response at Ex. NSA-25 (P.R. 372).  The text of these laws supports Commerce's finding that the Article 26(2) program is *de jure* specific to enterprises with direct investment gains from investments in qualified resident enterprises.  *See* Post-Preliminary Analysis Memorandum at 5-6 (P.R. 394); IDM at 77-78.  As Commerce explained, the program is "limited by law to certain enterprises."  *Id.*  Because the program is limited to those companies, while also excluding enterprises with gains held for less than 12 months, Commerce's finding that the program is specific under 19 U.S.C. § 1677(5A)(D)(i) is reasonable and complies with the statutory *de jure* specificity definition.  *See id.*

JA Solar argues that Commerce cannot base a *de jure* specificity finding merely on the "uneven application of a subsidy."  JA Solar Br. 32.  But Commerce did not base its specificity finding on an "uneven application."  Instead, it found that the Article 26(2) program expressly limits access to the subsidies to certain enterprises or industries, which is the proper statutory standard.  *See BGH Edelstahl*, 600 F. Supp. 3d at 1264 (setting forth standard).  In support of its position, JA Solar cites this Court's decision in *Asociación de Exportadores e Industriales de*

*Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021). *See* JA Solar

Br. 32 (citing *Asociación de Exportadores*, 523 F. Supp. 3d at 1403). In that case, the Court

rejected Commerce's finding of *de jure* specificity based on a lack of uniform treatment across

the agricultural sector, holding that such uniform treatment is "not equivalent to its *explicit*

*restriction* of those benefits to a specific enterprise or industry." *Asociación de Exportadores*,

523 F. Supp. 3d at 1403. In this case, by contrast, Commerce did identify an explicit restriction

and specific group of enterprises that benefits from the Article 26(2) program. *See* IDM at 77.

Therefore, the Court's holding in *Asociación de Exportadores* is inapposite to this case.

Likewise, the Federal Circuit's holding in *AK Steel Corp. v. United States*, 192 F.3d 1367

(Fed. Cir. 1999), is inapposite. JA Solar cites *AK Steel* for the proposition that Commerce must

identify a "causal nexus between the 'alleged program and benefit.'" JA Solar Br. 35 (citing

*AK Steel*, 192 F.3d at 1373-74). In that case, the Court held that Commerce lacked substantial

evidence to support its finding that the Korean government provided preferential treatment to the

Korean Steel industry through a scheme of "aggressive targeting" that Commerce sought to

demonstrate circumstantially. *AK Steel*, 192 F.3d at 1373-74. The holding in *AK Steel* pertains

to an administrative determination published almost 30 years prior to the final results in this case,

pursuant to a substantially different statutory specificity provision. *Id.* at 1372. *AK Steel* does

not account for intervening changes to the statute, interpretive guidance provided by the SAA, or

practical guidance wrought by Commerce's experience in administrating the current statute, and

as a result is of limited relevance to Commerce's determination in this case.

Even if *AK Steel* were to apply, it would be inapposite. JA Solar describes the Federal

Circuit's holding in *AK Steel* as requiring that Commerce identify a specific industry at which a

subsidy program is targeted. This is an inaccurate characterization of the Federal Circuit's

holding because the decision applied to a particular theory of specificity that Commerce

espoused in that proceeding, and not in this case.  *See id.* at 1373-74.  Commerce in this case did

not identify a specific industry or group of industries benefitting from the Article 26(2) program

because the statute does not require Commerce to find *de jure* specificity on an industry basis.

*See* IDM at 77 (finding program limited to "certain enterprises"); 19 U.S.C. § 1677(5A)(D)(i)

(referencing "enterprise *or* industry" (emphasis added)); *cf. Gov't of Québec v. United States,*

567 F. Supp. 3d 1273, 1290-92 (Ct. Int'l Trade 2022) (sustaining determination that Québec's

on-the-job training tax credit program is *de facto* specific because recipients were limited in

number on enterprise basis (appeal pending)).

JA Solar also argues that Commerce's finding that the Article 26(2) program is limited to

a group of enterprises is contrary to the plain meaning of the statute, contending that "a subsidy

can only be countervailed if it 'directly, firmly, or explicitly assigns limits to or restricts the

bounds of a particular subsidy to a given enterprise or industry.'"  JA Solar Br. 34-35 (quoting

*Asociación de Exportadores*, 523 F. Supp. 3d at 1403).  But it is unclear how the Article 26(2)

program fails to meet this criterion when it is limited to resident enterprises with investment

gains from other resident enterprises and also excludes any enterprises with gains on investments

held for less than 12 months.  JA Solar's argument relies on its claim that "'Enterprises with

investment gains' cannot reasonably be viewed as a type of enterprise or industry{.}"  JA Solar

Br. 35.  Notwithstanding that this understates the limitations imposed by the program, JA Solar

fails to offer support for why "enterprises with investment gains" would not be considered a

"type of enterprise."  *Id.* at 34-35.  Moreover, JA Solar's statutory interpretation, in which a

subsidy must be limited to a "type of enterprise" to be *de jure* specific, is at odds with the

statute's text, which requires only that the enacting law "expressly limits access to the subsidy."

19 U.S.C. § 1677(5A)(D)(i).  The Article 26(2) program expressly limits access to the subsidy to a group of enterprises, meeting the statutory standard.  Nor does JA Solar's assertion that the criteria for the program are automatic change this fact.  *See* JA Solar Br. 35, 36.

In addition to its statutory argument, JA Solar argues that Commerce's finding with respect to the Article 26(2) program contradicts Commerce's regulatory guidance, which provides that the purpose of the specificity test is "that subsidies that are distributed very widely throughout an economy are not countervailed."  JA Solar Br. 37 (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,357 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*)).  Yet JA Solar disregards the sentence immediately preceding that guidance, rejecting comments calling for a "group characteristic" criterion to be added to Commerce's specificity test and providing that "{t}here is no requirement that the members of a group share similar characteristic."  *Id.* The regulatory guidance that JA Solar disregards cuts directly against its position that Commerce must identify a "type" of enterprise to find that a program is expressly limited to a group of enterprises.  *See* JA Solar Br. 36-38.  Indeed, contrary to JA Solar's comparison of this case to *Government of Québec*, the subsidy program that Commerce found *de facto* specific in that case applied to enterprises across various industries.  *See* 567 F. Supp. 3d at 1290-92 (sustaining determination that Québec's on-the-job training tax credit program is *de facto* specific).

Further, the SAA's interpretative guidance, while articulating a similar policy against finding very widely distributed subsidies specific, also provides that the "specificity test was not intended to function as a loophole through which narrowly focused subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law."  SAA at 930, 1994 U.S.C.C.A.N. 4242.  Commerce's application of the specificity laws to the Article 26(2) program ensures that the program cannot "escape the purview" of Commerce's review solely

because the enterprises to which the program is limited are not of the same type.  That the

program is "limited by law to certain enterprises" (IDM at 77) also refutes JA Solar's claim that

Commerce's application of the statute "has no limits."  Risen Br. 37-38.  Therefore, Commerce's

finding that the Article 26(2) program is *de jure* specific comports with both the statute's

language and its purpose.

### B.  Commerce Reasonably Found That The Article 26(2) Program Provides A Financial Contribution And Benefit

Commerce's finding that the Article 26(2) program provides a financial contribution and

benefit in the form of foregone tax revenue is also lawful.  The statute states that an authority

provides a financial contribution by "foregoing or not collecting revenue that is otherwise due,

such as granting tax credits or deductions from taxable income."  19 U.S.C. § 1677(5)(D)(ii).

Commerce's regulations provide that, in the case of a financial contribution in the form of a tax

exemption, a benefit exists to the extent that the tax paid is less than what would have been paid

absent the program.  19 C.F.R. § 351.509(a)(1).  Commerce found that the Article 26(2) program

provides a financial contribution because it exempts respondents from taxes that would otherwise

be owed to the government of China, and that JA Solar received a benefit in the amount of that

exemption.  IDM at 77-78; *see* JA Solar Post-Preliminary Questionnaire Response at 6 (Apr. 25,

2022) (P.R. 393) ("JA Solar companies received assistance under this program in the form of a

deduction from the taxable income, i.e., the full amount of the equity investment income.").

JA Solar argues that Commerce "ignored the reality" of the Article 26(2) program by not

accounting for the effect the program has on double taxation of JA Solar entities.  JA Solar Br.

38-40.  But JA Solar itself disregards the principle that Commerce does not consider the *effect* of

a subsidy in determining whether a subsidy exists, and moreover considers only whether a CVD

respondent received a subsidy.  *See* IDM at 77-78 (citing 19 U.S.C. § 1677(5)(C)); *see also BGH*

*Edelstahl*, 600 F. Supp. 3d at 1253 ("neither the statute nor the regulation considers the purpose of the tax" (citing 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.509(a)(1))).  In other words, the fact that an investor JA Solar entity received an exemption on income it received through a distribution of profits is not negated by the fact that the investee company paid taxes on the underlying revenue, even if the investee company is another JA Solar entity.  As Commerce found, the focus of its analysis is on the experience of the respondent entit(ies) that received the benefit by claiming on their tax return an exemption for investment gains.  *See* IDM at 77-78.

JA Solar suggests that Commerce's finding is rooted in a misunderstanding of the concept of double taxation.  JA Solar Br. 40-41 (citing *Porsche Motorsport N. Am., Inc. v. United States*, No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115, at *26 (Aug. 22, 2018); *Atlas Copco, Inc. v. United States*, 651 F. Supp. 1446, 1448 (Ct. Int'l Trade 1986)).  But these cases have no relevance to whether Commerce may conclude that a subsidy provides a financial contribution when it is designed to avoid double taxation, which is a fundamentally different question from whether double taxation exists.  JA Solar argues, without support, that Commerce must interpret the statute and regulations "in a way to avoid countervailing a program that is designed to avoid double taxation."  JA Solar Br. 41.  Because the statute and regulations do not require Commerce to consider a subsidy's overall effect, this statement is incorrect, and Commerce's finding that the Article 26(2) program provides a financial contribution that benefits JA Solar in the amount of revenue foregone is lawful.

## C.  Commerce Reasonably Found That The Article 26(2) Program Is Recurring

Commerce's finding that the Article 26(2) program constitutes a recurring subsidy is supported by substantial evidence and otherwise lawful.  Commerce's regulations provide a non-binding illustrative list of recurring and non-recurring benefits, and states that Commerce will

31

normally treat direct tax exemptions as recurring.  19 C.F.R. § 351.524(c)(1).  Additionally,

Commerce's regulations provide that, if a subsidy is not on the illustrative list or is not addressed

elsewhere in the regulations, or if a party argues that a subsidy on the list of recurring subsidies

should nonetheless be treated as non-recurring, the following criteria apply:

> (i) Whether the subsidy is exceptional in the sense that the
> recipient cannot expect to receive additional subsidies under the
> same program on an ongoing basis from year to year;
> (ii) Whether the subsidy required or received the government's
> express authorization for approval (i.e., receipt of benefits is not
> automatic); or
> (iii) Whether the subsidy was provided for, or tied to, the capital
> structure or capital assets of the firm.

19 C.F.R. § 351.524(c)(2).

Commerce preliminarily found that the Article 26(2) program is recurring because it is a

tax exemption and is therefore presumed to be recurring under 19 C.F.R. § 351.524(c)(1).  Post-

Preliminary Analysis Memorandum at 6 (P.R. 394).  Despite JA Solar's protests, Commerce

maintained its finding in its final results because "investment gains may be received regularly,

{and} companies may claim the exemption annually."  IDM at 78.  JA Solar argues that the

investment gains exempted under the Article 26(2) program during the period of review were "a

singular event," and therefore non-recurring, but fails to establish that proposition.  JA Solar Br.

41-42.  Commerce analyzed the program for this first time in this review, and therefore was

required to analyze whether it would be recurring in future reviews.  Given that tax benefits

under the Article 26(2) program can be claimed annually and investment gains received

regularly, Commerce reasonably deemed it the type of program through which a company can

expect to receive a subsidy regularly.  *See* IDM at 78.  JA Solar fails to explain, outside of its

insistence that its receipt of income under the program was a "one-time investment return" (even

though multiple JA Solar entities received the subsidy during the review period), why it would

be unreasonable for Commerce to expect companies to receive income from investments held in resident enterprises annually.  JA Solar Br. 41; *see also* JA Solar Post-Preliminary Questionnaire Response at 6-8 (P.R. 393; C.R. 538) (listing recipients); Post-Preliminary Analysis Memorandum at 6 (P.R. 394) (same).  JA Solar's assertion that one instance in which it received the subsidy involved profits from more than one year fails to render unreasonable Commerce's treatment of the program consistent with its normal practice.  *See id.* at 42.

Moreover, JA Solar does not provide evidence that the Article 26(2) program is non-recurring pursuant to the criteria listed in 19 C.F.R. § 351.524(c)(2), aside from briefly referencing section 351.524(c)(2)(iii).  JA Solar Br. 41-42.  JA Solar argues that its receipt of income from investments held on resident enterprises is tied to the "capital structure" of JA Solar, without any further explanation.  *Id.* (citing *CVD Preamble*, 63 Fed. Reg. at 65,393).  But the *CVD Preamble* indicates that Commerce intended that "the benefit from a subsidy provided for, or tied to, the capital structure or capital assets of a firm to be non-recurring because these types of subsidies generally benefit the creation, expansion, and/or continued existence of a firm."  *CVD Preamble*, 63 Fed. Reg. at 65,393.  On its face, nothing about JA Solar's receipt of investment income suggests the income was necessary to its expansion or continued existence in a manner that would support finding that the subsidy is non-recurring, and JA Solar does not identify any record evidence that indicates otherwise.  Therefore, because Commerce normally treats tax exemption programs as recurring, because the Article 26(2) program provides a benefit that companies could expect to receive on an annual basis, and because JA Solar does not present evidence to demonstrate otherwise, Commerce's determination to treat the Article 26(2) program as a recurring subsidy is supported by substantial evidence and otherwise lawful.

V.   **Commerce's Benefit Calculation For The Land-Use Rights For Less Than Adequate Renumeration Program Is Supported By Substantial Evidence And Lawful**

   A.   **Commerce's Selection Of The Thai CBRE Data As A Benchmark Source Is Supported By Substantial Evidence And Otherwise Lawful**

Commerce's regulations provide for a three-tiered hierarchy by which Commerce measures the adequacy of remuneration. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012). First, Commerce will normally measure "adequate remuneration" using a "tier-one" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(i), by comparing government prices to a market-determined price for the good or service resulting from actual transactions in the country in question. When market-based prices are unavailable, Commerce will use a "tier-two" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(ii), by comparing government prices to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." If world market prices are unavailable, Commerce will resort to a "tier-three" benchmark, pursuant to 19 C.F.R. § 351.511(a)(2)(iii), under which Commerce will measure adequate remuneration by assessing whether the government-provided input price "is consistent with market principles."

Because Commerce found that land markets in China are distorted, and because land is an inappropriate input to analyze by recourse to a world-market price, Commerce used a tier-three benchmark for land, pursuant to 19 C.F.R. § 351.511(a)(2)(iii). PDM at 21-22; *see also generally* Land-Use Rights Memorandum (P.R. 104). Commerce selected both the Thai CBRE data and Malaysian MIDA data as sources for its land benchmark, finding that both sources were appropriate for use based on the factors that Commerce articulated in its *Sacks from China* investigation. Those factors include "national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production."

*Id.* at 22-23 (citing *Laminated Woven Sacks from the People's Republic of China*, 74 Fed. Reg. 67,893, 67,906-08 (Dep't of Commerce Dec. 3, 2007) (prelim. determ.) (*Sacks From China*); *see also* IDM at 70-71. Commerce simple-averaged these two data sources to construct one tier-three benchmark price for land. PDM at 23; IDM at 71.

JA Solar contests Commerce's determination to use the Thai CBRE data as one of the sources for its land benchmark, first arguing that the Thai CBRE data itself is "grossly outdated," and further arguing that the information that Commerce relied on to make its selection of the Thai CBRE data is too outdated to be of relevance to the period of review. JA Solar Br. 18-25. Commerce, however, explained why the Thai CBRE data was a suitable source to use as part of its land benchmark. *See* IDM at 70-71. Commerce explained that it addressed the Thai CBRE data's lack of contemporaneity by indexing it for inflation to the period of review. *See id.* at 71. Commerce further determined that, once indexed using Consumer Price Index (CPI) data, the Thai data remained a suitable source for the land benchmark, based on similarity of geographic location, per capita income, regional population density, and economic development. *Id.* at 70-71. Additionally, Commerce explained that averaging both the Thai and Malaysian data was advantageous because it "created a more robust benchmark that does not rely on one data source to the exclusion of the other." *Id.* at 71. Hence, while recognizing that the Thai CBRE data were not as contemporaneous as they once were, Commerce concluded based on these factors that the data remain probative and usable for determining the land prices benchmark. *Id.*; *cf. Canadian Solar Inc. v. United States*, 537 F. Supp. 3d 1380, 1391 (Ct. Int'l Trade 2021) (sustaining use of Thai land data and stating "{i}t is within Commerce's discretion to weigh the relevant factors").

Relatedly, neither the statute nor the regulations offer specific guidance as to how Commerce should select benchmarks pursuant to tier three, other than that Commerce should

analyze whether the input price is being provided "consistent with market principles."  19 C.F.R.
§ 351.511(a)(2)(iii).  In this regard, Commerce's explanation that indexing the Thai data to
account for contemporaneity and averaging it with the MIDA data "created a more robust
benchmark" (IDM at 71) comports with the methodology that Commerce's regulations provide
for calculating tier-two benchmarks:  "Where there is more than one commercially available
world market price, {Commerce} will average such prices to the extent practicable, making due
allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).  Commerce's
methodology to index and average the Thai CBRE data, rather than abandon it altogether, thus
comports with Commerce's stated approach for calculating tier-two benchmarks.

Commerce's determination that the Thai data remain probative as a land benchmark
source is also consistent with this Court's holding in *Fujian Yinfeng Import & Export Trading
Co. v. United States*, No. 21-00088, 2022 WL 4180886, at *8 (Ct. Int'l Trade Sept. 13, 2022).
Referencing the "deference due to Commerce on a highly technical matter," *Fujian Yinfeng*
sustained Commerce's reliance on the Thai CBRE data, alone, in a CVD investigation also
covering the year 2019.  *Id.* (citing *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038-39
(Fed. Cir. 1996) (discussing deference to "Commerce's technical expertise in identifying,
selecting and applying methodologies to implement the dictates set forth in the governing
statute")).  As Commerce explained in its final results, Commerce's determination to average the
two benchmark sources represents an evolution of Commerce's previous practice with respect to
this issue.  IDM at 71.  Commerce's methodology should be given deference in light of
Commerce's technical expertise, the complexity inherent in selecting land benchmarks, and the
lack of guidance in the statute and regulations.  *See Thai Pineapple Pub. Co. v. United States*,

187 F.3d 1362, 1365 (Fed. Cir. 1999) ("{R}eviewing courts must accord deference to the agency in its selection and development of proper methodologies.").

At the same time, we recognize that the Court has recently remanded Commerce's reliance on a simple average of the Thai CBRE and MIDA data in Commerce's 2017 review of this order. *See Risen CVD II*, 2023 WL 2890019, at *6-7. Although the Court in *Risen CVD II* held that Commerce had not addressed the Court's concern about the Thai CBRE data's staleness, Commerce in this case explained that indexing the data for inflation addressed contemporaneity issues while also finding that the Thai data, once indexed, were still probative for benchmarking purposes and provided a "more robust" benchmark when combined with the Malaysian data. *See* IDM at 70-71; *cf. Risen CVD II*, 2023 WL 2890019, at *7 ("{Commerce} has to decide if it has such defective data that it should be rejected in favor of better data.").[6]

JA Solar additionally contends that Commerce applied a different methodology by rejecting non-contemporaneous benchmarks for ocean freight and natural gas in prior CVD proceedings. JA Solar Br. 18-20 (citing, for example, *Multilayered Wood Flooring From the People's Republic of China*, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020) (final admin. review), at IDM Cmt. 7; *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019) (final admin. review), at IDM Cmt. 7. Developing a tier-three benchmark for land as *in situ* property, however, is somewhat unique from obtaining world market benchmark information for more generic commodities and services. *See* PDM at 21,22 (explaining that land is not sold on world market); Land-Use Rights Memorandum at 2-3, 27 (P.R. 104) (same); *see also CVD Preamble*, 63 Fed. Reg. at 65,378 (stating tier-three analysis

---

[6] The *Risen CVD II* litigation is also ongoing, and Commerce's remand determination with respect to the Thai data issue is not final.

"may be necessary for such goods or services as electricity, *land leases*, or water, *and the circumstances of each case vary widely* (emphasis added)).

Hence, as we discuss above, Commerce's land benchmarks are selected through a land-specific analysis that Commerce has used since its determination in *Sacks from China*.  *See* PDM at 21-22; *Sacks from China*, 74 Fed. Reg. at 67,906-08; Land-Use Rights Memorandum at 2 (P.R. 104).  Although Commerce clearly weighed contemporaneity as a factor, *see* IDM at 71, it concluded that the Thai CBRE data, as indexed for inflation, were still probative and created a "more robust" benchmark when used in combination with the MIDA data.  *Cf. Canadian Solar*, 537 F. Supp. 3d at 1391 ("It is within Commerce's discretion to weigh the relevant factors.").  JA Solar's comparison of this case to previous ocean freight and natural gas determinations is thus unavailing.  *Cf. Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014) ("each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record" (footnote omitted)).

Separately from its arguments about alleged staleness of the Thai CBRE data, JA Solar contends that the information on which Commerce relied in determining that Thailand and China are comparable for benchmarking purposes is too old to be probative.  *See* JA Solar Br. 22-25.  Importantly, JA Solar did not place information on the record to challenge Commerce's comparability discussion in the 2018 Land-Use Rights Memorandum (which *is* on the record).  *See generally* Land-Use Rights Memorandum at 30 (P.R. 104).  Instead, JA Solar points to the fact that Thailand is not included on Commerce's potential surrogate country list for its 2019 *antidumping* administrative review concerning solar cells from China and to concerns about comparability that the Court raised in litigation concerning the 2017 review.  *See* JA Solar Br. 23-24.  Commerce, however, addressed the concerns that JA Solar raises in the context of the

remand in the 2017 review, explaining that JA Solar misinterprets the nature of Commerce's surrogate country lists in antidumping proceedings and concluding that Thailand and China were sufficiently similar (in addition to being geographically proximate) to continue using Thailand as a benchmark country.  *See* 2017 Remand Results, Ct. Int'l Trade No. 20-3912, ECF No. 94 at 11-13, 22-23.  Given the lack of contrary evidence on the record of this case, JA Solar's comparability arguments do not provide a valid basis to overturn Commerce's determination.

**B.  Commerce's Calculation Of The Allocation For JA Solar's Receipt Of Land-Use Rights Prior To 2018 Is Reasonable**

Commerce will allocate a non-recurring benefit to a firm over the number of years corresponding to the average useful life of renewable physical assets, unless the amount of that benefit is less than 0.5 percent of relevant sales, at which point Commerce will allocate the non-recurring benefit to the year of receipt.  19 C.F.R. § 351.524(b).  Commerce calculates its allocations for a given year pursuant to the formula described in 19 C.F.R. § 351.524(d).  When a "benefit stream"—or the amount of allocable benefit attributed to a subsidy received in a year prior to the period of review—is in place, it is not amenable to *post hoc* adjustments.  *See Toscelik Profil ve Sac Endustrisi A.S. v. United States*, No. 13-00371, 2014 WL 5462542, at *4 (Ct. Int'l Trade Oct. 29, 2014) ("{A} grant has only a singular benefit amount, and in the absence of clear indication to the contrary, a singular benefit amount is not variable and subject to recalculation in successive reviews . . . Had Commerce intended otherwise, there would have been no reason to create a multi-year benefit-stream formula.").

JA Solar contests Commerce's allocation of the benefit stream following Commerce's calculation of the benefit from the land for less than adequate remuneration program for 2017 in two respects:  first, JA Solar argues that Commerce should have found those land use rights to be recurring in the 2017 review period, and second, JA Solar argues that Commerce should not have

allocated the benefit based on the Thai CBRE data.  JA Solar Br. 25-31.  As a general matter, JA

Solar's argument is misplaced because Commerce does not revisit calculations made in previous

reviews.  *See* IDM at 73 (explaining, regarding benefit to be allocated from JA Solar's pre-2018

land-use right purchases, "those benefit streams have already been established and duties have

been put in place based on those streams").  With respect to Commerce's determination not to

find the pre-2018 leases recurring, and thus not to expense those subsidies to the year of receipt,

that aspect of Commerce's *2017 Final Results* is final and cannot be revisited.  *See Crystalline*

*Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic*

*of China*, 85 Fed. Reg. 7,727 (Dep't of Commerce Feb. 11, 2020), and PDM at 48-49 (treating

subsidy as non-recurring), *unchanged in 2017 Final Results*, 85 Fed. Reg. 79,163, and IDM Cmt.

8 (remand pending on other aspects of land subsidy issue); *cf. Vt. Yankee Nuclear Power Corp.*

*v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 554-55 (1978) (observing that, absent finality,

"there would be little hope that the administrative process could ever be consummated in an

order that would not be subject to reopening" (citation omitted)); *Norsk Hydro Canada, Inc. v.*

*United States*, 472 F.3d 1347, 1361 (Fed. Cir. 2006) (explaining that revisiting such issues would

"impair the finality of any one annual review," inappropriately prolonging CVD disputes).

     The appropriate time for JA Solar to raise this issue would have been in the 2017 review.

JA Solar did not do so, and therefore Commerce did not receive an opportunity to address the

issue that JA Solar now raises in the context of this review.  *See 2017 Final Results*, 85 Fed. Reg.

79,163 at Cmt. 8 (summarizing JA Solar's arguments regarding land benchmark).  Indeed, on the

only occasion of which we are aware in which this Court opined on a similar issue, the Court

held that Commerce may alter a benefit stream only if "it can be demonstrated that Commerce's

prior determination is 'clearly erroneous and would work a manifest injustice.'"  *Toscelik*, 2014

WL 5462542, at *4 (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).  JA Solar

provides no evidence that Commerce's determination to treat land leases as non-recurring in its

2017 review meets this high standard.  Although Commerce found purchases of land for less

than adequate renumeration to be recurring in this review, its determination on the issue in the

*2017 Final Results* is final and was unchallenged, meaning it should not be disturbed.  Likewise,

JA Solar's argument that Commerce should revise the nature of its calculations from the 2017

review to substitute land leasing benchmarks for land purchasing benchmarks inappropriately

attempts to revisit issues that were finally decided in the 2017 review.  *See* JA Solar Br. 27-29.

For similar reasons, Commerce in this review should not be required to use different data

for benefit streams established in the 2017 review compared to the Thai CBRE data that it used

in the 2017 final results.  *See* JA Solar Br. 29-31.  Although JA Solar did challenge Commerce's

reliance on the Thai CBRE data in that review, Commerce's determination on remand is still

pending, and finality concerns dictate that Commerce must be able to rely on an established

benefit stream in order to comply with its statutory requirement to complete the underlying

review.  The Federal Circuit in *Norsk Hydro* explained:

> Given that Commerce undertakes annual reviews, it would be
> duplicative and wasteful for later reviews to revisit matters subject
> to review in prior {periods of review}.  Revisiting issues that were
> resolved in prior review proceedings would impair the finality of
> any one annual review, potentially prolonging a {countervailing
> duty} dispute far beyond the year to which it relates.

472 F.3d at 1361.  The same finality concerns apply in this case.  Even if Commerce were to

recalculate the benefit stream established in 2017, it is unclear how Commerce would do so with

the ultimate disposition of the *2017 Final Results* still pending.  Precluding Commerce from

relying on the benefit streams established in that review could potentially forestall the

completion of several years of reviews in the future.  Therefore, the Court should recognize the

finality concerns inherent in JA Solar's challenge to Commerce's 2017 benefit streams and

sustain Commerce's reliance on the Thai CBRE data to allocate benefit based on those streams.

## VI. Commerce's Reliance On Both The Descartes And Xeneta Data In Calculating An Ocean Freight Benchmark Is Supported By Substantial Evidence And Lawful

Commerce calculates tier-two benchmarks pursuant to 19 C.F.R. § 351.511(a)(2)(ii),

which directs Commerce to calculate a benchmark based on a "world market price where it is

reasonable to conclude that such price would be available to purchasers in the country in

question." When more than one world market price is available, Commerce will average those

prices "to the extent practicable, making due allowance for factors affecting comparability." 19

C.F.R. § 351.511(a)(2)(ii). For tier-one and tier-two benchmarks, Commerce's regulations

instruct it to "adjust the comparison price to reflect the price that a firm actually paid or would

pay if it imported the product," including delivery charges and import duties. 19 C.F.R.

§ 351.511(a)(2)(iv).

Commerce selected the Descartes and Xeneta data for use in calculating a benchmark for

the ocean freight adjustments and constructed a benchmark by averaging together data points for

each of the routes listed in that data, before averaging all of the routes together to derive a single

benchmark for ocean freight adjustments. IDM at 47. Risen argues that Commerce should not

have used Descartes data in its calculations, even though Commerce decreased the Descartes

data's weight by averaging the individual routes identified in each dataset. Risen Br. 13-17.

Risen's core contention concerns the quality and number of data points in the Descartes data. As

Risen argues, the Descartes data "is only based on routes from {the United States} to China, are

based on only one single carrier's prices, and are in reality representative of one repeated

datapoint for the entire {period of review} for one stand-alone rate." Risen Br. 15.

Commerce addressed Risen's complaints by averaging the prices established for individual routes. *See* IDM at 47. Not only does this account for differences in routes between the datasets, it also accounts for the fact that the Descartes data includes fewer data points because it reduces the Descartes data's weight in the benchmark calculation. At the same time, merely because the Descartes data may be different and encompass fewer data points compared to the Xeneta data does not mean that the data is aberrational, especially in light of Commerce's regulatory preference to use multiple prices when practicable. *See* 19 C.F.R. § 351.511(a)(2)(ii).

Further, to the extent Risen argues that the Descartes prices cannot be "world market prices" because they pertain only to United States to China routes, that argument misreads Commerce's regulations. *See* Risen Br. 15-16. The regulations neither define "world-market price" nor require Commerce to rely on sources that provide an amalgam of international prices. The only limitation that 19 C.F.R. § 351.511(a)(2)(ii) places on Commerce's discretion to select world-market prices is that Commerce must make "due allowance for factors affecting comparability," which Commerce did in this case by weighting the Descartes data according to the limited number of routes provided. *Cf. Thai Pineapple*, 187 F.3d at 1365 (discussing deference to agency methodologies). Additionally, the regulations direct Commerce to select an ocean freight benchmark that "would be available to purchasers in the country in question," and Risen concedes that the rate in the Descartes data stems from an actual freight carrier, which would presumably be available to Chinese purchasers. Risen Br. 15 ("{T}he Descartes data is representative of a single company's single ocean rate.").

Finally, this Court sustained Commerce's use of Descartes data to calculate an ocean freight benchmark in *Fujian Yinfeng. See* 2022 WL 4180886, at *7-8. We recognize that the Court has also recently remanded Commerce's reliance on Descartes data in the 2017 review of

this order, although Commerce's remand determination in that case is still pending.  *See Risen CVD II*, 2023 WL 2890019, at *7-9.  We therefore respectfully request that Commerce's inclusion of the Descartes data in the ocean freight benchmark for this review be sustained.

## **CONCLUSION**

For these reasons, aside from our voluntary remand request, we respectfully request that this Court deny plaintiffs' motions for judgment on the administrative record, sustain the relevant portions of Commerce's final determination, and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:
SPENCER NEFF
Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce

/s/ Joshua E. Kurland
JOSHUA S. KURLAND
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 616-0477
Email:  Joshua E. Kurland@usdoj.gov

May 23, 2023

*Attorneys for Defendant United States*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limitation in Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 13,873 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


/s/ Joshua E. Kurland