UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| RISEN ENERGY CO., LTD.<br>        Plaintiff,<br><br>and<br><br>JA SOLAR TECHNOLOGY YANGZHOU CO., LTD. and SHANGHAI JA SOLAR TECHNOLOGY CO., LTD., ET AL.,<br>        Consolidated Plaintiffs,<br>    v.<br><br>UNITED STATES,<br>        Defendant. | Consol. Court No. 22-231 |

**PLAINTIFF'S REPLY RBIEF**

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 15th St., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: July 26, 2023

**TABLE OF CONTENTS**

I.   The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence And Contrary to Law ........................... 1

II.  The Department's Reliance on the Descartes Ocean Freight Data is Not Supported by Substantial Evidence .............................................................. 8

III. Conclusion ........................................................................................ 10

# TABLE OF AUTHORITIES

**CASES**

*Archer Daniels Midland Co. v. United States*, 917, F. Supp. 2d 1331 (Ct. Int'l Trade 2013) ........2

*Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015)...............9

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) ................................................................................................................................... 1-2

*Cooper Kunshan Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287 (Ct. Int'l Trade 2022) ......................................................................................................................................6

*Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52.......................2

*Dalian Meisen Woodworking Co., Ltd. v. United States*, 2023 Ct. Intl. Trade LEXIS 70 ..............7

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ........................2

*Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019)......................................................................................................................2

*Risen Energy Co. v. United States, 2023 Ct. Intl. Trade LEXIS 52*..............................................7, 9

*Yama Ribbons & Bows Co. v. United States*, 419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019)........ 5-6

**STATUTES & REGULATIONS**

19 U.S.C. § 1677(5) ........................................................................................................................9

**ADMINISTRATIVE DECISIONS**

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 57,809 (Dep't of Commerce Oct. 19, 2021) (final admin. review).............6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (Dep't Commerce July 7, 2022)...................................................1, 8, 9

*Forged Steel Fittings from the People's Republic of China*, 87 Fed. Reg. 35,498 (Dep't of Commerce June 10, 2022) (final determ.) ...................................................................................6

Plaintiff Risen Energy Co., Ltd. ("Risen") hereby files its reply brief to Defendant United States' response brief.  *See* U.S. Br. (May 23, 2023); ECF 33; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 40,491 (Dep't Commerce July 7, 2022) ("Final Results"), *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR429**.

I. **The Department's Application of The EBC Countervailing Duty Program to Risen Is Unsupported By Record Evidence and Contrary to Law.**

The Department's use of adverse facts available ("AFA") to find that Risen benefitted from the EBC program when record evidence only contains evidence of non-use is unreasonable and unlawful.  The United States' response brief fails to understand the unique posture of a cooperating party, Risen, being penalized with the AFA rate and the factual posture of this case with respect to EBC certifications and the Department's new EBC supplemental questionnaire procedures.

The United States primarily focuses on Risen's supposed failure to fill the gap left by the GOC, discussed further below.  However, the United States also reiterates that it is the government of China's failure to cooperate that led to the AFA finding.  U.S. Br. at 16-19.  This fails to properly understand the Court precedent on this matter.  Risen fully cooperated in this review.  While the United States may be correct that an AFA inference impacting a cooperating party due to the government of China's failure may be lawful, the Department has been cautioned by the Courts to mitigate the impact on the cooperating party.  For example, in *Changzhou Trina II,* while in one sentence acknowledging the collateral effect of the GOC's non-cooperation on the cooperating respondent, the Court stated in the next sentence that "the Department, however, should seek to avoid such impact if relevant information exists elsewhere

1

on the record." *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1325 (Ct. Int'l Trade 2018) ("*Changzhou Trina II*").  *Changzhou Trina II* is the Court's first opinion remanding several aspects of the Department's final results in the *Solar Cells from China* POR 2014 CVD review.  *See id.* at 1323.  In that opinion, the Court overturned the Department's AFA finding on the EBC program and directed the Department to explain what information is actually missing from the record, and reasonably show that such information is, in fact, unverifiable.  *Id.*, at 1327.  Central to the *Fine Furniture* decision that the United States cites, was the fact that the Department did not use "any adverse inferences for the facts provided by Fine Furniture, the Department did not apply adverse inferences against Fine Furniture."  *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371 (Fed. Cir. 2014); *see also Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1333-34 (Ct. Int'l Trade 2019) ("*Jiangsu Zhongji I*") (internal citation omitted).  The Court instructed the Department to "consider what information could be verified that would show non-use" and emphasized that "effort should be made to avoid the collateral consequences to cooperating parties of another's non-cooperation."  *Id.*, at 1334 (*citing Archer Daniels Midland Co. v. United States*, 917, F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013)); *Dalian Meisen Woodworking Co. v. United States*, 2022 Ct. Intl. Trade LEXIS 52, *16 (Discussing the EBC program and reminding the Department that the "application of an adverse inference is based on a respondent's efforts to comply with Commerce's requests for information. The purpose of the application of adverse facts available is to encourage respondents to comply with Commerce's requests.").  The Department has not tried to mitigate the impact of the GOC's failure to comply on cooperating Risen and has not considered the information that Risen did provide.

      The Department's application of AFA to Risen for the EBC program in this review

2

misunderstands several factual situations: 1) the Department never requested information from Risen's Customers regarding the EBC program and 2) Risen did provide certifications for the majority of its Customers.

First, the United States claims that Risen failed to provide complete information to allow the Department to fill the gap left by the government of China. U.S. Br. at 18-19. Hereby, the United States fails to understand the factual record and posture of this review. The Department's initial questionnaire does not request that a respondent wishing to show non-use of the EBC program must submit certifications from its Customers. The questionnaire only requests that Risen provide a list of its Customers to the GOC, the role Risen played in helping its Customers obtain buyers credits, and how it confirmed that tis Customers did not use the program, if that was the case. Risen Section III at 40; **PR48**. Risen fully answered all of these questions. Risen explained that it has never assisted any Customers to obtain credits under this program. *See* Risen Section III Resp. at 41; **CR211; PR187**. Risen also stated its understanding, as corroborated by the GOC, that the exporter - in this case, Risen itself - must be aware of any such loan in any case because the exporter has to be involved in the EX-IM Bank's loan evaluation and approval proceeding and the post-lending loan management proceeding. *Id*. Notably, the China EX-IM Bank itself confirmed that Risen and none of its Customers benefitted from the EBC program, which is further evidence that all four Customers did not benefit from the program. GOC Initial Questionnaire Resp. (June 21, 2021) at 136; **CR235; PR192**. Risen also stated that it contacted <u>all</u> of its Customers and confirmed they did not use the program. Risen Section III Resp. at 41; **CR211; PR187**. However, the Department's position, as reiterated by the United States, is that Risen was obligated to provide information that it was never requested to provide. This runs afoul of the AFA statute.

Further, the United States reiterates that it would have issued Risen a supplemental EBC questionnaire if it had provided certifications for all Customers. U.S. Br. at 18, 20-22. However, there is no relevance between issuing the EBC supplemental questionnaire and which or whether all Customers provided certifications. The purpose of the EBC supplemental questionnaire is to collect information from the Customers. The Department had the list of Risen's U.S. Customers and if the Department decided to collect EBC information from these Customers, then it is only logical that the Department would issue the questionnaire to all Customers. When the Department issues supplemental questionnaires requesting information from affiliated companies or producers of subject merchandise (if the respondent was a trading company) in countervailing cases, for example, the Department does not first ask whether the company will cooperate and respond. The Department issues the request for information and then the company responds or does not. Indeed, as the EBC questionnaire itself is generic, i.e., not adjusted for a particular Customer or product, it was no different for the Department to issue this questionnaire to Risen than in any other case. Only issuing the questionnaire when Customers provided certifications is not logical given the Department did not request such certifications, and so there is no difference in cooperation with the Department among the U.S. Customers.

Indeed, if the Department was able and planning to issue an EBC supplemental questionnaire on this information, it does not stand to reason that the Department could not issue the questionnaire regardless of whether Customers provided certifications in the original questionnaire. The Department had the list of Risen's Customers and had Risen's statements that neither it nor its Customers used the EBC program; the Department needed no further information in order to issue the supplemental questionnaire. Indeed, the fact that most of Risen's Customers did provide certifications should have, at a minimum, prompted the

4

Department to issue the EBC supplemental questionnaire.

The United States repeats that Risen should have known certifications from all of its Customers were required in order for the Department to issue the EBC supplemental questionnaire, but this fails to understand how new the Department's developing approach to this program is. *See* U.S. Br. at 20. Risen submitted its Section III questionnaire response in June 2021. At this time, the *Risen Energy* CIT 20-3912 and *Dalian Meisen* CIT 20-110 remand proceedings (further discussed below) had not yet occurred, which Risen understands are among the first instances where the Department issued the supplemental EBC questionnaires and made any statements about this being a new practice. Counsel is aware of a few other earlier cases where the Department issued similar EBC supplemental questionnaires, but this was very inconsistent and uncommon until only recently, and the Department had never clarified in those earlier cases that it was only issuing the questionnaire if the respondent provided certifications from all Customers. Further, even the United States concedes that its practice with respect to this program is new, stating that is requests voluntary remand with respect to JA Solar to "bring its determination in this case into compliance with its current practice" as elaborated in the 2017 Remand Results. U.S. Br. at 15. Notably, the Risen 2017 Remand Results came out only in 2023 and 2022, further underscoring that the Department's practice with regard to certifications was certainly not clear at the time that Risen submitted its Section III questionnaire in June 2021.

Indeed, in the earlier reviews of this very Order, Risen had provided certifications for every single one of its Customers, and the Department never issued an EBC Customer supplemental questionnaire and always found use of the EBC program. Further, there had even been Court precedent where the respondent filed no certifications of non-use and the Court still found the Department has no basis to find use of the program as AFA. *Yama Ribbons & Bows*

5

*Co. v. United States*, 419 F. Supp. 3d 1341, 1355 (Ct. Int'l Trade 2019).  The other Court precedent even where respondents did provide certifications from all Customers also did not emphasize that was the only reason the Department's AFA finding of use was unreasonable.  Therefore Risen was certainly not on any reasonable notice that the Department was going to issue a supplemental questionnaire to Risen at all, much less only if it provided certifications from all Customers.

      The United States cites to a couple cases indicating that Risen should have known it must submit certifications for all Customers, but the cases do not actually support this premise.  In *Mobile Access Equipment from China* and *Forged Steel Fitting from China*, the United States is correct that the Department did find non-use for respondents that provided supplemental questionnaires responses for all of its Customers.  U.S. Br. at 21 (citing these cases).  However, the decisions do not indicate that the Department would not have issued those questionnaires if the respondents had not provided certifications for all of its Customers in the initial questionnaire.  Further, while those cases were closer in time to Risen's submission of the initial questionnaire (final decisions in October 2021 and June 2022), the decisions were still <u>after</u> Risen submitted its questionnaire in June 2021.  The United States also cited to *Cooper Kunshan* to supports its position that it was not required to issue a supplemental to Risen due to the GOC's non-cooperation.  U.S. Br. at 20.  However, that Court even specifically contemplated that "given the record here, there is no indication that the respondents' Customers were prepared to provide certifications or participate in verification."  *Cooper Kunshan Tire Co., Ltd. v. United States*, 610 F. Supp. 3d 1287, 1318 (December 2022) (also noting that the Customer was an affiliate, so the lack of a certification from it could be particularly indicative of potential non-cooperation given how easy it would have been to provide the certification).  The opposite

6

factual situation occurred here. Risen did provide certifications for three Customers and then Risen tried to submit the certification for the fourth Customer, but it was rejected as untimely. **PD342**; *see also* U.S. Br. at 23. The Department had every reason to believe that issuing the EBC supplemental questionnaire would not be futile, because all of Risen's Customers had tried to submit certifications of non-use to the record. Further, none of these Customers were affiliated, and Risen had no control over them to get this information so quickly early in the proceeding, unlike in *Cooper Kunshan*.

Second, the Department position that it could not issue the EBC supplemental questionnaire much less verify the non-use certifications for the Customers that did provide the certifications is illogical and contrary to Court precedent. In other words, *arguendo*, if the one Customer did use the EBC program, that has absolutely no bearing on whether another Customer used the EBC program. Accordingly, even if assuming as AFA (which for the reasons discussed above, would still not be supported by the record) that the one Customer did benefit from the EBC program, the Department could verify and find non-use of the EBC program by the other Customers. *See Risen Energy Co. v. United States, 2023 Ct. Intl. Trade LEXIS 52*, *14 (discussing that the Department had no basis to apply AFA with respect to Customers that did provide requested information); *Dalian Meisen Woodworking Co., Ltd. v. United States*, 2023 Ct. Intl. Trade LEXIS 70, *23 (discussing that the Department was not missing information with respect to the Customers that did provide requested information).

Ultimately, the record in the instant review contains no evidence that Risen or its Customers used or benefitted from the EBC program. Instead of confronting the information provided by Risen itself and its Customers or request further reasonable information from them on this program, the Department unreasonably determined on its own that the Customers would

7

not provide this information and thus Risen could not cure the GOC deficiency. The Court should remand and order the Department to consider all information on the record and attempt to reasonably verify non-use of the program for *all* Customers.

**II.     The Department's Reliance on the Descartes Ocean Freight Data is Not Supported by Substantial Evidence.**

In the Final Results, the Department relied upon an average of Xeneta and Descartes freight data. IDM at Comment 7. While the Department agreed with some of Risen's arguments below and enacted a more reasonable averaging methodology than it has in the past, this still does not cure the fact that the Descartes is not representative. U.S. Br. at 42-43. In response to Risen's various arguments that the Descartes data is not representative, the United States argues that the fact that the rates are only between the US-China and only include fewer data points is accounted for in the averaging of the routes. *Id*. Notably, this does not address the contemporaneity points raised by Risen. The Descartes data is based on one single ocean tariff rate from one freight forwarder that the company submitted on *May 11, 2001*. Petitioner Benchmarks (November 17, 2021) at NFI-12 **CR444-446; PR306-307**. Thus, in reality, the Descartes data is out-dated and representative of only a single company's single ocean rate. The Descartes data thus is not representative of commercial freight rates during the POR. The Descartes data is from a rate from 18 years prior to the POR that the freight forwarder just did not indicate had an end date in the Descartes system.

Second, an average of Xeneta and Descartes freight data does not appropriately account for the fact that it's not just that Descartes had "fewer data points" but Descartes had one single data point while Xeneta had thousands per month from numerous freight forwarders/carriers. Risen Benchmarks (November 17, 2021) at Exhibit 6 (Xeneta methodology) **CR439; PR304**. Therefore, the inclusion of the Descartes data even in the more limited fashion as the Department

8

has done, still gives this non-contemporaneous single data point far more weight than is reasonable or contemplated by the Department's regulatory obligations. *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (Ct. Int'l Trade 2015) ("The statute requires that 'the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.' 19 U.S.C. § 1677(5)(E). Such '[p]revailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.' *Id*."). As this Court has previously found, "{t}he Xeneta data seems to provide a broadly based average. If Commerce cannot supply a convincing reason as to why the Descartes data improves accuracy, Commerce should not use it."). *Risen Energy Co. v. United States*, 2023 Ct. Intl. Trade LEXIS 52, *25.

      The Court should order the Department to consider the entire record and justify how the Descartes data fulfils the regulatory requirement for benchmarks or withdraw the Descartes data entirely from its calculations.

### III.     Conclusion

In light of the foregoing, the Department's *Final Results* were not supported by substantial evidence or in accordance with the law.  Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

                                         Respectfully submitted,

                                          /s/ Gregory S. Menegaz
                                         Gregory S. Menegaz
                                         Alexandra H. Salzman
                                         Vivien Jinghui Wang[**]
                                         **DEKIEFFER & HORGAN, PLLC**
                                         Suite 1101
                                         1156 15th St., N.W.  20005
                                         Tel: (202) 783-6900
                                         Fax:  (202) 783-6909
                                         email:  gmenegaz@dhlaw.com
Date: July 26, 2023                    *Counsel to Plaintiff*

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

10

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **2,829** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
*Counsel to Plaintiff*