## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE**

_____

|  |  |  |
|---|---|---|
| **RISEN ENERGY CO., LTD.,** | ) | |
| **Plaintiff,** | ) | |
| **and** | ) | |
| **JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., ET AL.,** | ) | **Consol. Court No. 22-00231** <br> **Nonconfidential Version** |
| **Consolidated Plaintiffs and Plaintiff-Intervenors,** | ) | |
| **v.** | ) | |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

_____

**REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD ON BEHALF OF CONSOLIDATED PLAINTIFFS AND PLAINTIFF-INTERVENORS JA SOLAR TECHNOLOGY YANGZHOU CO., LTD., SHANGHAI JA SOLAR TECHNOLOGY CO., LTD., JA SOLAR CO., LTD. (A.K.A JINGAO SOLAR CO., LTD.) AND JA SOLAR (XINGTAI) CO., LTD.**

Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
Ronalda G. Smith
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com

July 26, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... iii

ARGUMENT .................................................................................................................................... 1

   I.   THE COURT SHOULD GRANT THE UNITED STATES' REQUEST TO
REMAND COMMERCE'S USE OF ADVERSE FACTS AVAILABLE IN FINDING
THAT JA SOLAR USED THE EXPORT BUYER'S CREDIT PROGRAM ...................... 1

   II.  COMMERCE'S DETERMINATION THAT THE TAX EXEMPTIONS UNDER
ARTICLE 26(2) OF THE ENTERPRISE INCOME TAX LAW ARE
COUNTERVAILABLE AND RECURRING WAS NOT SUPPORTED BY
SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW ...................... 4

      A.   The Article 26(2) Tax Exemption Program is Not De Jure Specific .......................... 5

      B.   The Article 26(2) Program Did Not Confer a Financial Contribution or Benefit .... 9

      C.   The Article 26(2) Program is Not Recurring .......................................................... 12

   III. COMMERCE'S DECISION TO INCLUDE THE 2010 CBRE REPORT TO
CALCULATE THE BENCHMARK FOR THE LAND PROGRAM WAS NOT
SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH
LAW ......................................................................................................................................... 15

   IV. COMMERCE'S REFUSAL TO REVISE THE BENEFIT CALCULATIONS FROM
THE 2017 REVIEW WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND
NOT IN ACCORDANCE WITH LAW ................................................................................ 18

   V.   COMMERCE'S DECISION TO INCLUDE DESCARTES DATA IN
CALCULATING THE OCEAN FREIGHT BENCHMARK WAS NOT SUPPORTED
BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW .............. 20

CONCLUSION ............................................................................................................................ 21

# TABLE OF AUTHORITIES

## Cases

Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States,
    __ CIT __, 523 F. Supp. 3d 1393 (2021)................................................................ 5
Atlas Copco, Inc. v. United States,
    10 CIT 790, 651 F. Supp. 1446 (1986).............................................................. 11
Bethlehem Steel Corp. v. United States,
    26 CIT 1003, 223 F. Supp. 2d 1372 (2002).......................................................... 4
BGH Edelstahl Siegen GmbH v. United States,
    __ CIT __, 600 F. Supp. 3d 1241 (2022)............................................................. 5
BGH Edelstahl Siegen GmbH v. United States,
    Ct. No. 21-00080, 2023 Ct. Intl. Trade LEXIS 73  (May 9, 2023) ....................... 5, 8
Canadian Solar, Inc. v. United States,
    No. 18-00184, 2020 Ct. Intl. Trade LEXIS 157 (Oct. 19, 2020) ......................... 3
Changzhou Trina Solar Energy Co. v. United States,
    __CIT__, 466 F. Supp. 3d 1287 (2020)................................................................. 3
Changzhou Trina Solar Energy Co. v. United States,
    __ CIT __, 255 F. Supp. 3d 1312 (2017)............................................................. 17
E.I. DuPont De Nemours & Co. v. United States,
    22 CIT 220, 4 F. Supp. 2d 1248 (1998).............................................................. 4
Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States,
    __ CIT, __, 415 F. Supp. 3d 1195 (2019) ......................................................... 21
Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States,
    __ CIT __, 498 F. Supp. 3d 1345 (2021)............................................................. 7
Porsche Motorsport N. Am., Inc. v. United States,
    No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115 (Aug. 22, 2018) ....................... 11
Risen Energy Co. v. United States ,
    __ CIT __, 570 F. Supp. 3d 1369 (2022)........................................................ 17, 21
Risen Energy Co. v. United States,
    No. 20-03912, 2023 Ct. Intl. Trade LEXIS 52 (Apr. 11, 2023) .................... 17, 18, 21
Royal Thai Gov't v. United States,
    30 CIT 1072, 441 F. Supp. 2d 1350 (2006)......................................................... 19
SKF USA Inc. v. United States,
    263 F.3d 1369 (Fed. Cir. 2001) ......................................................................... 3
Toscelik Profil ve Sac Endustrisi A.S. v. United States,
    38 CIT 1534 (2014)............................................................................................ 19
Werner & Pfleiderer Corp. v. United States,
    17 CIT 916 (1993).............................................................................................. 11

## Statutes

19 U.S.C. § 1677(5)(A)-(B)................................................................................. passim

19 U.S.C. § 1677(5)(D)(ii) ........................................................................................ 11
19 U.S.C. § 1677(5)(E) ......................................................................................... 9, 11
19 U.S.C. § 1677(5A)(D)(i) ....................................................................................... 5
19 U.S.C. § 1677(5A)(D)(ii) ................................................................................... 6, 7
19 U.S.C.S. § 1677m(i)(3)(B) .................................................................................... 4

**Regulations**

19 C.F.R. § 351.509(a)(1) ................................................................................ 9, 10, 11
19 C.F.R. § 351.511(a)(2)(ii) .................................................................................... 20
19 C.F.R. § 351.524(a) ............................................................................................. 18
19 C.F.R. § 351.524(c)(2) .............................................................................. 12, 13, 14
19 C.F.R. § 353.36(a)(iv) ........................................................................................... 4

**Other Authorities**

<u>Countervailing Duties; Final Rule</u>, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1999).. 15,
    16, 17, 18

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the</u>
    <u>People's Republic of China: Final Results and Partial Rescission of Countervailing Duty</u>
    <u>Administrative Review; 2019</u>, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) .......... 1

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the</u>
    <u>People's Republic of China: Final Results of Countervailing Duty Administrative Review;</u>
    <u>2013</u>, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016) ................................................. 3

<u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the</u>
    <u>People's Republic of China: Final Results of Countervailing Duty Administrative Review and</u>
    <u>Rescission of Review, in Part; 2016</u>, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019)
    ............................................................................................................................................. 19

<u>Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial</u>
    <u>Rescission of Countervailing Duty Administrative Review; 2017</u>, 85 Fed. Reg. 76,011 (Dep't
    of Commerce Nov. 27, 2020) ............................................................................................. 18

Pursuant to Rules 56.2 and 81 of the Rules of the U.S. Court of International Trade, Consolidated Plaintiffs and Plaintiff-Intervenors JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd. (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd. (collectively, "JA Solar"), reply to the response brief of Defendant United States.  See Def.'s Opp'n to Pls.' Rule 56.2 Mot. For J. Upon the Agency R. (May 23, 2023), ECF. No. 33 ("Def.'s Br.").

## ARGUMENT

### I.  THE COURT SHOULD GRANT THE UNITED STATES' REQUEST TO REMAND COMMERCE'S USE OF ADVERSE FACTS AVAILABLE IN FINDING THAT JA SOLAR USED THE EXPORT BUYER'S CREDIT PROGRAM

The Court should grant the United States' voluntary remand request for "Commerce to reconsider its application of adverse factual inference in selecting among the facts otherwise available on the record regarding JA Solar's use of the {Export Buyer's Credit Program ("EBCP")}."  See id. at 13.  The United States explains that, although JA Solar provided a "non-use certification for its sole importer during the period of review," Commerce applied an adverse factual inference after the finding that "JA Solar failed to provide non-use certifications for from all of its downstream United States Customers."   Id. at 14 (citing to Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2019, 87 Fed. Reg. 40,491 (Dep't of Commerce July 7, 2022) ("Final Results") (P.R. 437), and accompanying Issues and Dec. Mem. at Cmt.1, p. 23("Final IDM") (P.R. 429)).  The United States requested the remand so that Commerce may apply its refined practice regarding EBCP, "determining that it requires non-use certifications only for United States importer customers, and not for further downstream customers."  Id.  The United States notes that if its request for remand

is granted, "Commerce intends to reconsider its application of an adverse inference to JA Solar regarding the EBCP and, if necessary, to proceed to verification of the non-use information that JA Solar provided." Id. at 15.  JA Solar supports the voluntary remand request for Commerce to reconsider its application of adverse facts available ("AFA") to find that JA Solar used the EBCP. On remand, however, the only reasonable determination is for Commerce to find that JA Solar did not use the EBCP because JA Solar's sole importer customer has certified non-use and the same sales structure has been recently verified by Commerce.   See Rule 56.2 Mot. For J. Upon the Agency R. of Consol. Pls. and Pl. Intervenors at 13-14, ECF No. 29 ("JA Solar Br.") (Nonconfidential Version).

On remand, Commerce must find that JA Solar did not use the EBCP without a verification because ample evidence exists on the record demonstrating non-use of the EBCP and there is no gap in the record.  In its Section III questionnaire response, JA Solar submitted a certified statement that neither JA Solar USA, Inc. ("JA Solar USA"),[1] JA Solar's sole affiliated importer and reseller in the United States, nor any of its unaffiliated customers "received assistance under the {EBCP}." Letter on Behalf of JA Solar to Dep't of Commerce re: Section III Response Part IV at Vol. I, p. 47-48 (June 29, 2021) (Business Proprietary Document) ("Section III Part IV") (C.R. 330-362). JA Solar also submitted non-use declarations from its reseller and downstream unaffiliated customers setting forth that "[███████████████████████████████████

████████████████████████████████████████████████████

███████████████ ]." Id. at Vol. I, Ex. 23.  In addition to submitting the customer certifications, JA Solar detailed that no JA Solar affiliate, has ever:

- {r}eceived a contract from any seller related to their participation in the export buyer's credit program,

---

[1] As explained in JA Solar's initial brief, the fact that its affiliated U.S. importer is JA Solar USA Inc is now public information.

- {r}eceived a visit from the China Export-Import Bank to investigate and verify the performance capability of JA Solar,
- {r}eleased any documents, such as credit information, to the Chinese ExportImport Bank, {or}
- {p}urchased any export credit insurance with beneficiary being the Chinese Export-Import Bank.

Id. at Vol. I, p. 48 (Public Version) (P.R. 213-216).  No party challenged the veracity of the information on the record demonstrating non-use and no party offered any contradictory evidence.  On remand, Commerce must follow its practice of finding non-use based on the customer declarations on the record without verification.  See JA Solar Br. at 15-16 (Nonconfidential Version) (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't of Commerce July 19, 2016), and accompanying Issues and Dec. Mem. at Cmt. 1 (second review)); Changzhou Trina Solar Energy Co. v. United States, ___CIT___, __, 466 F. Supp. 3d 1287, 1291 (2020) (third review); Canadian Solar, Inc. v. United States, No. 18-00184, 2020 Ct. Intl. Trade LEXIS 157, at *6-8 (Oct. 19, 2020) (fourth review);  see also  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (explaining that a decision is arbitrary when an agency treats a similar situation differently without providing sufficient reasoning).

In addition, Commerce conducted a verification of JA Solar USA and determined that JA Solar did not use the EBCP in the 2017 administrative review.  See Final Results of Redetermination Pursuant to Court Remand at 1, Risen Energy Co., Ltd. v. United States, No. 20-03912 (Oct. 7, 2022) (Public Version), ECF No. 94-1 (finding "no indication that JA Solar used the program").  Although the verification pertained to a different period of review ("POR"), it corroborates JA Solar USA's non-use certification when JA Solar's sales structure remained the same in this POR.  Moreover, Commerce regularly uses its discretion to refrain from conducting

verification of a respondent that has recently been verified.  See E.I. DuPont De Nemours & Co. v. United States, 22 CIT 220, 227, 4 F. Supp. 2d 1248, 1254 (1998) (noting that the determination that "'good cause' exists for verification" is within Commerce's discretion) (citing to 19 C.F.R. § 353.36(a)(iv)); see also 19 U.S.C.S. § 1677m(i)(3)(B) (verification is not required if a verification was performed in the two immediately preceding reviews).  Because ample record evidence supports a finding of non-use and because the EBCP verification of JA Solar's same sales structure showed non-use in a previous review, Commerce must remove the benefits under this program on remand without any verification.

## II. COMMERCE'S DETERMINATION THAT THE TAX EXEMPTIONS UNDER ARTICLE 26(2) OF THE ENTERPRISE INCOME TAX LAW ARE COUNTERVAILABLE AND RECURRING WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Contrary to the United States' arguments, Commerce's treatment of the Tax Exemptions under Article 26(2) of the Enterprise Income Tax Law Program ("Article 26(2) Tax Exemption Program") was unsupported by substantial evidence and not in accordance with law because the program was not specific and conferred no benefit but, rather, the program was an automatic tax provision to prevent double taxation.  Pursuant to 19 U.S.C. § 1677(5)(A)-(B), a countervailable subsidy is one that "(1) provides a financial contribution to a person; (2) a benefit is thereby conferred; and (3) the subsidy is specific."  Bethlehem Steel Corp. v. United States, 26 CIT 1003, 1009, 223 F. Supp. 2d 1372, 1377 (2002).  Commerce's assignment of benefits to JA Solar under the Article 26(2) program was unlawful because this program is not de jure specific and does not provide a financial contribution.  In addition, even if the Court sustains Commerce's countervailability determination, Commerce's decision to treat the benefits as recurring was unsupported by substantial evidence and not in accordance with law.

4

**A.  The Article 26(2) Tax Exemption Program is Not <u>De Jure</u> Specific**

The United States fails to explain how Commerce's determination in finding the Article 26(2) Tax Exemption Program <u>de jure</u> specific was supported by substantial evidence and in accordance with law.  To find that a domestic subsidy program is <u>de jure</u> specific, Commerce must determine that "the authority providing the subsidy, or the legislation pursuant to which the authority operates, <u>expressly limits</u> access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i) (emphasis added); <u>see also</u> <u>Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States</u>, __ CIT __, __, 523 F. Supp. 3d 1393, 1403 (2021) (holding that the plain language meaning of "expressly limits" is to "directly, firmly, or explicitly assign{} limits to or restricts the bounds of a particular subsidy to a given enterprise or industry").  The Court in <u>BGH II</u> stated that a program is only <u>de jure</u> specific when it is "expressly limited" to industries or group of enterprises that are "<u>specifically named</u>."  <u>BGH Edelstahl Siegen GmbH v. United States</u>, Ct. No. 21-00080, 2023 Ct. Intl. Trade LEXIS 73, at *15 (May 9, 2023) ("<u>BGH II</u>") (quoting 19 U.S.C. § 1677(5A)(D)(i)) (emphasis added).

The United States cites <u>BGH I</u> to support Commerce's <u>de jure</u> specificity determination but the facts are distinguishable here.  <u>See</u> Def.'s Br. at 25 (citing to <u>BGH Edelstahl Siegen GmbH v. United States</u>, __ CIT __, __, 600 F. Supp. 3d 1241, 1264 (2022) ("<u>BGH I</u>")).  In that case, the Court held that "Commerce reasonably determined the ETS additional free allowances program {was} <u>de jure</u> specific because it {was} expressly limited to a group of companies."  <u>BGH I</u>, __ CIT at __, 600 F. Supp. 3d. at 1264.  Commerce found that eligibility for the ETS program was "limited by law to companies on the carbon leakage list."  <u>Id.</u>  Not only did the list specify individual companies, but the eligibility in joining the list also favored "sectors and subsectors" with significant risk of carbon leakage.  <u>Id.</u>  By contrast, the Article 26(2) Tax Exemption Program

is not limited to companies on a particular list, nor does the program limit eligibility and favor any

sectors or subsectors like the ETS program in BGH I.   See JA Solar Br. at 35 (Nonconfidential

Version); see also Letter on Behalf of the GOC to Dep't of Commerce re: GOC's Post Preliminary

Supplemental Questionnaire Response at 15-16 (Feb. 14, 2022) (Public Document) (P.R. 372)

("GOC Post Prelim. SQR") (stating that Article 26(2) Tax Exemption Program is "applicable to

all legal person enterprises within China without any bias as to enterprise type, industrial sector,

or geographical location").  The United States claims that JA Solar does not offer support for why

"'enterprises with investment gains' are not a 'type of enterprise.'"  Def.'s Br. at 28.  The United

States fails to recognize that the program is available to any qualified resident enterprise in any

industry, which does not represent a singular "type of enterprise" to which the subsidy is granted.

The United States, therefore, fails to provide support to Commerce's specificity determination

under 19 U.S.C. § 1677(5A)(D)(i) by citing to BGH I.

Further, the program meets the safe harbor criteria set forth in 19 U.S.C. § 1677(5A)(D)(ii)

that includes the factors for Commerce to decide whether a program is not de jure specific.  A

subsidy will not be considered de jure specific where there are objective criteria or conditions

governing the eligibility for, and the amount of, a subsidy' and

> (I) eligibility is automatic,
> (II) the criteria or conditions for eligibility are strictly followed, and
> (III) the criteria or conditions are clearly set forth in the relevant statute, regulation,
> or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions" means
> criteria or conditions that are neutral and that do not favor one enterprise or industry
> over another.

19 U.S.C. § 1677(5A)(D)(ii); see also Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United

States, __ CIT __, __, 498 F. Supp. 3d 1345, 1354 (2021).  First, eligibility for the program is

automatic for any company has "gains derived by a resident enterprise through direct investment

in another resident enterprise" and is "applicable to all legal person enterprises within China without any bias as to enterprise type, industrial sector, or geographical location."  GOC Post Prelim. SQR at 15-16 (P.R. 372); see also Letter on Behalf of JA Solar to Dep't Commerce re: Post Preliminary Supplemental Questionnaire Response at Ex. PRSQ-1 (Apr. 25, 2022) (Public Version) ("JA Post-Prelim. SQR") (setting forth in Articles 1 and 2 that the Law of the People's Republic of China on Enterprise Income Tax applies to all enterprises) (P.R. 393).  Secondly, the conditions for eligibility are strictly followed because the exemption is merely reported in a company's income tax return.  See GOC Post Prelim. SQR at 18 (stating that "{t}he records kept by the government authority in relation to this program are the income returns filed by the companies") (P.R. 372).  The tax exemption can be easily verified in a company's tax return as set forth above.  Third, the "criteria are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification."  19 U.S.C. § 1677(5A)(D)(ii)(III).  Article 26(2) of the Enterprise Income Tax Law provides that the gains from dividends, bonuses or other returns on equity investment between resident enterprises shall be exempted from income tax without specifying that this tax exemption is provided to a particular enterprise.  See JA Post-Prelim. SQR at Ex. PRSQ-1 (Public Version) (P.R. 393); see also GOC Post Prelim. SQR at 15-16 (P.R. 372).  Further, Article 83 of the Implementation Regulations of the Enterprise Income Tax Law ("Implementation Regulations") provides that gains from equity investment between resident enterprises, which qualify for an exemption under Article 26(2) of the Enterprise Income Tax Law, refers to equity investment "gains derived by a resident enterprise through direct investment in another resident enterprise."  See JA Post-Prelim. SQR at Ex. PRSQ-2 (Public Version) (P.R. 393); see also GOC Post Prelim. SQR at 15 (P.R. 372).  In sum, the Article 26(2) Tax Exemption program meets all three safe harbor criteria set forth in 19 U.S.C. §

1677(5A)(D)(ii), is not "specific as a matter of law" and, therefore, Commerce was unsupported in countervailing this program.

The Court in <u>BGH II</u> ruled that the eligibility criteria are still neutral under the safer harbor clause 19 U.S.C. § 1677(5A)(D)(ii), even if only one industry qualifies for the program. <u>BGH II</u>, 2023 Ct. Intl. Trade LEXIS 73, at *15. The Court remanded Commerce's <u>de jure</u> specificity determination because the program did not "favor 'a specific subset of special contract customers based on their electricity prices.'" <u>Id.</u> at *13 (defining "special contract customers" as "those who use large amounts of electricity"). The Court overturned Commerce's determination in concluding that the program "favors" certain contract customers, when the eligibility criteria are neutral. <u>Id.</u> at *14-15 ("'Favors' in the <u>de jure</u> context would mean that the law itself <u>singled out</u> industries for special treatment."). Though some "special contract customers" qualified for the program, the Court stated "{t}hat one industry received a benefit and another did not does not mean the first industry was favored. It only means that the industry qualified under the criteria." <u>Id.</u> Like in <u>BGH II</u>, here neither Commerce nor United States explained how the eligibility criteria of the Article 26(2) Tax Exemption Program – resident enterprises with investment gains – are not neutral or favors any industries or enterprises. Rather, resident enterprises with investment gains are just like the special contract customers in <u>BGH II</u> - they qualify under the neutral criteria for the program benefits and are not "favored" by the program. The Court, therefore, must find Commerce's <u>de jure</u> specificity determination contrary to the law.

The record reflects that the Article 26(2) Tax Exemption Program is not specific to an enterprise type, industry sector or even geographic location. The program did not "expressly limit" access to program benefits or "specifically name" an enterprise type or sector. Rather, the program was an automatic tax provision given to all resident enterprises to prevent double taxation. Nothing

in the United States' response brief refutes these points.  As such, the Court should find that Commerce's <u>de jure</u> specificity determination was unsupported by substantial evidence and not in accordance with law.

**B.  The Article 26(2) Program Did Not Confer a Financial Contribution or Benefit**

Commerce's determination that that the Article 26(2) program is countervailable was also unsupported by substantial evidence and not in accordance with law because the program does not provide a financial contribution nor confer a benefit to a respondent as it is designed to avoid double taxation on qualified gains from dividends, bonus issues or other returns on equity investment between resident enterprises.  Commerce can only countervail a program where it provides a benefit and "{i}n the case of a program that provides for a full or partial exemption or remission of a direct tax . . . a benefit exists to the extent that the tax paid by a firm as result of the program is less than the tax the firm would have paid in absence of the program."  19 C.F.R. § 351.509(a)(1); <u>see also</u> 19 U.S.C. § 1677(5)(E).  Commerce's determination was contrary to this statutory and regulatory authority and the United States fails to redeem that determination with the arguments in its response brief.

The record evidence related to the Article 26(2) Program establishes that there is no financial contribution by the government authority or benefit to JA Solar.  What the United States continues to misunderstand is that there is, in fact, no tax exemption at JA Solar investor companies because the Chinese authority already collected taxes at investee level.  <u>See</u> Final IDM at Cmt. 20, p. 77 (P.R. 429) (finding that "{b}ecause tax exemptions under Article 26(2) of the EITL and Article 83 of the Implementation Regulations of the EITL are limited by law to certain enterprises (*i.e.*, enterprises with investment gains derived from direct investment in another resident enterprise, excluding investment gains obtained for holding listed and circulating shares issued by

a resident enterprise for less than 12 months consecutively), we determine that this tax exemption program is specific under section 771(5A)(D)(i) of the Act").  Instead, the gains derived from a JA Solar company's investment (the "investor") in another resident enterprise (the "investee") correspond to the profits of that investee that are attributable to the investment shares of the investor.  See JA Solar Agency Br. at 40 (Public Version) (P.R. 407).  The profits of the investee, however, are taxed separately at the investee level, and without the investment provided by the investor, the taxable income of the investee would be lower.  Id.  In essence, the Article 26(2) Tax Exemption program is designed such that the income – whether on the books of the investor or the investee – is only taxed once.  Id.  The Chinese government authority receives its full tax, but instead of receiving that tax income from the investor (here, JA Solar), the government receives the tax income from the investee company by taxing the investee company's profit.  This is not a countervailable "exemption or remission of taxes" as envisioned by Commerce's regulations, 19 C.F.R § 351.509(a)(1), and, therefore, Commerce's determination to the contrary is unsupported by substantial evidence and not in accordance with law.

Commerce's determination is further unreasonable and unsupported because it had the effect of double taxing JA Solar.  Specifically, where there was no tax forgone by the Chinese authority because the investee paid taxes on the investment by JA Solar, Commerce's decision to place a countervailing duty on JA Solar related to this program represents a second taxation on the same transaction.  The United States argues that "the statute and regulations do not require Commerce to consider a subsidy's overall effect," and that it is irrelevant as to whether a program exists or is designed to avoid double taxation.  Def.'s Br. at 31.  The United States, however, ignores that the only reasonable interpretation of 19 C.F.R. § 351.509(a)(1), is one that avoids double taxation as the CIT has held in analogous cases reviewing determinations by U.S. Customs

and Border Protection ("CBP") and its precursor agency the United States Customs Service.  See Werner & Pfleiderer Corp. v. United States, 17 CIT 916, 917-18 (1993) (holding that the purpose of Tariff Schedule of the United States provisions related to reimported goods "is to eliminate an assessment of duty which has the appearance of double taxation") (internal citation omitted).   In other cases involving the question of duty free treatment of reentered goods, the CIT recognized the broad principle that "{d}ouble taxation . . . is not a preferred result."  Porsche Motorsport N. Am., Inc. v. United States, No. 16-00182, 2018 Ct. Intl. Trade LEXIS 115, at *26 (Aug. 22, 2018) (citing to Atlas Copco, Inc. v. United States, 10 CIT 790, 792-93, 651 F. Supp. 1446, 1448 (1986) ("Atlas Copco")).  Likewise, here, Commerce should have avoided imposing a second tax on JA Solar in the form of a countervailing duty when JA Solar's investment was already taxed by the Chinese authority by collecting from the investee company and its decision to the contrary was unreasonable.

The Article 26(2) Tax Exemption Program operates comparably to the customs re-entry provisions discussed above which are designed to offer relief from the unfavorable result of "repeated assessments of duty" and "the provision should be interpreted fairly and broadly."  Atlas Copco, 10 CIT at 792-93, 651 F. Supp. at 1448 (emphasis added).  Similarly, the Article 26(2) Tax Exemption Program does not require the investor (JA Solar) to pay taxes because the investment gains are taxed at the investee level.  See JA Solar Agency Br. at 42 (Public Version) (P.R. 407). This program does not result in the GOC "foregoing or not collecting revenue that is otherwise due," because the GOC receives the full amount of income tax that is due on those gains.  19 U.S.C. § 1677(5)(D)(ii).  Further, the program does not provide a benefit because the tax paid by the firm is not less than what the firm would have paid in absence of the program.  See 19 C.F.R. § 351.509(a)(1); see also 19 U.S.C. § 1677(5)(E).  The tax burden is merely being shifted from the

11

investor to the investee and is not an actual savings to the investor.  See JA Solar Agency Br. at

43 (Public Version) (P.R. 407).

Like U.S. law, the Chinese law provides tax emptions under Article 26(2) in order to avoid

double taxation.  The program does not confer a benefit.  The Court, therefore, should find that

Commerce's determination that the Article 26(2) Program conferred a benefit was unsupported by

substantial evidence and not in accordance with law and remand to Commerce for reconsideration.

### C.  The Article 26(2) Program is Not Recurring

Commerce's treatment of the alleged benefit as recurring was unsupported by substantial

evidence and not in accordance with law because the program is tied to capital structure and is not

granted on an ongoing basis.

For a subsidy to be treated as non-recurring, the following criteria apply:

(i)     Whether the subsidy is exceptional in the sense that the recipient cannot expect to
        receive additional subsidies under the same program on an ongoing basis from year to
        year;

(ii)    Whether the subsidy required or received the government's express authorization for
        approval (i.e., receipt of benefits is not automatic); or

(iii)   Whether the subsidy was provided for, or tied to, the capital structure or capital assets
        of the firm.

19 C.F.R. § 351.524(c)(2) (emphasis added).  "{C}apital structure is considered to be the

combination of common equity (including retained earnings), preferred stock, and long-term debt

that comprises a firm's financial framework."  Countervailing Duties; Final Rule, 63 Fed. Reg.

65,348, 65,393 (Dep't of Commerce Nov. 25, 1999) ("CVD Preamble").  A subsidy that is tied to

a company's capital structure or assets "generally benefit{s} the creation, expansion, and/or

continued existence of a firm."  Id. ("For example, debt forgiveness benefits the capital structure

of a company by reducing long-term liabilities, and thus increasing net worth.")  Further, "a

government's coverage of a company's losses benefits its capital structure because the company need not cover the losses out of its retained earnings." Id.

The United States argues that "JA Solar does not provide evidence that the Article 26(2) program is nonrecurring pursuant to the criteria listed in 19 C.F.R. § 351.524(c)(2), aside from briefly referencing section 351.524(c)(2)(iii)." Def.'s Br. at 33. The facts contradict this argument. In particular, the Article 26(2) Tax Exemption Program meets the three criteria set forth in 19 C.F.R. § 351.524(c)(2) in that 1) it is not expected to be received on an "ongoing basis from year to year," 2) the subsidy "received the government's express authorization," and 3) the subsidy is "provided for, or tied to, the capital structure of the firm." 19 C.F.R. § 351.524(c)(2). First, benefits under the program cannot reasonably be expected to be received from year to year because for a company to distribute profits to its investors, it must first accumulate profits. The record shows that the JA Solar companies received the tax exemption under the program only when they distributed profits, which was not done on a yearly basis. See JA Solar Agency Br. at 48 (Public Version) (P.R. 407) (citing to JA Post-Prelim. SQR at 7 (Public Version) (P.R. 393)). Specifically, the profits accumulated for [ ███████████████████████ ] before distribution. JA Post-Prelim. SQR at 6-8 (Business Proprietary Document) (C.R. 538). Second, the tax exemptions are provided by government authorization to companies with "gains derived by a resident enterprise through direct investment in another resident enterprise." JA Solar Agency Br. at 45 (Public Version) (P.R. 407) (citing to GOC Post Prelim. SQR at 15-16 (P.R. 372)). Third, the subsidy is tied to the company's capital structure because the Article 26(2) tax exemption is fully dependent on the distribution of a company's profits. 19 C.F.R. § 351.524(c)(2)(iii); see also CVD Preamble, 63 Fed. Reg. at 65,393 (setting forth that "capital structure is considered to

13

{include} common equity (including retained earnings) . . . that comprises a firm's financial framework.")

The United States further argues that JA Solar does not explain "why it would be unreasonable for Commerce to expect companies to receive income from investments held in resident enterprises annually." Def.'s Br. at 32-33. To the contrary, JA Solar explained that the source of the investment income received by of all of its affiliates was derived from cumulative undistributed profits of [ ███████████████████████████████ ], and that it <u>was not</u> received on a yearly basis. <u>See</u> JA Post-Prelim. SQR at 7-8 (Business Proprietary Document) (C.R. 538). The 2018 Audit Reports for each entity demonstrate that they accumulated profits for [ ████ ] before distribution of profit. <u>Id.</u> JA Solar could not "expect to receive additional subsidies under the same program on an ongoing basis from year to year" <u>because it may accumulate profits for years before distributing them to its investors.</u> 19 C.F.R. § 351.524(c)(2)(i) (emphasis added); <u>see also</u> <u>Final Affirmative Countervailing Duty Determination: Certain Steel Products From Austria</u>, 58 Fed. Reg. 37,217, 37,226 (Dep't of Commerce July 9, 1993) (setting forth that "exceptional" benefits that are not received on a regular basis are more likely to be non-recurring). It is, therefore, unreasonable for Commerce to expect the JA Solar companies to receive investment income yearly when the record shows that these companies often accumulate profits for years before distribution.

The United States cites to the <u>CVD Preamble</u>, "indicate{ing} that Commerce intended that 'the benefit from a subsidy provided for, or tied to, the capital structure or capital assets of a firm to be non-recurring because these types of subsidies generally benefit the creation, expansion, and/or continued existence of a firm.'" Def.'s Br. at 33 (quoting <u>CVD Preamble</u>, 63 Fed. Reg. at 65,393). The United States claims that "nothing about JA Solar's receipt of investment income

suggests the income was necessary to its expansion or continued existence in a manner that would support finding that the subsidy is non-recurring, and JA Solar does not identify any record evidence that indicates otherwise."  <u>Id.</u>  The United States' argument is contrary to the very regulation it cites for support, which plainly states that "this criterion to {this} test in no way envisions or requires an examination of the effects or uses of the subsidy."  CVD Preamble, 63 Fed. Reg. at 65,393.  "Rather, {Commerce} will examine whether, at the point of bestowal, the subsidy was provided to, or tied to, the company's capital structure or capital assets."  <u>Id.</u>  Here, at the time of bestowal, the exemption was directly tied to a company's capital structure and a company normally would not expect to receive an exemption on an ongoing basis from year to year.  <u>See</u> JA Solar Br. at 41-42 (Nonconfidential Version).  The Article 26(2) Tax Exemption Program does "generally benefit the creation, expansion, and/or continued existence of {firms}" in that it protects companies from the burden of double taxation and "benefits the capital structure of a company by reducing long-term liabilities."  CVD Preamble, 63 Fed. Reg. at 65,393.

JA Solar, in sum, did not and could not have claimed the tax exemption year to year.  For these reasons, the only reasonable classification of the Article 26(2) Tax Exemption program is non-recurring.  Commerce's determination to the contrary was unsupported by substantial evidence and not in accordance with law.

## III. COMMERCE'S DECISION TO INCLUDE THE 2010 CBRE REPORT TO CALCULATE THE BENCHMARK FOR THE LAND PROGRAM WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's inclusion of the Reports by Coldwell Banker Richard Ellis for Thailand ("2010 CBRE Report") in the land for LTAR program ("land program") benchmark calculation was unsupported by substantial evidence and not in accordance with law because the 2010 CBRE

Report is outdated and only the Malaysian Investment Development Authority in a report ("MIDA Report") is contemporaneous.  The United States fails to convincingly rebut this claim.

As illustrated in JA Solar's initial brief, Commerce has as an established practice of excluding non-contemporaneous data in benchmark calculations when contemporaneous data are available on the record.  See JA Solar Br. at 18 (Nonconfidential Version) (citing Multilayered Wood Flooring From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2017, 85 Fed. Reg. 76,011 (Dep't of Commerce Nov. 27, 2020), and accompanying Issues and Dec. Mem. at Cmt. 7, pp. 41-42 ("It is Commerce's practice not to use non-contemporaneous data when contemporaneous data for benchmarking purposes are otherwise available."); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2016, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019), and accompanying Dec. Mem. at Cmt. 7, p. 62.  In its response brief, the United States seems to suggest that Commerce does not have the same preference for contemporaneous data in developing a tier-three benchmark, while citing to no regulations or caselaw supporting such claim.  See Def.'s Br. at 37-38.

The United States argues that Commerce addressed the lack of contemporaneity of the 2010 CBRE Report by "indexing it for inflation to the period of review" using the Consumer Price Index ("CPI").  Id. at 35 (citing to Final IDM at 71 (P.R. 429)).   The Court, however, has held that though Commerce used price inflators to adjust data to be contemporaneous with the POR in past proceedings, Commerce only does so when there is no contemporaneous data available on the record.  See Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 255 F. Supp. 3d 1312, 1323 (2017).  The United States further conclusively states that the inclusion of the 2010

CBRE Report provided a "more robust" benchmark but fails to explain how nine-years-out-of-date land prices add to accuracy of the benchmark calculation when contemporaneous MIDA prices already reflect the land market conditions during the POR.  See Def.'s Br. at 35-36.  The Court, therefore, must remand Commerce's inclusion of the outdated 2010 CBRE Report and instruct Commerce to use the contemporaneous MIDA Report only.

Moreover, this Court has remanded Commerce's use of the same 2010 CBRE Report twice in the appeal of the 2017 CVD review in the same case.  See Risen Energy Co. v. United States , __ CIT __, __, 570 F. Supp. 3d 1369, 1375 (2022) ("Risen I") ("Plaintiffs properly note that the 2010 CBRE Report is stale compared to more contemporaneous benchmark data and becomes staler with each successive administrative review."); Risen Energy Co. v. United States, No. 20-03912, 2023 Ct. Intl. Trade LEXIS 52, at *19 (Apr. 11, 2023) ("Risen II") ("Commerce must provide a compelling reason for its continued use of the stale 2010 CBRE report or otherwise use the Malaysian data only.").  The United States fails to explain how the record evidence in this review would address the Court's concern about the stale data in the same report and would support a different ruling.  See Def.'s Br. at 37.  Specifically, the United States claims that Commerce in this case indexed the data to address the contemporaneity issue and included the 2010 CBRE Report to provide a more robust benchmark.  See id.  These are not distinguishable facts from the Risen appeals, as Commerce also indexed the 2010 data to POR 2017 in that review, and has also attempted to combine the 2010 CBRE Report with the MIDA Report, but that determination was overturned by the Court.  See Risen II, 2023 Ct. Intl. Trade LEXIS 52, at* 15-19.  In fact, the case against the 2010 CBRE Report is even stronger in the present appeal because those data are now even more outdated than they were in the 2017 review.  This Court, therefore, should find its

rulings in the <u>Risen</u> appeals persuasive and remand the same outdated report in this review for Commerce's reconsideration.

In sum, the Court should find Commerce's selection of the land benchmark in this review unsupported by substantial evidence and remand Commerce's inclusion of the 2010 CBRE Report for reconsideration because Commerce has an established practice of excluding non-contemporaneous data when contemporaneous data exist on the record and because this Court's rulings in the <u>Risen</u> appeals discussing the same report are persuasive.

## IV. COMMERCE'S REFUSAL TO REVISE THE BENEFIT CALCULATIONS FROM THE 2017 REVIEW WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

As illustrated in JA Solar's initial brief, Commerce's refusal to expense the benefits of the 2017 leases was unsupported by substantial evidence and not in accordance with law because the land lease program is recurring.  <u>See</u> JA Solar Br. at 26 (Nonconfidential Version) (citing to Final IDM at Cmt. 18, p. 73 (P.R. 429)).  Commerce has a regulatory obligation to "allocate (expense) a recurring benefit to the year in which the benefit is received."  19 C.F.R. § 351.524(a).  In this case, the land leases cover year 2017 and the lease payments also occurred in 2017.  <u>See</u> JA Solar Br. at 26; Mem. from Robert Copyak to the File re: JA Solar's Amended Final Calculations at Attach. II, [ ████████████████ ] Tab (Aug. 8, 2022) (Business Proprietary Document) (C.R. 572).  The United States does not dispute Commerce's regulatory obligation to treat land leases as recurring and fails to defend Commerce's refusal to expense the benefits of the 2017 leases to year 2017 in this review.  <u>See</u> 19 C.F.R. § 351.524(a).

The United States argues that benefit streams are not subject to post hoc adjustments once they are established but ignores the fact that the benefit stream of the 2017 leases was established erroneously in the first place.  <u>See</u> Def.'s Br. at 39 (citing to <u>Toscelik Profil ve Sac Endustrisi A.S.</u>

v. United States, 38 CIT 1534, 1540 (2014)).  Toscelik sets forth that benefit streams can be amended in a subsequent review if "Commerce's prior determination is 'clearly erroneous and would work a manifest injustice.'"  38 CIT at 1540; see also Royal Thai Gov't v. United States, 30 CIT 1072, 1074, 441 F. Supp. 2d 1350, 1354 (2006) (noting that reconsideration by the Court may be justified where there is "the need to correct a clear error or prevent manifest injustice" (citation and quotation omitted)).  Here, where Commerce's treating the 2017 leases as non-recurring was unlawful as explained in JA Solar's initial brief, see JA Solar Br. at 26-28 (Nonconfidential Version), allocating the benefits throughout AUL in the prior review is "clearly erroneous" and represents "manifest injustice."  Toscelik, 38 CIT at 1540.

The United States argues that JA Solar did not provide evidence that Commerce's 2017 review determination meets this standard.  See Def.'s Br. at 41.  JA Solar did just that, however, in establishing that Commerce's refusal to expense the benefits of the 2017 leases was contrary to law.  Nothing is more "clearly erroneous" than a direct violation of the law.  The issue here is not post hoc adjustments to a previously established benefit stream, but rather, the unlawful establishment of the benefit stream in the first place.  Commerce's error in treating the 2017 leases as nonrecurring also cannot be cured by the fact that JA Solar did not appeal this decision in the prior review, as it continues to cause renewed harm in the nature of overcollection of duties in subsequent PORs.  The Court, therefore, should recognize that Commerce's refusal to expense JA Solar's land benefits in the 2017 review was unlawful and, accordingly, remand here for Commerce to reconsideration its allocation of applicable benefit stream to the present 2019 POR.[2]

---

[2] Although JA Solar disputes the benchmark selection for the land purchases reported in the 2017 review in this litigation, JA Solar recognizes that Commerce's final determination in the ongoing appeal of the 2017 review will be relevant.  Commerce's second remand redetermination is currently pending this Court's decision.  See Final Results of Redetermination Pursuant to Court

## V.   COMMERCE'S DECISION TO INCLUDE DESCARTES DATA IN CALCULATING THE OCEAN FREIGHT BENCHMARK WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT IN ACCORDANCE WITH LAW

Commerce's decision to include the Descartes data and to average the Xeneta data and the Descartes data for a two-tier benchmark was unsupported by substantial evidence and not in accordance with law as the Descartes data do not reflect a world market price and because this Court's instructions for Commerce to remove the Descartes data in the Risen appeals are highly persuasive.

In measuring adequate renumeration using a tier-two world price source, Commerce "will seek to measure the adequacy of renumeration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  19 C.F.R. § 351.511(a)(2)(ii) (emphasis added).  Commerce's inclusion of the Descartes data contravenes the plain language of the regulatory phrase "world market price" when the Descartes data only include U.S.-China routes.  See Habaş Sinai Ve Tibbi Gazlar Istihsal Endustrisi, A.S. v. United States, __ CIT, __, __, 415 F. Supp. 3d 1195, 1211-14 (2019) (remanding Commerce's circumstance of sale adjustment because it contravenes the "plain language" of the regulation).  The United States erroneously claimed that "{t}he regulations {do not} define 'world-market price,'" Def.'s Br. at 43.   The plain meaning of "world market price" is self-evident in that it refers to worldwide or global prices and it is absurd to conclude, as Commerce did, that shipping data for one route from the United States to China meets the definition of "world market price."  Commerce's use of Descartes data, therefore, contravenes the plain meaning of the regulation and should be remanded.

---

Remand, Risen Energy Co., Ltd. v. United States, No. 20-03912 (Jul. 12, 2023), ECF No. 116 ("Risen Second Redetermination").

In addition, this Court also provides persuasive insight for the removal of the Descartes data.  See Risen Energy I, __ CIT at __, 570 F. Supp. 3d at 1376-79; Risen Energy II, 2023 Ct. Intl. Trade LEXIS 52, at *19-25.  Specifically, in Risen I, this Court remanded Commerce's simple averaging of the Descartes and Xeneta data and reasoned that "the Descartes data likely does not add to the accuracy of the benchmark calculation when there is the clearly acceptable Xeneta data available." __ CIT at __, 570 F. Supp. 3d at 1378.  In Risen Energy II, the Court remanded Commerce's weighted-averaging of the two sources and stated that "{i}f Commerce cannot supply a convincing reason as to why the Descartes data improves accuracy, Commerce should not use it." Risen Energy II, 2023 Ct. Intl. Trade LEXIS 52, at *25; see also id. at *24 ("Commerce did not fully consider the potential impact that a small sample size could have when affecting the comparability of the Descartes and Xeneta datasets.").  Further, in the second remand results of that review, Commerce "recalculated the ocean freight benchmark by relying solely on the Xeneta ocean freight prices."  Risen Second Redetermination at 11-12.

In sum, the Descartes data do not represent "world market price" and also do not add any accuracy to the benchmark calculation when truly worldly and viable Xeneta are available.  The Court should remand Commerce's inclusion of the Descartes data with instructions to remove the Descartes data from its benchmark calculation and rely on the Xeneta data alone in calculating its ocean freight benchmark.

## CONCLUSION

For the foregoing reasons, JA Solar respectfully requests that the Court grant JA Solar's Motion for Judgment Upon the Agency Record as the Final Results were not supported by substantial evidence and not in accordance with law. To remedy these errors, JA Solar requests that the Court remand the Final Results to Commerce for redetermination consistent with the points

of law and record evidence discussed and with the specific declarations and instructions enumerated in JA Solar's initial Motion for Judgment Upon the Agency Record and this reply brief.

Respectfully submitted,

Dated: July 26, 2023

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
Ronalda G. Smith
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd. (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures.  Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,946 words.

Dated: July 26, 2023

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
Yixin (Cleo) Li
Ronalda G. Smith
Mowry & Grimson, PLLC
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
trade@mowrygrimson.com
*Counsel to JA Solar Technology Yangzhou Co., Ltd., Shanghai JA Solar Technology Co., Ltd., JA Solar Co., Ltd. (a.k.a JingAo Solar Co., Ltd.) and JA Solar (Xingtai) Co., Ltd.*