Slip Op. 23-148

## UNITED STATES COURT OF INTERNATIONAL TRADE

RISEN ENERGY CO., LTD.,

     Plaintiff,

JA SOLAR TECHNOLOGY YANGHOU CO. LTD., *ET AL.*,

     Consolidated Plaintiffs,

v.

UNITED STATES,

     Defendant.

Before: Jane A. Restani, Judge

Consol. Court No. 22-00231

## <u>OPINION AND ORDER</u>

[Commerce's Final Results in the Eighth Administrative Review of Commerce's countervailing duty order on crystalline silicon photovoltaic cells from the People's Republic of China are partially sustained and partially remanded for reconsideration consistent with this opinion.]

Dated: October 11, 2023

<u>Gregory Stephen Menegaz</u> and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC, of Washington, DC, argued for Plaintiffs. With them on the brief were <u>James Kevin Horgan</u>, and <u>Vivien Jinghui Wang</u>.

<u>Bryan Patrick Cenko</u> and <u>Yixin (Cleo) Li</u>, Mowry & Grimson, PLLC, of Washington, DC, argued for Consolidated Plaintiffs. With them on the brief were <u>Sarah Marie Wyss</u>, <u>Ronalda G. Smith</u>, <u>Jacob Max Reiskin</u>, <u>Jacob E. Spegal</u>, <u>Jeffrey Sheldon Grimson</u>, <u>Jill A. Cramer, and</u> <u>Kristin Heim Mowry</u>.

<u>Joshua Ethan Kurland</u>, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for Defendant. With him on the brief were <u>Brian M. Boynton</u>, <u>Patricia M. McCarthy</u>, and <u>Reginald T. Blades, Jr.</u> Of counsel on the brief was <u>Spencer Neff</u>, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Restani, Judge: This action is a challenge to the final determination made by the United States Department of Commerce ("Commerce") in the Eighth Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China ("China") covering the period from January 1, 2019, to December 31, 2019.  Plaintiffs and Consolidated Plaintiffs request that the court hold aspects of Commerce's final determination unsupported by substantial evidence or otherwise not in accordance with law.  The United States ("Government") asks that the court sustain Commerce's final determination.

## BACKGROUND

Commerce published a countervailing duty order on solar cells from China on December 7, 2012.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing Duty Order, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012).  In February 2021, Commerce began its Eighth Administrative Review of the order for this countervailing duty order, covering the period from January 1, 2019, to December 31, 2019.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg. 8,166 (Dep't Commerce Feb. 4, 2021).  In March 2021, Commerce selected Risen Energy Co, Ltd. ("Risen") and JA Solar Co., Ltd. ("JA Solar") as mandatory respondents in this review.  See Respondent Selection Memorandum, P.R. 46 (Mar. 29, 2021).

Commerce published its preliminary results on January 6, 2022, see Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2019, 87 Fed. Reg. 748 (Dep't Commerce Jan. 6, 2022), along with the accompanying Preliminary Issues and Decision Memorandum, Decision Memorandum for the

Preliminary Results of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, C-570-980, POR 01/01/2019–12/31/2019 (Dep't Commerce Dec. 30, 2021) ("PDM").

Commerce published its amended final determination on September 12, 2022. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2019, 87 Fed. Reg. 55,782 (Dep't Commerce Sept. 12, 2022); see also Issues and Decision Memorandum for Final Results of the Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, C-570-980, POR 01/01/2019-12/31/2019 (Dep't Commerce June 29, 2022) ("IDM").

## JURISDICTION & STANDARD OF REVIEW

The court's jurisdiction continues pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court sustains Commerce's final redetermination results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(a)(2)(B)(i).

## DISCUSSION

### I.   Export Buyer's Credit Program

The Government of China's ("GOC") Export Buyer's Credit Program ("EBCP") promotes exports by providing credit at preferential interest rates to qualifying foreign purchasers of GOC goods. See Clearon Corp. v. United States, 43 CIT __, __, 359 F. Supp. 3d 1344, 1347 (2019). As in prior reviews, in response to Commerce's requests, Risen and JA Solar reported that none of their customers used the EBCP during the period of review ("POR") and confirmed that they had never been involved in assisting customers in obtaining loans under the program. See Risen

Initial Questionnaire Response at 40–41, Exs. 19–20, P.R. 187–190, C.R. 211–216 (June 21,

2021); JA Solar Initial Questionnaire Response at 47–49, Ex. 22, P.R. 213–216, C.R. 330–362

(June 29, 2021).  Commerce's questionnaire asked Risen and JA Solar what steps each "took to

determine that no customer used" the EBCP.  See Risen Initial Questionnaire Response at 40–41;

JA Solar Initial Questionnaire Response at 47–49.  In response, JA Solar provided customer

declarations certifying non-use of the EBCP from its sole U.S. importer customer as well as

multiple, but not all, of the importer's downstream unaffiliated customers.  JA Solar Initial

Questionnaire Response at 47–49, Ex. 22.  At the same time, Risen provided non-use certifications

for three of its four non-affiliated customers.  See Risen Initial Questionnaire Response at 41, Ex.

20.  Later, on December 13, 2021, Risen submitted the non-use certification for the fourth

customer.  Commerce Rejection Memorandum at 1, P.R. 342 (Dec. 20, 2021).  Commerce rejected

the submission as untimely filed because it was unsolicited, did not comply with 19 C.F.R. §

351.301(c)(5), and was not submitted at least thirty days before the scheduled preliminary results.

Commerce Rejection Memorandum at 1.

        In its own response, the GOC deemed that some of Commerce's questions about the EBCP

were inapplicable because "the GOC believes that none of the respondents under review applied

for, used, or benefitted from the alleged program."  GOC Initial Questionnaire Response at 135,

P.R. 192–204, C.R. 235–255 (June 22, 2021).  Consistent with the provided certifications, the

GOC, by searching the China Ex-Im Bank's loan database, corroborated that Risen, JA Solar, and

their customers did not use the EBCP during the POR.  Id. at 136.  The GOC also noted that

normally "the Chinese exporter is aware of the buyer's receipt of the loans and is involved in the

loan evaluation proceeding . . . ."  Id. at 136; see also id. at Ex. F-2.  Because of this, the GOC

concluded that Risen and JA Solar would be "in a position to verify and confirm the existence, if

any, of sales contracts that were supported by the export buyer's credits of the EX-IM Bank." Id.
at 136, 138.  Further, the provided Administrative Measures of Export Buyer's Credit indicated
that the EBCP "is mainly used for supporting the export of capital goods, (such as Chinese
electromechanical products, complete sets of large-scale equipment) and High-tech products and
services."  Id. at Ex. F-2.  Although Commerce asked the GOC to provide a list of "all
partner/correspondent banks involved in disbursement of funds under the" EBCP, the GOC
declined to provide it because, as stated by the GOC, none of the respondents benefited from the
program.  Id. at 136.

      In its final determination, Commerce applied an adverse factual inference to find that Risen
and JA Solar used the EBCP.  IDM at 29–32.  Specifically, Commerce found that the GOC failed
to adequately respond to Commerce's request for a list of all partner banks involved in the
disbursement of funds under the EBCP.  Id. at 30–31.  Without this information, Commerce
reasoned that it could not fully verify the non-use certifications because Commerce would not
know the names of banks that might appear in customers' books that disbursed the EBCP.  IDM
at 31.  Further, Commerce also found that Risen and JA Solar failed to provide non-use
certifications from all of their U.S. customers.  Id. at 23.  Accordingly, Commerce applied adverse
facts available ("AFA") because the GOC was the only party able to provide the requested
information, the GOC did not cooperate to the best of its ability, and the information was necessary
to verify non-use.  Id. at 31–32.

      If "necessary information is not available on the record" or if a responding party "withholds
information" requested by Commerce, Commerce shall "use the facts otherwise available in
reaching the applicable determination[.]"  19 U.S.C § 1677e(a).  Commerce "may use an inference
that is adverse to the interests of that party in selecting from among the facts otherwise available"

when information is missing from the record because a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce.  19 U.S.C. § 1677e(b).  This is described as "AFA."

The application of adverse facts that collaterally impact a cooperating party is disfavored. Fine Furniture (Shanghai) Ltd. v. United States, 36 CIT 1206, 1212 n.10, 865 F. Supp. 2d 1254, 1262 n.10 (2012), aff'd, 748 F.3d 1365 (Fed. Cir. 2014).  "When Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer, however, it is expected to consider such evidence."  GPX Int'l Tire Corp. v. United States, 37 CIT 19, 58–59, 893 F. Supp. 2d 1296, 1332 (2013), aff'd, 780 F.3d 1136 (Fed. Cir. 2015); see also Guizhou Tyre Co., Ltd. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018) ("To apply AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — . . . that is a fate this court should sidestep.") (citation omitted).

In the Government's brief, the Government requests a remand for Commerce to reconsider the application of AFA for JA Solar's use of the EBCP.  Gov't Br. at 13–14.  The Government explained that Commerce had refined its EBCP practice by requiring non-use certifications from only U.S. importer customers, not further downstream customers.  Id. at 14.  The Government stated that, if granted, Commerce will use the remand to reconsider its use of AFA and, if necessary, attempt to verify the non-use information that JA Solar provided.  Id. at 15.  The court grants the Government's request and remands this issue to Commerce to apply its new procedure.

As for Risen, the first step is to determine whether Risen provided sufficient information in the non-use certifications to fill the gap regarding potential use of the EBCP.  When Commerce's questionnaire asked Risen what steps it took to determine its customers did not use the EBCP,

Risen explained that it had contacted each of its U.S. customers and provided non-use certifications from three of its four customers.[1]  See Risen Initial Questionnaire Response at 41, Ex. 20.  Later, Risen attempted to submit the non-use certificate for the final customer, but Commerce rejected the submission as unsolicited and untimely.  See Commerce Rejection Memorandum at 1.  Commerce ultimately concluded that Risen failed to fill the gap by not providing non-use certifications for all customers, and applied AFA.  IDM at 23.  But it appears to the court that Risen filed the original non-use certifications as a response to Commerce's request.  Commerce requested information from Risen about how it determined none of its customers used the EBCP, and Risen responded by providing documents from customers certifying that they did not use the program.  See Risen Initial Questionnaire Response at 41, Ex. 20.

Section 1677m(d) requires that if Commerce "determines that a response to a request for information . . . does not comply with the request, [Commerce] shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy . . . ."  19 U.S.C. § 1677m(d).  Recently the court held that § 1677m(d) does not require Commerce to ask respondents for supplemental information when the GOC's response was deficient because § 1677m(d) only provides the deficient party with the opportunity to remedy, not affected third parties.  See Cooper (Kunshan) Tire Co. v. United States, 46 CIT __, __, 610 F. Supp. 3d 1287, 1317 (2022).  But the respondents in Cooper did not submit any non-use certifications or otherwise attempt to demonstrate non-use of the EBCP.  Id. at 1306.  Here, though, Commerce requested proof from Risen and JA Solar of how they knew their

---

[1] It is also unclear to the court based on this record why Risen would not know if its customers used the EBCP.  The GOC clearly answered that typically Chinese exporters would be involved in a customer using the EBCP.  GOC Initial Questionnaire Response at 136, see also id. at Ex. F-2.  There is no record evidence undermining that statement.

customers did not use the EBCP, and Risen and JA Solar demonstrated their knowledge through the certifications.  Risen Initial Questionnaire Response at 41, Ex. 20.  When Commerce found that the non-use certifications did not fill the gap because they were incomplete, it essentially declared the responses deficient.  Thus, Commerce was required under § 1677m(d) to provide Risen with an opportunity to supplement the record, which the court finds Risen likely could have done given the attempted December filing of the missing customer certification.  Accordingly, the court remands for Commerce to consider Risen's rejected filing with the other accepted response as complete non-use certifications.

On remand, Commerce may choose to attempt to verify the customer certifications.  Throughout the long history of EBCP litigation in the court there has been an absolute dearth of evidence that any U.S. customer has ever used the program.  No party has ever demonstrated that a U.S. customer has received financing through the EBCP.[2]  Thus, if Commerce chooses to attempt verification, the court expects that Commerce will not pursue onerous verification requirements.  Commerce is attempting to verify non-use by U.S. companies that Commerce has no statutory right to investigate, many of whom are unaffiliated with respondents, and years after the customers conducted business with the respondents.  If there were more evidence that Commerce would find anything relevant in the records of the non-affiliate customers, then perhaps rigorous verification would be necessary.  Although why onsite visits would be helpful has not been explained.  For now though, the court is unconvinced that Commerce would find any EBCP use.  Commerce may attempt to verify but only to the extent it does not overly burden voluntary participants.

---

[2] Commerce verified at oral argument that no use of this program for exports to the United States has ever been uncovered.

## II.    Article 26(2)

In June 2021, Risen reported that its cross-owned company, Risen Ningbo Electric Power Development Co., Ltd., received benefits during the POR from a program it referred to as "[i]ncome tax preference for dividends, bonuses and other equity investment income between eligible resident companies." Risen Ningbo Questionnaire Response at 8, P.R. 181 (June 17, 2021). According to Risen, it received a benefit under Article 26(2) of China's Enterprise Income Tax Law and Article 83 of the law's implementing regulations. Id. The GOC included the Enterprise Income Tax Law in its initial questionnaire response. GOC Initial Questionnaire Response at Ex. B-2. In its preliminary results, Commerce identified the program as potentially countervailable. PDM at 68. Commerce issued a supplemental questionnaire, which the GOC responded to by providing the text of the Enterprise Income Tax Law's implementing regulations. GOC Post-Preliminary Questionnaire Response at Ex. NSA-25, P.R. 372 (Feb. 14, 2022). In a supplemental questionnaire response, JA Solar also reported receiving benefits under Article 26(2), but explained that "[a]ll resident enterprises are entitled to this program." JA Solar Post-Preliminary Questionnaire Response at 3, P.R. 393, C.R. 538 (Apr. 25, 2022).

Commerce published a post-preliminary analysis memorandum where it determined that the Article 26(2) Tax Program is specific as a matter of law under 19 U.S.C. § 1677(5A)(D)(i) ("de jure specific"). Post-Preliminary Analysis Memorandum at 5–6, P.R. 394 (May 6, 2022). Article 26(2) makes the income that "enterprise[s]" earn tax-exempt so long as the income is from "investment gains derived by a resident enterprise through direct investment in another resident enterprise . . . ." Id. Article 83 clarifies that such income excludes "investment gains obtained for holding listed and circulating share issued by a resident enterprise for less than 12 months

consecutively."  <u>Id.</u>  Commerce reasoned that because tax exemptions under Article 26(2) are limited to enterprises with investment gains derived from "direct investment in another resident enterprise," this program is <u>de jure</u> specific.  <u>Id.</u>  In the final results, Commerce continued to find that the Article 26(2) Program is <u>de jure</u> specific because the recipients are limited by law to certain enterprises.  <u>IDM</u> at 77.

Now, JA Solar challenges Commerce's determination that the tax program is <u>de jure</u> specific.  JA Solar Br. at 32.  It argues that defining this tax program as specific violates § 1677(5A)(D)(i) because Article 26(2) is not limited to an enterprise type, industry, or geographic location.  JA Solar Br. at 33–35.  In response, the Government asserts that the Article 26(2) program is limited by law to certain enterprises, so Commerce's finding that the program is <u>de jure</u> specific is reasonable.  Gov't Br. at 26.  Commerce defined the allegedly specific enterprise as "enterprises with investment gains derived from direct investment in another resident enterprise, excluding investment gains obtained for holding listed and circulating shares issued by a resident enterprise for less than 12 months consecutively."  <u>IDM</u> at 77.  The Government relies on statutory language that provides that "any reference to an enterprise or industry . . . includes a group of such enterprises or industries" and argues that the Article 26(2) program expressly limits access to a group of enterprises.  Gov't Br. at 25, 27–29 (citing 19 U.S.C. § 1677(5A)).

The court reviews Commerce's interpretation of a statute by applying the two-step test laid out in <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 842–43 (1984).  First, the court must ascertain whether Congress has "directly spoken to the precise question at issue." <u>Id.</u> at 842.  If Congress's intent is clear then "that is the end of the matter," as the agency and the court must "give effect to the unambiguously expressed intent of Congress."  <u>Id.</u> at 842–43.  In determining whether this step is satisfied, the court looks to the statute's text and employs the

"traditional tools of statutory construction." Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (quoting Chevron, 467 U.S. at 843 n.9).  If the statute is "silent or ambiguous with respect to the specific issue" then the court must determine whether the agency's interpretation is "based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.

Section 1677(5A)(D)(i) provides that a subsidy is de jure specific "where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry."  19 U.S.C. § 1677(5A)(D)(i).  The plain meaning of "enterprise" in this context is "a unit of economic organization or activity," especially "a business organization."  Enterprise, Merriam-Webster, https://www.merriam-webster.com/dictionary/enterprise (last visited Sep. 15, 2023).  This is underscored by the legislative history, which references "state-owned enterprises" throughout.  H.R. REP. 103-826(I).  Under the plain meaning of enterprise, to be de jure specific, a subsidy must be limited to a specific business organization or a limited group of businesses.  Thus, a subsidy is de jure specific when the authority providing the subsidy, or its operating legislation, expressly limits access to the subsidy to a business or industry, or to a group of businesses or industries.  See 19 U.S.C. § 1677(5A)(D)(i).  There is no ambiguity in this provision.

Here, Commerce's de jure specificity finding for the Article 26(2) program is not supported by substantial evidence.  Commerce has not identified an adequately specific enterprise or industry that the Article 26(2) program is limited to under § 1677(5A)(D)(i).  Commerce stated that it was limited to "enterprises with investment gains derived from direct investment in another resident enterprise," but this is not a limit to specific enterprises or industries.  See BGH Edelstahl Siegen GmbH v. United States, 46 CIT __, __, 600 F. Supp. 3d 1241, 1256 (2022) (holding a subsidy to be de jure specific because only industries identified in the text of each law were eligible for relief).

Rather, the Article 26(2) program is open to all enterprises and industries who have investment gains derived from investing in other resident enterprises. Alternatively, a subsidy may be de jure specific if it is limited to an express list of companies. See id. at 1264 (finding a subsidy program is de jure specific because it is expressly limited by law to companies on the carbon leakage list). The Article 26(2) program is also not expressly limited to a list of companies. Commerce's interpretation of the statute is unreasonable and not in accordance with law. The court therefore rejects Commerce's finding that the Article 26(2) program is de jure specific. The court remands for Commerce to remove the program as a countervailable subsidy.[3]

### III.   Land Benchmark

Also at issue in this case are countervailing duties associated with land leases obtained by JA Solar. JA Solar Br. at 2; Gov't Br. at 2. Commerce concluded that JA Solar received a recurring benefit from land leases in China and used data from the CB Richard Ellis for Thailand 2010 report ("2010 CBRE") to calculate the value of that benefit. IDM at 69–73. JA Solar argues that the 2010 CBRE data is stale and fails the substantial evidence test. JA Solar Br. at 29. Additionally, JA Solar requests that the court order Commerce to reopen its 2017 administrative review so that an allocated nonrecurring land benefit determined during that review can be recalculated as a recurring benefit expensed to 2017 alone. Id. at 25–31. Recalculating the 2017 land valuations as a recurring benefit and expensing the benefit to 2017 as requested would eliminate the 2017 benefit stream from the countervailing duties calculation for 2019. Id. Commerce argues that the 2017 administrative review is final and closed, and that a change to Commerce's calculation method in

---

[3] There is no record evidence, and Commerce made no attempt to show, that the Article 26(2) program is a de facto specific subsidy under 19 U.S.C. § 1677(5A)(D)(iii).

2019 does not require Commerce to reopen the 2017 administrative review.  Gov't Br. at 40.   JA Solar did not contest Commerce's treatment of land as a nonrecurring benefit in 2017.  Id.

The Government has asked for remand on the land benchmark issue, but not on the question of the finality of the 2017 administrative review.

### A.  The Land Benchmark Issue

Prior to finding a countervailable subsidy, Commerce must establish that an authority provided a financial contribution, and a benefit was thereby conferred.  19 U.S.C. § 1677(5)(B). A foreign government's provision of goods to a respondent for less than adequate remuneration constitutes a benefit.  Id. § 1677(5)(E)(iv).  In such circumstances, Commerce determines the amount of the subsidy by comparing remuneration actually paid with adequate renumeration with a market-determined price for the goods or services, under "a three-tiered hierarchy" employed by Commerce "to determine the appropriate remuneration benchmark."  Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018) ("Changzhou Trina I"); see 19 C.F.R. § 351.511(a)(2)(i)–(iii) (2021).  Commerce derives a tier-one benchmark "by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in question."  19 C.F.R. § 351.511(a)(2)(i).

In the absence of such a benchmark, Commerce turns to a tier-two benchmark "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question."  Id. § 351.511(a)(2)(ii). "If there is no world market price available to purchasers in the country in question," however, Commerce moves on to a tier-three analysis and "measures[s] the adequacy of remuneration by assessing whether the government price is consistent with market principles."  Id. § 351.511(a)(2)(iii).  If Commerce determines that the government price is not consistent with

market principles it will look to construct an external benchmark.  <u>Canadian Solar Inc. v. United States</u>, 45 CIT __, __, 537 F. Supp. 3d 1380, 1389 n.6 (2021).

A tier-three benchmark "measure[s] the adequacy of remuneration by assessing whether the government price is consistent with market principles."  19 C.F.R. § 351.511(a)(2)(iii).  "If Commerce determines that the government price is not consistent with market principles it will look to construct an external benchmark."  <u>Risen Energy Co. v. United States</u>, 570 F. Supp. 3d 1369, 1374 (CIT 2022) ("Risen I").  When Commerce has multiple datasets available, it "will average such prices to the extent practicable, making due allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).  Commerce must ensure that all datasets averaged are individually good data sets, and not otherwise defective, as "[d]efects in data are not cured by averaging with better data."  <u>Risen Energy Co. v. United States</u>, No. 20-03912, 2023 WL 2890019, at *9 (CIT Apr. 11, 2023) ("<u>Risen II</u>").  One of the factors that may make data inappropriate for use in a benchmark calculation is staleness.  <u>See Risen I</u>, 570 F. Supp. 3d 1369, at 1375.

Here, JA Solar contests the use of the 2010 CBRE data in the tier-three benchmark calculation.  <u>IDM</u> at 71.  JA Solar argues that the 2010 CBRE Thailand data is stale and that Commerce should use the MIDA data alone.  <u>Id.</u>  Commerce asserts that averaging the MIDA and 2010 CBRE data creates a more robust data set.  <u>Id.</u>  As both parties have noted, this issue has been extensively addressed recently by the court in <u>Risen I</u> and <u>Risen II</u>.  <u>See Risen I</u>, 570 F. Supp. 3d; <u>Risen II</u>, 2023 WL 2890019.  As requested, the court will remand, with the note that Commerce should particularly consider the holdings of this court in <u>Risen II</u>, in which, as JA Solar points out, the court has already remanded on this issue, finding that the use of the CBRE data is insufficiently explained to meet the substantial evidence standard.  <u>See Risen II</u>, 2023 WL 2890019 at *9.

Accordingly, the court remands to Commerce for reconsideration of the land benchmark calculation.

### B.  **The 2017 Benefit Stream**

Courts will ordinarily not reopen matters that have been decided unless it would be "clearly erroneous and would work a manifest injustice" not to.  See Arizona v. California, 460 U.S. 605, 618 n.8 (1983) (citation omitted).  Here, JA Solar argues a decision regarding a benefit from the 2017 administrative review that was previously allocated to 2019 is clearly erroneous and should be reopened and reevaluated.  JA Solar Br. at 25–31.  Commerce disagrees, arguing for the importance of finality of the 2017 review.[4]  Gov't Br. at 39–41.

A determination of amortization is a final decision.  In Toscelik Profil ve Sac Endustrisi A.S. v. United States, the court encountered a similar request to reopen a nonrecurring benefit calculation, and declined to do so, finding that once a benchmark for the earlier period was established and the amortization schedule was in place, "use of that benchmark and schedule became final and unappealable."  No. 13-00371, 2014 WL 5462542, at *4 (CIT Oct. 29, 2014). 19 C.F.R. § 351.504, which governs calculation of an amortized benefit, provides: "[i]n the case of a grant, a benefit exists in the amount of the grant."  The use of the singular means that a grant has only a singular benefit amount, and in the absence of clear indication to the contrary, a singular benefit amount is not variable and subject to recalculation in successive reviews.  See also 19 C.F.R. § 351.511(c) ("[i]n the case of the provision of infrastructure, the Secretary will normally treat the benefit as non-recurring and will allocate the benefit to a particular year in accordance

---

[4] JA Solar and Commerce agree that, for the 2019 administrative review, the leases at issue should properly be treated as a recurring benefit.  IDM at 73.  Agreement that a new method should be used does not necessarily mean that the old method was in error.  Although it might be better to treat periodic reduced lease payments as a recurring benefit, it has not been demonstrated that very long term favorable leases cannot be treated as a non-recurring benefit.

with § 351.524(d)").  Had Commerce intended otherwise, there would have been no reason to create a multi-year benefit-stream formula.  Yearly revaluation of the benefit would be inconsistent with the regulatory definition of the benefit of "'the' grant"; therefore, "absent a showing of manifest injustice or clear erroneousness, reopening that calculation was inappropriate." Toscelik, 2014 WL 5462542, at *4.

There is a strong interest in protecting the finality of the decision-making process absent a showing that leaving a matter closed will cause a manifest injustice or would be clearly erroneous. Id.  In Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1361 (Fed. Cir. 2006), the Federal Circuit reviewed a Court of International Trade decision in which the court was asked to consider the reviewability of decisions made outside the POR.  The federal circuit upheld Commerce's determination that the appropriate period of review was the POR as reasonable "because the statute contemplates annual reviews, and hence limiting § 1675 review to entries made during the POR in issue reasonably serves important goals of finality and efficiency."  Id. The circuit further noted that,

> Given that Commerce undertakes annual reviews, it would be duplicative and wasteful for later reviews to revisit matters subject to review in prior PORs. Revisiting issues that were resolved in prior review proceedings would impair the finality of any one annual review, potentially prolonging a CVD dispute far beyond the year to which it relates.  The same potential exists with respect to issues relating to entries from a prior year that were not raised for Commerce review during the appropriate POR.  With respect to these issues there is also the risk that, owing to the passage of time, relevant evidence might be lost.

Id. (emphasis added). Absent a showing of manifest injustice or clear erroneousness, all interest points to protecting the finality of review.

Here, as in <u>Toscelik</u>, the benefit and amortization schedule established in the earlier administrative review is final.[5]  The remaining question therefore is whether leaving the amortized benefit to coexist in the period of review with the recurring benefit Commerce has calculated is clearly erroneous or otherwise manifestly unjust.

Litigation is not an endless opportunity to rewrite the record.  In 2017, JA Solar could have argued that its land rights were a recurring benefit, not a nonrecurring benefit.  It chose not to. Requiring JA Solar to live with the result of that decision is neither clearly erroneous nor manifestly unjust.  In <u>Toscelik</u>, requiring Commerce to leave a prior amortization that it later felt undervalued a benefit received in place was not manifestly unjust nor clearly erroneous; so here, allowing Commerce to leave in place a prior amortization that JA Solar argues is unfavorable is neither manifestly unjust nor clearly erroneous.  <u>See</u> <u>Toscelik</u>, 2014 WL 5462542, at *4.  The finality of administrative review is critical whether the government wishes to reopen a prior review seeking more money, or a plaintiff wishes to reopen a prior review, seeking to pay less.  In neither case is leaving the administrative review in place, alone, clearly erroneous nor manifestly unjust.[6]

JA Solar's argument for manifest injustice or clear erroneousness fundamentally boils down to, Commerce changed its mind in 2017 and so Commerce should be required to retroactively apply that change to alter prior decisions that JA Solar does not like.  Commerce is

---

[5] Of course, it would be remiss not to acknowledge the elephant in the room.  Practically, the 2017 review is still before this court in <u>Risen II</u>.  While the court acknowledges that the 2017 review remains before the court on remand on other matters, the court declines to hold that dragging out litigation in one period of review undermines the finality of the period of review as it relates to later legal issues that may arise in litigation surrounding subsequent periods of review.

[6] At oral argument, both Commerce and JA Solar confirmed that the leases calculated as a nonrecurring benefit in 2017 are not the same leases calculated as a recurring benefit in 2019. Likewise, both confirmed that there is no concern that a single benefit was double counted in the 2019 review as a result of the amortization of the 2017 benefit.

allowed to change its mind—in fact, it is regularly required to do so, since, for example, it is required to use "the best available information" when making benchmark determinations for nonmarket economies.  SolarWorld Americas, Inc. v. United States, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (citing 19 U.S.C. § 1677(5)(b)(c)(1)).  The best available information may change from year to year; when it does, Commerce must be able to take account of that fact without jeopardizing the integrity of previous administrative reviews that were themselves based on the best information available at the time they were made.  The existence of new information alone cannot possibly be the basis for reopening a prior administrative review, or no review would ever be considered final. This is particularly true when the party that would benefit from the new information had the power to produce it previously, as is the case here.

JA Solar missed its opportunity to argue that land leases were recurring, and not nonrecurring, in 2017; the burden it now bears is one of its own making.  That is not manifestly unjust.  That Commerce has been sympathetic to JA Solar's 2019 arguments does not require it to now undo its 2017 decisions, and to hold otherwise would be to greatly endanger the interest in the finality of review.  Accordingly, the court declines to order the 2017 review reopened and sustains Commerce's determination on this point.

## IV.    Ocean Freight

At issue here is the benchmark set by Commerce in assessing the value of ocean freight. Risen argues that Commerce's use of a tier-two benchmark, sourced from the average of two freight datasets, was unsupported by substantial evidence because one of the datasets was sourced from a small sample.  Risen Br. at 13–16.  The government responds that the benchmark is a reasonable implementation of the regulations, which require Commerce to average world-market prices for a benchmark when it has multiple datasets available.  Gov't Br. at 42–43.

As discussed above, Commerce applies a tier-two benchmark "by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). "Where there is more than one commercially available world market price, [Commerce] will average such prices to the extent practicable, making due allowance for factors affecting comparability." Id. Commerce also "adjust[s] the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." Id. § 351.511(a)(2)(iv).

Commerce's regulations for tier-two benchmarks do not require the comparable product and market be identical in order for a benchmark to appropriately represent the world market price. See id. § 351.511(a)(2)(ii); see also Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 52 F. Supp. 3d 1351, 1369 (2015) ("[T]here is nothing that requires that [Commerce] use prices for merchandise that are identical.") (emphasis omitted). At the same time, "[a]n import benchmark's comparability means it must bear a reasonably realistic resemblance to the importing market's reality or it will not be in accordance with the statute." Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 39 CIT __, __, 61 F. Supp. 3d 1306, 1341 (2015) (internal quotation marks omitted).

During the administrative proceeding, JA Solar and Risen submitted ocean freight price data for the benchmark calculation sourced from Xeneta. See JA Solar's Benchmark Submission at 4–5, Ex. 4B; Risen's Benchmark Submission at 1, Ex. 4. The Xeneta data reflected monthly ocean freight pricing data for shipping a 20-foot standard container to Shanghai and Tianjin from Antwerp, Barcelona, Buenos Aires, Busan, Cai Mep, Hamburg, Jakarta, Japan, Laem Chabang, Los Angeles, Mumbai, Rotterdam, Savannah, Tanjung Pelepas, and Tokyo. JA Solar's Benchmark Submission at 4–5, Ex. 4B; Risen's Benchmark Submission at 1, Ex. 4.

At the same time, the American Alliance for Solar Manufacturing submitted monthly freight quotes from Descartes for shipping rates to Shanghai for solar glass, aluminum extrusions, and polysilicon inputs.  See Alliance's Benchmark Submission at 5–6, Ex. NFI-10.  The Descartes data reflected the freight rate for shipping 40-foot containers from various American ports to Shanghai.  Id.  Each datapoint has an identical "tariff code."  Id.

In the preliminary determination, Commerce calculated a tier-two benchmark for the price of ocean freight for bringing solar glass, polysilicon, and aluminum extrusions to China from various cities as a world market price, pursuant to 19 C.F.R. § 351.511(a)(2)(ii).  PDM at 28–29. Commerce accepted the submissions from JA Solar, Risen, and the Alliance.  Id. at 28.  Commerce averaged the prices from the datasets to create a value for ocean freight for the tier-two benchmark for solar grade polysilicon, aluminum extrusions, and solar glass inputs.  Id.  Commerce also stated that it "adjusted the benchmark price . . . to reflect the price that a firm actually would pay if it imported the product."  Id. at 29.   In Commerce's final determination, Commerce stated that its methodology gave too much weight to the Descartes data when the Xeneta data consisted of "significantly more data points."  IDM at 47.  Thus, Commerce recalculated the benchmark by averaging the monthly rates for all routes.  Id.

The Government has recently moved for a remand of Commerce's ocean freight calculations.  See Consent Motion to Remand Case at 7, ECF No. 47 (Sept. 1, 2023).  The Government stated that, in the most recent administrative review of the countervailing duty order on solar cells from China, Commerce found that materially similar Descartes data was not appropriate to develop a world market price.  See id.  The Government requests remand for Commerce to reconsider whether, in light of this recent administrative conclusion, it remains

appropriate to use the Descartes data in this review.  See id.  The court grants the Government's

request.

**CONCLUSION**

For the foregoing reasons, the court remands to Commerce for a determination consistent

with this opinion on the issues.  The remand determination shall be issued within 90 days hereof.

Comments may be filed 30 days thereafter and any response 15 days thereafter.

/s/ Jane A. Restani____<br>Jane A. Restani. Judge

Dated:  October 11, 2023<br>
       New York, New York